Approved: *Derek Wikstrom* (signature)
DEREK WIKSTROM
Assistant United States Attorney

Before:THE HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York

------------------------------------X
:**SEALED COMPLAINT**
IN THE MATTER OF:
THE EXTRADITION OF:18 U.S.C. § 3184
HYUK KEE YOO:
a/k/a "Hyukkee Yoo":20 mj 2252
a/k/a "Keith Yoo":
:
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss.:

DEREK WIKSTROM, the undersigned Assistant United States Attorney, being duly sworn, states on information and belief that the following is true and correct:

1. In this matter, I represent the United States in fulfilling its treaty obligations to the Republic of Korea.

2. There is an extradition treaty in force between the United States and the Republic of Korea, Extradition Treaty between the Government of the United States of America and the Government of the Republic of Korea, U.S.-S. Korea, June 9, 1998, S. TREATY DOC. NO. 106-2 (1999) (the "Treaty").

3. Pursuant to the Treaty, the Government of the Republic of Korea has submitted a formal request through diplomatic channels for the extradition of HYUK KEE YOO, a/k/a "Hyukkee Yoo," a/k/a "Keith Yoo" ("YOO").

4. According to the information provided by the Government of the Republic of Korea, YOO is charged with seven counts of embezzlement, in violation of Article 355(1) of the Criminal Act and Article 3(1)(1) and 3(1)(2) of the Act on the Aggravated Punishment, Etc. of Specific Economic Crimes.

5. These offenses are alleged to have been committed within the jurisdiction of the Republic of Korea. A warrant for YOO's arrest was issued on May 8, 2014, by Judge Seong-yong Park of the Incheon District Court in the Republic of Korea.

1

6. From my review of the English translation of the documents supporting the extradition request, I have learned that YOO is alleged to have leveraged his family's power as business and religious leaders in Korea to pilfer the assets of various companies (the "Victim Companies"). Specifically, YOO is alleged to have conspired with the chief executive officers of the Victim Companies to enter into sham contracts that served as vehicles through which YOO embezzled millions of dollars, to the detriment of the Victim Companies' shareholders. According to the documents provided by the Republic of Korea in support of its request for extradition:

    a. YOO is the son of the prominent founder and former leader of a religious group in Korea (the "Church"). Beginning in 2010, YOO served as the de facto leader of the Church.

    b. The Yoo family collectively controls a holding company (the "Holding Company"), which in turn holds a stake in a number of other companies, including the Victim Companies. YOO personally holds 19.44% of the shares in the Holding Company.

    c. At least some of the executives, employees, and shareholders of each of the relevant Victim Companies are followers of the Church. Furthermore, there is an overlapping leadership structure between many of the Victim Companies and the Holding Company—a number of the Victim Company executives with whom YOO conspired are officers or directors of multiple entities within the overall corporate structure. For example, one co-conspirator not named as a party to this proceeding ("CC-1"), who worked for a private company YOO created and owned (the "YOO Private Company"), was a Director of both the Holding Company and one of the Victim Companies ("Victim-Company-1"), and served as an Auditor of another Victim Company ("Victim-Company-2"). Similarly, another co-conspirator not named as a party to this proceeding ("CC-2"), served as CEO of both the Holding Company and Victim-Company-1.

    d. The aforementioned corporate governance structure, combined with YOO's powerful influence over executives of the Victim Companies through his stature in the Church and his relationship to his father, enabled YOO to orchestrate his embezzlement schemes.

    e. The schemes, in which YOO conspired with the CEOs of the Victim Companies to cause them to make payments to him in exchange for fraudulent goods or services, took three forms. First, YOO and his co-conspirators caused some of the Victim Companies to make payments to YOO or to the YOO Private Company, a private company YOO registered in or around November 2005, under pretextual and fraudulent trademark licensing agreements. Second, YOO and his co-conspirators caused some of the Victim Companies to make payments to YOO or to the YOO Private Company under pretextual and fraudulent agreements for business consulting services. Third, YOO and his co-conspirators caused the Victim Companies to fund an exhibition of photographs created by YOO's father, by making disguised payments that were structured as advance payments for the purchase of the photographs at inflated values.

2

f.  The Victim Companies obtained little to nothing of value in return for their payments to YOO. CC-1, who—in addition to his various other roles mentioned above—was in charge of general affairs and financial matters at the YOO Private Company, told Korean prosecutors that the YOO Private Company had "only three employees," that none of them had "any academic or professional background in business consulting," and that "[a] business consulting fee was merely a means to collect money illegally" from the various Victim Companies. CC-1 further stated that YOO "ordered me to transfer the money overseas or use . . . most of the consulting fees and trademark royalties paid by affiliate companies for buying real estate." Specifically, CC-1 recalled purchasing "luxurious offices and apartments in Gangnam, Seoul, under the name of YOO Hyuk Kee," buying shares of the Holding Company, and "frequently wir[ing] the money into YOO Hyuk Kee's overseas bank accounts."

g.  As a result of the sham contracts, YOO defrauded the Victim Companies of more than KRW 29 billion (at current exchange rates, KRW 29 billion is equal to approximately $23 million). The victims of YOO's embezzlement scheme include the ordinary shareholders of the Victim Companies, whose investment suffered because YOO was plundering the assets of the companies in which they held an interest.

7.  The specific, alleged fraudulent schemes that form the basis of the seven embezzlement counts against YOO, as described in the documents provided by the Republic of Korea in support of its request for extradition, are described below:

a.  In or around January 2008, YOO conspired with CC-2, who was the CEO of Victim-Company-1, to sign a contract requiring Victim-Company-1 to pay YOO 1% to 1.5% of its revenue to use its existing corporate name, which YOO registered as a trademark despite the fact that the name had no brand value. Despite this lack of brand value, CC-2 told Korean prosecutors that he caused Victim-Company-1 to make the payments because YOO's father was "the person who helped me work at [Victim-Company-1] so I had no choice but to accept [YOO's] request and offer money as trademark royalties." Victim-Company-1's payments to YOO were trademark royalty payments "in name only," according to CC-2, who told prosecutors that the payments were "actually a means to embezzle money from [Victim-Company-1]." From January 2008 until June 2010, Victim-Company-1 paid YOO approximately KRW 1,235,426,771 (equal to more than $1 million at current exchange rates).

b.  In or around January 2009, YOO conspired with the CEO of Victim-Company-2, a person not named as a party to this proceeding ("CC-3"), to enter into a contract pursuant to which Victim-Company-2 would pay 0.8% to 1.6% of its monthly revenue to YOO in royalty payments for using a trademark YOO had registered. The trademark licensing agreement was a sham, as evidenced by the fact that Victim-Company-2 had previously been using the name for approximately 10 years before YOO registered it and then demanded Victim-Company-2 pay a fee. Victim-Company-2 agreed to do so. According to an individual who served as CEO of Victim-Company-2 for a period of time, the trademark was created by company staff in 1998, but after YOO registered the trademark in 2009, "we couldn't help but pay the fees," not because it was in Victim-Company-2's financial interest, but instead because of who YOO's father was. The monthly fee was unilaterally set by YOO and not based on

3

common market pricing. From January 2009 to December 2013, YOO received approximately KRW 5,346,311,045 (equal to more than $4.3 million at current exchange rates) from Victim-Company-2 under this pretextual trademark licensing agreement.

    c. In or around January 2009, YOO conspired with a person not named as a party to this proceeding ("CC-4"), who was the CEO of another Victim Company ("Victim-Company-3"), to sign an "Exclusive License Contract" pursuant to which Victim-Company-3 paid YOO a percentage of its revenue as purported compensation for using its existing name, which YOO registered as a trademark. The amount of the royalty payments was singlehandedly decided by YOO. According to a statement made by CC-1 to Korean authorities, Victim-Company-3 was not making payments because it was actually in the company's financial interest to license the trademark—instead, the payments were "disguised as trademark royalties" as "a means to transfer affiliates' funds to YOO's family." From January 2009 until December 2011, YOO received approximately KRW 328,436,704 (equal to more than $260,000 at current exchange rates) from Victim-Company-3 for the trademark under this pretextual licensing agreement.

    d. In or around March 2010, YOO conspired with a person not named as a party to this proceeding ("CC-5"), who was the CEO of another Victim Company ("Victim-Company-4"), to sign a "Business Consulting Service Contract" pursuant to which the YOO Private Company would purportedly provide risk management advice. Under this contract, Victim-Company-4 was to pay the YOO Private Company KRW 25,000,000 every month. CC-5 and CC-1 decided on the contract terms, including the fee, without evaluating the need for consulting services, comparing estimates from other companies, or evaluating the YOO Private Company's level of expertise, past performance, or reliability. Banking records show that beginning in March 2010, Victim-Company-4 paid this monthly consulting fee directly into YOO's personal bank account. This continued until March 2014. The YOO Private Company only provided business consulting services on paper once or twice a year, and CC-5 told a Korean prosecutor that such work did not warrant the large consulting fee. Victim-Company-4 continued to pay KRW 300,000,000 in annual consulting fees, even as Victim-Company-4's debt exceeded its capital and its operating profit declined. In total, YOO received approximately KRW 1,225,000,000 (equal to more than $1 million at current exchange rates) from Victim-Company-4.

    e. In or around April 2010, YOO conspired with two people not named as parties to this proceeding ("CC-6," who is YOO's sister, and "CC-7"), who were the CEOs of another Victim Company ("Victim-Company-5"), to sign a "Consulting Service Contract." Pursuant to the contract, the YOO Private Company would purportedly provide management consulting, business valuation, marketing strategies, policy development, and international training programs to Victim-Company-5. As part of the agreement, Victim-Company-5 paid the YOO Private Company KRW 20,000,000 or KRW 30,000,000 as a business consulting fee every month from April 2010 to December 2013 for a total of approximately KRW 990,000,000 (equal to more than $800,000 at current exchange rates). The YOO Private Company did not actually provide the contracted consulting services, however. CC-7 told prosecutors that "there is no official record showing that the company received consulting services," and an employee of

4

Victim-Company-5 who was in charge of accounting could not confirm to Korean prosecutors that any consulting services were actually provided.

    f.  In or around February 2011, YOO conspired with CC-2 to receive fraudulent advisory fees from Victim-Company-1. According to CC-2, South Korea's National Tax Services found that the trademark licensing fees that Victim-Company-1 had been paying to YOO (*see supra* ¶ 7.a.) were no longer tax deductible, so "we turned to consulting fees." CC-2 further stated that he "had no choice but to follow [the] directions of YOO." From February 2011 until November 2011, YOO received monthly payments of KRW 20,000,000, totaling approximately KRW 200,000,000 (equal to more than $160,000 at current exchange rates) in fraudulent advisory fees.

    g.  In or around 2013, YOO embezzled approximately KRW 19,862,077,987 (in excess of $16 million at current exchange rates) by causing the Victim Companies to fund an exhibition of YOO's father's photographs. According to CC-1, YOO "ordered affiliate firms to prepare funds for purchasing [YOO's father's] photographs through capital increase by consideration." CC-1 stated that the Victim Companies' CEOs "had no choice but to do what [YOO] told them to do," because of who YOO's father was. CC-2 told prosecutors in Korea that YOO caused various Victim Companies to make significant payments to an entity in the United States established by YOO and his father and for which YOO served as CEO, purportedly to purchase the father's photographs. The payments, which according to CC-2 were disguised as capital increases or subscription of new shares of stock, were made by Victim Companies that were not in the business of purchasing photographs, including a company that sold dietary supplements and a company that sold car parts. The various affiliated Victim Companies made payments in exchange for YOO's father's photographs even though, according to CC-2, they "had no idea about his works and didn't decide what works they would buy. CEOs had no choice but to follow what YOO Hyuk Kee told them to do."

  8.  According to information obtained by the United States Marshals Service, YOO may be found within the jurisdiction of the Southern District of New York.

  9.  Tom Heinemann, an Assistant Legal Adviser in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic notes by which the request for extradition was made and a copy of the Treaty, stating that the offenses for which extradition is demanded are provided for by the Treaty, and confirming that the documents supporting the request for extradition are properly certified by the principal U.S. diplomatic or consular officer in the Republic of Korea, in accordance with 18 U.S.C. § 3190, so as to enable them to be received into evidence.

  10.  The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic notes from the Republic of Korea, a copy of the Treaty, and the certified documents submitted in support of the request (marked collectively as Government Exhibit A) are filed with this complaint and incorporated by reference herein.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of Hyuk Kee YOO in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and the Republic of Korea, and that this Complaint and the arrest warrant be placed under seal, except as disclosure is needed for execution of the warrant, until such time as the warrant is executed.

_____
DEREK WIKSTROM
Assistant United States Attorney
Southern District of New York


Sworn to before me this
27 day of February, 2020

_____
THE HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York