UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Extradition of          No. 20 Mag. 2252
Hyuk Kee Yoo a/k/a "Keith Yoo"

- - - - - - - - - - - - - - - - - - - - - - - - - - - X


# MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SOUTH KOREA'S REQUEST TO CERTIFY YOO HYUK KEE ("KEITH YOO") AS EXTRADITABLE


Paul Shechtman
BRACEWELL LLP
1251 Avenue of the Americas
49th Floor
New York, NY 10020
212-508-6107
paul.shechtman@bracewell.com


Shawn Naunton
ZUCKERMAN SPAEDER LLP
485 Madison Avenue
10th Floor
New York, NY 10022
646-746-8655
snaunton@zuckerman.com

Attorneys for Defendant Keith Yoo

October 5, 2020

### TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ................................................................................................................1

POINT ONE: THE CHARGES AGAINST KEITH YOU ARE TIME-BARRED ......................5

    A.    The Statute of Limitations Issue is for the Court to Decide ...................................5

    B.    The Statute of Limitations is Five Years ..............................................................13

    C.    The Korean Arrest Warrant Did Not Toll the Statute of Limitations ...................14

    D.    Keith Yoo Did Not Flee from Justice ...................................................................16

POINT TWO: THERE IS NOT PROBABLE CAUSE THAT KEITH YOO
                  COMMITTED EMBEZZLEMENT CRIMES ...................................................17

    A.    Legal Principles ...................................................................................................17

    B.    Alleged Embezzlement from Semo .....................................................................19

    C.    Alleged Embezzlement from Moreal ...................................................................26

    D.    Alleged Embezzlement from Ahae Co. ................................................................29

    E.    Alleged Embezzlement from Onnara Shopping ...................................................31

    F.    Alleged Embezzlement I from Chonhaiji (Trademark) ........................................32

    G.    Alleged Embezzlement II from Chonhaiji (Consulting Agreement) ....................33

    H.    Alleged Embezzlement III from Chonhaiji (Photographs) ...................................35

    I.    Summary ..............................................................................................................38

CONCLUSION ..................................................................................................................39

<u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

<u>CASES</u>

<u>Blaxland v. Commonwealth Dir. Of Pub. Pros.</u>, 323 F.3d 1198 (9th Cir. 2003)............................6

<u>Caplan v. Vokes</u>, 649 F.2d 1336 (9th Cir. 1981)..........................................................12

<u>Citizens & S. Nat. Bank v. Bougar</u>, 434 U.S. 35 (1977) ................................................7

<u>Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.</u>, 529 U.S. 193 (2000) ......................7

<u>E. Airlines, Inc. v. Floyd</u>, 499 U.S. 530 (1991) ........................................................7, 9

<u>Extradition of Sindona</u>, 450 F. Supp. 672 (S.D.N.Y. 1978) ........................................18

<u>Farmers' & Merchants' Bank of Monroe N.C. v. Fed. Reserve Bank of Richmond</u>,
    262 U.S. 649 (1923)............................................................................................7

<u>Freedman v. United States</u>, 437 F. Supp. 1252 (N.D. Ga. 1977).................................17

<u>Gill v. Imundi</u>, 747 F. Supp. 1028 (S.D.N.Y. 1990)....................................................38

<u>Haynes v. United States</u>, 891 F.2d 235 (9th Cir. 1989) ................................................8

<u>In Matter of Extradition of Ernst</u>, 1998 WL 395267 (S.D.N.Y.)..................................18

<u>In re Extradition of Ben-Dak</u>, 2008 WL 1307816 (S.D.N.Y.)......................................18

<u>In re Extradition of Gang-Choon Han</u>, 2012 WL 33201 (C.D. Cal.) ...........................14

<u>In re Extradition of Khochinsky</u>, 116 F. Supp. 3d 412 (S.D.N.Y. 2015) .....................18

<u>In re Kaine</u>, 55 U.S. 103 (1852)...................................................................................13

<u>Jhirad v. Ferrandina</u>, 486 F.2d 442 (2d Cir. 1973)(<u>Jhirad</u> I)........................................16

<u>Jhirad v. Ferrandina</u>, 536 F.2d 478 (2d Cir. 1976)(<u>Jhirad</u> II) ......................................16

<u>Johnson v. Star Freight, LLC</u>, 2018 WL 4520212 (N.D. Ga.)........................................8

<u>Johnson v. Wells Fargo Home Mortgage, Inc.</u>, 635 F.3d 401 (9th Cir. 2011) ...............7

<u>KRCC v. Keith Yoo</u>, Index No. 156487/2015 (Sup. Ct. N.Y. County)..........................17

Lo Duca v. United States, 93 F.3d 1100 (2d Cir. 1996) ..................................................5

Marathon Oil Co. v. United States, 374 F.3d 1123 (Fed. Cir. 2004)...............................7

Martinez v. United States, 828 F.3d 451 (6th Cir. 2016)...............................................15

Medellin v. Texas, 552 U.S. 491 (2008) .........................................................................9

Patterson v. Wagner, 785 F.3d 1277 (9th Cir. 2015)................................................6, 11

Photopaint Technologies, LLC v. Smartlens Corp., 335 F.3d 152 (2d Cir. 2003) .....................7-8

Republic of Korea v. Yoo Dae-gyun, 2015 Ga Hap 561354 ...........................................4

Sainez v. Venables, 588 F.3d 713 (9th Cir. 2009).....................................................14-15

Shapiro v. Ferrandina, 478 F.2d 894 (2d Cir. 1973).....................................................13

Sumitomo Shoji Am. v. Avagliano, 457 U.S. 176 (1982) ..............................................9

Theron v. United States, 832 F.2d 492 (9th Cir. 1987) .................................................13

U.S. v. Pena-Bencosme, 2006 WL 3290361 (E.D.N.Y.)...........................................17, 18

United States v. Howard, 489 F.3d 484 (2d Cir. 2007) .................................................17

United States v. Marion, 404 U.S. 307 (1971)...............................................................12

United States v. Rogers, 461 U.S. 677 (1983) .................................................................7

United States ex rel. Holzendorf v. Hay, 20 App. D.C. 576 (D.C. Cir. 1902) ...............8

Van Duc Vo v. Benov, 447 F.3d 1235 (9th Cir. 2006)....................................................6

STATUTES AND RULES

18 U.S.C. §3184.............................................................................................................5

18 U.S.C. §3282...........................................................................................................13

18 U.S.C. §3282(a) ......................................................................................................13

18 U.S.C. §3290...........................................................................................................16

OTHER AUTHORITIES

Extradition Treaty, U.S.-S. Kor., art. VI, June 9, 1998, T.I.A.S. No. 12, 962 ...............................6

B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995) ...................................................8

Hearing Before the Committee on Foreign Relations, Senate, 106th Cong. 37 (1999) ...............10

May, Black's Law Dictionary (11th ed. 2019) ...............................................................................8

Resolution of Advice and Consent of 27 May 1987 to the U.S.-U.S.S.R. Treaty on the
     Elimination of Their Intermediate-Range and Shorter-Range Missiles (INF Treaty),
     134 Cong. Rec. 12, 849 (1988) .........................................................................................12

Restatement (Third) of Foreign Relations Law §325, Reporters Note 5 (1987) ...........................9

S. EXEC. REP. No. 106-13 (1999) ...................................................................................9, 12, 16

This memorandum is respectfully submitted in support of the motion of Yoo Hyuk Kee ("Keith Yoo") to dismiss the request of South Korea to find him extraditable pursuant to the Extradition Treaty between the United States and South Korea.[1]

<u>INTRODUCTION</u>

On July 22, 2020, Keith Yoo was arrested at his home in Pound Ridge, New York, on a complaint seeking his extradition to South Korea to stand trial on seven embezzlement charges.  As discussed below, the Court should not certify Keith Yoo as extraditable.  The statute of limitations has run on all seven of the embezzlement charges (Point One below), and, in any event, probable cause is lacking for them (Point Two below).  This case deserves the most careful attention because, if returned to Korea, Keith Yoo will not receive a fair trial.  Some history is necessary to understand why that is undoubtedly true.

Keith Yoo is the son of Yoo Byeong-eun, a South Korean religious leader, businessman, inventor and photographer.  In 1962, at age 21, Yoo Byeong-eun converted to Christianity and became a key figure in the Evangelical Baptist Church of Korea, which now has more than 40,000 members worldwide.  Yoo Byeong-eun got his start in business in 1976, when he acquired a failing company.  He subsequently had interests in companies in an array of industries, including shipbuilding, electronics, toys, cosmetics, paint and health foods. (Throughout this brief, the businesses are referred to as "the affiliated companies.")  To this day, many church members are employed in those companies.  Yoo Byeong-eun was also an inventor,

---

[1]      We follow the Korean convention of referring to individuals by their last name followed by their first name.

holding several patents.  Several of the affiliated companies manufacture and sell items that he patented.[2]

One of the affiliated companies was Chonghaejin Marine, which operated a ferry, the Sewol, between Incheon and Jeju.  On April 16, 2014, the ferry sank, resulting in 304 deaths, many of them students on a school trip.  Outrage followed the accident, and the Yoo family became pariahs.  (Media coverage, some of it later retracted, proclaimed that the Yoo family controlled the operation of the ferry, which it did not.)  On April 23, Korean investigators raided the offices of Chonghaejin Marine and some 20 other affiliated companies.  Yoo Byeong-eun became a fugitive, and a manhunt ensued.  A $500,000 reward was offered for his capture, and 6,000 police officers and army troops stormed a church complex searching for him.  On June 12, 2014, he was found dead in a plum orchard.

Yoo Byeong-eun's death did not slow the Korean government's investigations. Nine senior executives of the affiliated companies were indicted and convicted of embezzlement and/or breach of trust for allegedly depleting their companies of money to enrich the Yoo family. In May 2014, Korea requested the United States to extradite Keith Yoo to face trial as an accomplice to the alleged embezzlements.[3]  It was not until late 2019, however, after Korea made

---

[2]    In 2009, Yoo Byeong-eun began photographing nature through the window of his studio south of Seoul.  (He used the artistic pseudonym Ahae, which means "child.")  His works were subsequently exhibited in numerous locations around the world, including Grand Central Station, the Louvre, and Versailles.

[3]    Prosecuting the Yoo family has become a regular occurrence in Korea.  In June 2017, after a protracted proceeding, Yoo Somena, Yoo Byeong-eun's oldest daughter, was extradited from France to Korea on embezzlement charges.  She was convicted of breach of trust and sentenced to four years in prison.  The French government subsequently rejected Korea's effort to expand the charges against her.  Yoo Byeong-eun's wife, Kwon Yun-ja, was convicted of embezzlement, as were two of his brothers and older son.  In all, 44 members of the Evangelical Baptist Church were convicted of crimes in the aftermath of the ferry accident.

five supplemental submissions, that the Department of Justice authorized Keith Yoo's arrest.  At his arraignment, he was denied bail and is now in custody.

The Korean government's animus against the Yoo family cannot be overstated.  In a statement issued on May 27, 2014, Park Geun Hye, then Korea's President, announced that "[t]he family of Byeong Eun Yoo is the fundamental cause of this [ferry] disaster," and urged "the judicial authority to do their best to arrest them quickly, discover the truth, resolve suspicions, and punish them according to law."  Four days later, President Park reiterated that "the family of Byeong Eun Yoo has caused serious harm to the public . . . and they are fleeing from the law and deceiving the public and causing chaos in society."  The next day, she sounded the same theme: the Yoo family "must be arrested immediately to resume law and order."[4]

President Park was not the only Korean official to pronounce Yoo Byeong-eun and his family guilty before they were charged.  Prime Minister Jung Hong Won emphasized the "need to show that both oneself and one's family will be ruined if one causes an accident like this."  Legislation was introduced -- the "Yoo Byeong-eun Act" -- to seize the Yoo family's assets, and a leading legislator promised to take "an initiating role to figure out concealed property of voracious corporations, their families and related third parties."  For his part, the lead investigator, Choi Jae Kyung, promised to "arrest Mr. Byeong Eun Yoo [and to] make sure that he is sentenced to the maximum penalty allowed by law."  Reading these pronouncements recalls the Queen's statement in Alice in Wonderland, "sentence first - verdict afterward," for the guilt of the Yoo family was assumed.

Nor has the passage of time dulled the zeal of Korean authorities.  Although Keith Yoo is charged only with embezzlement, the second Korean extradition submission, dated June

---

[4]      The quotations in this paragraph and the next are taken from Korean newspaper articles.

24, 2014, informs American authorities that they "need to know a few things in order to understand this case."  EX-YOO-S1-00020.  Those things include this:

> First, YOO Byung Eyn, the father of [Keith Yoo], created a certain Christian group which is regarded as a heresy within Christian circles of Korea and has an absolute power over its followers as the cult leader.  After 2010, [Keith Yoo] succeeded his father for practical purposes and is currently leading the religious group.

Id.  Why our government needed to know that Keith Yoo was a supposed "cult leader" to determine whether his extradition should go forward was not explained.

Moreover, the final Korean submission, dated June 7, 2019, leaves no doubt that Korean authorities hold the Yoo family responsible for the ferry tragedy.  The submission begins this way:

> Tragedy struck the Republic of Korea on April 16, 2014, when 'Sewol Ferry' sank in the territorial waters of Korea, killing a total of 304 people, including students on a school trip.  The ferry at issue was registered with Chonghaejin Marine Co., Ltd. ("Chonghaejin"), which was run by YOO Byeong Eyn and his family including [Keith Yoo].  Chonghaejin purchased from a Japanese marine company this time-worn ferry, which had been already operated for 18 years at a low price and renovated the ferry inordinately in order to add more cabins for maximizing profits and overloaded cargo almost doubling the maximum capacity, resulting in this incident.

EX-YOO-S5-00003.  The submission goes on to "emphasize . . . that Yoo Byeong Eyn and his family's embezzlement of some huge amount of corporate funds left the [ferry] company financially unsound [and] resulted in the loss of 304 innocent lives, including those of students."  EX-YOO-S5-00003-4.  Keith Yoo is not charged with embezzling from the ferry company, so what was "emphasize[d]" is irrelevant.[5]

---

[5]    Significantly (and omitted from the Korean submissions) is the fact that the Korean courts have determined that the "evidence is not sufficient to establish a significant causal relationship between [any] embezzlement offense as the cause of the . . . sinking accident."  See, e.g., Republic of Korea v. Yoo Dae-gyun, 2015 Ga Hap 561354 at 7 [claim for amount for reimbursement](available upon request).

Against this background, anyone who believes that Keith Yoo would receive a fair trial in Korea is closing his or her eyes to reality.

POINT ONE

THE CHARGES AGAINST KEITH YOO ARE TIME-BARRED

As discussed below, extradition of Keith Yoo to South Korea to stand trial for crimes that, if they occurred, were completed by March 2014 (more than six years ago) is barred by the statute of limitations.[6]  To understand why that is so requires answering four distinct questions:  (i) is the statute of limitations issue for the court or the Secretary of State to decide?; (ii) what is the applicable limitations period?; (iii) did the issuance of an arrest warrant for Keith Yoo in Korea on May 8, 2014, suspend the running of the statute of limitations?; and (iv) was the limitations period tolled by Keith Yoo's presence in the United States from April 7, 2014, to his arrest here in June 2020?  We address each of these questions in turn.

A.  The Statute of Limitations Issue is for the Court to Decide

Under the federal extradition statute, a country seeking a person's extradition from the United States must file a request with the Department of State.  If the request is determined to be within the scope of the relevant extradition treaty, a federal prosecutor is designated to file a complaint in district court seeking an arrest warrant for the person.  A federal judicial officer must then hold a hearing to determine whether to certify the person for extradition.  18 U.S.C. §3184; see also Lo Duca v. United States, 93 F.3d 1100, 1103 (2d Cir. 1996)("[t]he primary function of section 3184 is to interpose the judiciary between the executive and the individual").  The judge determines, inter alia, whether there is probable cause to sustain the charges.  Id.  If the judge

---

[6]     According to the Korean extradition papers, payments to Keith Yoo on the Semo consulting contract ended in March 2014; other payments ended then or earlier.

certifies that the individual is extraditable, the Secretary of State must then exercise his discretion as to whether to authorize extradition.  See Blaxland v. Commonwealth Dir. Of Pub. Pros., 323 F.3d 1198, 1208 (9th Cir. 2003)("the executive branch's ultimate decision . . . may be based on a variety of grounds, ranging from individual circumstances to foreign policy concerns, to political exigencies").  Thus, responsibility for extradition is divided between a judicial officer and the Secretary of State, with each having his or her role.

The threshold question here is whether the extradition treaty between the United States and South Korea imposes a bar to extradition if the statute of limitations has expired.  More precisely, is untimeliness a mandatory bar for the court to determine or a discretionary consideration for the Secretary of State?  See Van Duc Vo v. Benov, 447 F.3d 1235, 1247 (9th Cir. 2006)("discretionary decisions are within the province of the Secretary of State and not the extradition magistrate").  The issue is governed by Article 6 of the United States-South Korea Extradition Treaty, which provides:

> Extradition may be denied under this Treaty when the prosecution or the execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State.  The period during which a person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations.  Acts or circumstances that would suspend the expiration of the statute of limitations of either State shall be given effect by the Requested State, and in this regard the Requesting State shall provide a written statement of the relevant provisions of its statute of limitations, which shall be conclusive.

Extradition Treaty, U.S.-S. Kor., art. VI, June 9, 1998, T.I.A.S. No. 12, 962.

In 2015, the Ninth Circuit addressed this issue and concluded that the word "may" at the beginning of Article 6 indicates that untimeliness is "a discretionary factor for the Secretary of State to consider in deciding whether to grant extradition."  Patterson v. Wagner, 785 F.3d 1277, 1281 (9th Cir. 2015).  For the Ninth Circuit, the word "may" was talismanic.  Its use meant that

untimeliness was merely a factor for the executive branch to consider (among others) at the final stage of the process.  But the Ninth Circuit got it wrong.  As the Supreme Court has instructed, "the mere use of 'may' is not necessarily conclusive of [an] intent to provide for a permissive or discretionary authority."  Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co., 529 U.S. 193, 198 (2000).  When a treaty is being interpreted, analysis begins with the treaty's words, but does not end there.  Context and history can override what might appear to be plain meaning.  E. Airlines, Inc. v. Floyd, 499 U.S. 530, 535 (1991)("treaties are construed more liberally than private agreements and to ascertain their meaning, we may look beyond the written word, to the history of the treaty, the negotiations, and the practical construction adopted by the parties").

        Numerous cases confirm that use of the word "may" is not controlling in deciding whether the authority conferred is mandatory or permissive.  See United States v. Rogers, 461 U.S. 677, 706 (1983)("[t]he word 'may' . . . usually implies some degree of discretion, [but] [t]his . . . principle . . . can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute"); Citizens & S. Nat. Bank v. Bougar, 434 U.S. 35, 38 (1977)("[i]t is now settled that the statute's provision . . . despite the presence of what might be regarded as permissive language, is . . . mandatory"); Farmers' & Merchants' Bank of Monroe N.C. v. Fed. Reserve Bank of Richmond, 262 U.S. 649, 662-63 (1923)("the word 'may' is sometimes construed as 'shall' . . . where the context or the subject matter compels such construction"); Johnson v. Wells Fargo Home Mortgage, Inc., 635 F.3d 401, 412 (9th Cir. 2011)(interpreting "may" in the Federal Arbitration Act as imposing a mandatory duty); Marathon Oil Co. v. United States, 374 F.3d 1123, 1138 (Fed. Cir. 2004)("the word 'may' in some contexts is not permissive but indeed is interpreted as restrictive in nature"); Photopaint Technologies, LLC v. Smartlens Corp., 335 F.3d 152, 155-58 (2d Cir. 2003)(declining to afford "decisive effect" to

the ordinary permissive meaning of "may" in venue statute); <u>Haynes v. United States</u>, 891 F.2d

235, 239 (9th Cir. 1989)("[t]he word 'may' usually implies some degree of discretion [but that]

meaning may be defeated by a contrary legislative intent"); <u>United States ex rel. Holzendorf v.</u>

<u>Hay</u>, 20 App. D.C. 576, 579 (D.C. Cir. 1902)("[w]hilst the signification of 'may' in the

construction of a statute is ordinarily permissive, it is quite true that it will be regarded as [meaning]

'must' and 'shall' when . . . the real intention of the legislature was to impose a duty and not to

confer a discretionary power"); <u>Johnson v. Star Freight, LLC</u>, 2018 WL 4520212 at *3 (N.D.

Ga.)("the term 'may' often indicates that a particular action is permissive, rather than mandatory,

[b]ut this is not always the case").[7]

      A careful reading of the Treaty demonstrates that the drafters did not use "may"

consistently to identify those issues that were for the Secretary of State to consider in the exercise

of his discretion.  Article 2(4) of the Treaty, for example, provides that "the executive authority of

the Requested State may, in its discretion," grant extradition for offenses committed outside of the

territory of the Requesting State in certain circumstances.  If "may" always meant executive branch

discretion, the words "executive authority" and "in its discretion" would be surplusage.  Article

3(1) provides that the Requested State "shall have the power to extradite such person [its own

national] if, in its discretion, it be deemed proper to do so."  A sentence that uses both "shall" and

"in its discretion" evidences a lack of semantic precision.  Article 4(4) states that the "executive

authority of the Requested State may refuse extradition" for certain military offenses.  Here, too,

the words executive authority are surplusage if "may" signals executive discretion.  Also

---

[7]    <u>See also</u> May, Black's Law Dictionary (11th ed. 2019)("[i]n dozens of cases, courts have
held may to be synonymous with shall or must, usu[ally] in an effort to effectuate what is said to
be legislative intent"); B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995)("[c]ourts
in virtually every English-speaking jurisdiction have held . . . that shall means may in some
contexts, and vice versa").

noteworthy is Article 10(4), which states that a person who is provisionally arrested "may be discharged from custody" upon the expiration of two months from the date of the provisional arrest if the Requested State has not received a fully documented extradition request.  Despite the use of the word "may," the provision seems directed to the court, and discharge is likely mandatory in such circumstances.  Thus, reading the word "may" in Article 6 to allocate decision-making authority to the Secretary of State puts conclusive weight on a single word, where it does not belong.

Words matter in treaty interpretation, but, as noted above, so does "the history of the treaty, the negotiations, and the practical construction adopted by the parties."  E. Airlines, Inc., 499 U.S. at 535; see also Medellin v. Texas, 552 U.S. 491, 507 (2008)("we have also considered as aids in interpretation the negotiation and drafting history of the treaty as well as the post-ratification understanding of signatory nations").  The views of both the Senate (two-thirds of whose members must ratify a treaty), and the Executive are to be taken into account.  See Sumitomo Shoji Am. v. Avagliano, 457 U.S. 176, 184-85 (1982); see also Restatement (Third) of Foreign Relations Law §325, Reporters Note 5 (1987)("[a] court . . . is required to take into account . . . Committee reports, debates, and other indications of meaning that the legislative branch has attached to an agreement").

Fairly read, the legislative history of the United States-South Korea Treaty compels the conclusion that untimeliness bars extradition -- i.e., that the bar is mandatory -- and therefore that the issue is for the court.  Indeed, the Senate Report could not be clearer on the point.  First, in summarizing the provisions of the Treaty, the Foreign Relations Committee wrote that the Treaty "precludes extradition of offenses barred by an applicable statute of limitations."  S. EXEC. REP. No. 106-13, at 5 (1999)(emphasis added).  The word "precludes" does not allow for

discretion.  Second, in its Technical Analyses section, which was "prepared by the Office of International Affairs, United States Department of Justice, and the Office of the Legal Adviser, United States Department of State, based upon the negotiating notes," the Report indicates that "Korea insisted on this provision [Article 6] because Korean law demands that extradition be denied if the statute of limitations would have expired in either Korea or in the Requesting State." Id. at 8, 14 (emphasis added).  The words "insist" and "demand" bespeak lack of discretion.  Third, the sentence quoted above is footnoted (fn. 22) to a Korean text -- Section 7(1), Korea Extradition Law 1988 -- which states that generally "[n]o criminal shall be extradited . . . [w]here the prescription of indictment or sentence against an extraditable crime is completed under the Acts of the Republic of Korea or the requesting state."[8]  Available at http://www.oecd.org/site/adboecdanti-corruptioninitiative/39361750.pdf.  The use of the word "shall" in Korean law underscores that Korea sought a lapse-of-time provision that had mandatory effect.  Finally, in questioning John Harris, the Acting Director of the Office of International Affairs of the Department of Justice, during the hearing on the Treaty, Senator Grams noted that "Article 6 of the proposed treaty bars extradition in cases where the law of the Requested State would have barred the crime due to a statute of limitations having run out."  Hearing Before the Committee on Foreign Relations, Senate, 106th Cong. 37 (1999)(emphasis added).  Like "precludes," the word "bars" indicates a lack of discretion.  Tellingly, Mr. Harris said nothing to dispute Senator Grams' interpretation, which he would have if the Senator's words revealed a gross misunderstanding.

---

[8]     The period of prescription is synonymous with the limitations period.

Despite all of this, the Ninth Circuit read the Senate Report to support its conclusion that lapse of time was a discretionary consideration.  It bottomed that conclusion on the full colloquy between Senator Grams and Mr. Harris, which it quoted as follows:

SENATOR GRAMS:

Article 6 of the proposed treaty bars extradition in cases where the law of the requested State would have barred the crime due to a statute of limitations having run out . . . .  So the question is are you confident that this article of the treaty adequately insures that fugitives cannot simply run out the clock by fleeing to Korea?

MR. HARRIS:

Senator, this article of the treaty was the subject of considerable negotiation.  As you may recall, of the treaties that were before the Senate last fall, most of them had slightly different language.  Many of our most modern extradition treaties flatly state that the statute of limitations of the requesting State will apply.

We have a few in which it was not possible to reach that resolution.  In this case, because of the specific provisions of Korean law, we did agree that the statute of limitations of the requested State would apply.  But, as you have indicated, the specific language in the article is crafted so that those factors which toll the statute of limitations under the law of the requesting State would be given weight.

Patterson, 785 F.3d at 1282-83.  For the Ninth Circuit, "the import of Mr. Harris' words, given on behalf of the executive branch, [was] that Article 6 was the subject of considerable negotiations and that the specific language in the article is crafted to give 'weight' to a statute of limitations determination."  Id. at 1283.  Which is to say, Mr. Harris was supposedly contradicting Senator Grams gently and by implication.

That reading of the colloquy strains credulity.  Mr. Harris' words do not speak to the mandatory (or discretionary) nature of the lapse-of-time provision.  They address the third sentence of Article 6, which states that circumstances that "would suspend the statute of limitations in either State shall be given effect by the Requested State."  It was the third sentence which was "subject to considerable negotiation."  The drafters wanted to ensure that, although the statute of

limitations of the Requested State would govern, the tolling provisions of both countries would generally apply.  Mr. Harris said nothing, directly or by implication, to contradict Senator Grams' statement that if the statute of limitations had run, after giving effect to the tolls of both countries, "the proposed treaty [would] bar[] extradition."

This history matters greatly because, in approving the United States-South Korea Treaty, the Senate declared that the Treaty must be interpreted in accordance with "constitutionally based principles of treaty interpretation" as defined in two resolutions attached to two other treaties. S. EXEC. REP. No. 106-13 at 22-23.  The key interpretive principle is that "the United States shall interpret [the] Treaty in accordance with the understanding of [it] shared by the Executive and the Senate at the time of Senate consent to ratification."  See Resolution of Advice and Consent of 27 May 1987 to the U.S.-U.S.S.R. Treaty on the Elimination of Their Intermediate-Range and Shorter-Range Missiles (INF Treaty), 134 Cong. Rec. 12, 849 (1988).  The Senate Report makes clear that the understanding of the President and the Senate was that untimeliness precludes extradition, and therefore the issue is for the court.

Two final points bear emphasis.  In international as well as domestic law, statutes of limitations "represent an important right of the accused."  Caplan v. Vokes, 649 F.2d 1336, 1341 & n.7 (9th Cir. 1981).  They protect against the bringing of stale charges and "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced."  United States v. Marion, 404 U.S. 307, 322 (1971). If untimeliness were for the Secretary of State, in his discretion, that important right would be diluted.  If political considerations favored extradition, a person could be sent abroad for trial on even the stalest of charges. As the Supreme Court observed almost 170 years ago, "extradition without an unbiased hearing before an independent judiciary [is] highly dangerous to liberty, and

ought never to be allowed in this country." <u>In re Kaine</u>, 55 U.S. 103, 113 (1852).  Leaving the untimeliness issue to executive discretion is dangerous to liberty.

   Finally, it bears note that determining whether a statute of limitations has run is a quintessential judicial function.  To borrow the words of Judge Friendly, written in a related context, it is "a task particularly suited to the capacities of the judicial branch."  <u>Shapiro v. Ferrandina</u>, 478 F.2d 894, 906-07 (2d Cir. 1973).  Absent a clearer indication that the United States-South Korea Treaty delegates that determination to the Secretary of State, it is for this Court to take on the task and decide whether the charges against Keith Yoo are time-barred.

  B.  <u>The Statute of Limitations is Five Years</u>

   In its extradition request, Korea suggests that its statute of limitations governs and is as long as 15 years depending on the amount of money allegedly embezzled.  EX-YOO-S2-00042-43.  But the Treaty teaches otherwise.  It is the statute of limitations of the "Requested State" (here the United States) that governs.  <u>See</u> Article 6 ("[e]xtradition may be denied . . . when the prosecution . . . of the offense . . . would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State"); <u>Theron v. United States</u>, 832 F.2d 492, 499 (9th Cir. 1987)(the Treaty requires application of "the federal statute of limitations even for [a comparable] state offense because the United States is the contracting party").  The applicable federal statute is 18 U.S.C. §3282, the general provision for non-capital offenses, and, under it, the limitations period is "within five years next after [the] offense shall have been committed."[9]

---

[9]  18 U.S.C. §3282(a) provides as follows:

  Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the

According to the Korean submission, the embezzlement charges against Keith Yoo were committed between 2008 and March 2014. See supra p. 5 n.6. Thus, the statute of limitations expired in March 2019 unless it was tolled.

C.    The Korean Arrest Warrant Did Not Toll the Statute of Limitations

In its extradition request, Korea seems to suggest that the arrest warrant issued for Keith Yoo in Korea on May 8, 2014, tolled the statute of limitations. The Korean authorities write that "according to the Korean practice on investigation and indictment, a prosecutor does not indict a suspect without his custody," and therefore Keith Yoo was not indicted. EX-YOO-00081 (emphasis added).[10] But "practice" is not law, and, according to Korean law, only an indictment suspends the running of the statute.

Attached to this brief as Appendix A is an affidavit from Professor Sang Hoon Han of Yonsei University Law School, one of Korea's leading law schools, who has been teaching criminal law in Korea for 25 years. Professor Han makes clear that "the issuance of a warrant for arrest or a warrant for detention does not suspend the statute of limitations" in Korea. That interpretation, he writes, "is consistent with judicial precedent and academic consensus in Korea."

One American case reaches a contrary conclusion, but it is wrongly decided. In In re Extradition of Gang-Choon Han, 2012 WL 33201 at *12 (C.D. Cal.), the court found that the issuance of an arrest warrant in Korea was "sufficient to start [sic] tolling the limitations period for . . . the offenses" on which Korea sought extradition. It reached that conclusion without any citation to Korean law and solely in reliance on the Ninth Circuit's decision in Sainez v. Venables,

---

information is instituted within five years next after such offense shall have been committed.

[10]    Like most countries, South Korea does not employ a grand jury; an indictment there is what we would term a prosecutor's information here.

588 F.3d 713 (9th Cir. 2009).  The Han court's reliance on Sainez, however, was seriously misplaced.  Sainez involved an effort on the part of Mexico to extradite Aldo Crotte from the United States for a homicide offense.  The United States-Mexico Extradition Treaty includes a lapse-of-time provision, which bars extradition if the offense for which extradition is sought is time-barred according to the law of either country.  The applicable statute of limitations was determined to be five years, and the issue was whether the warrant for Crotte's arrest, issued within the five-year period, tolled the statute.  Finding that a Mexican arrest warrant was "the equivalent of a United States indictment," the court held that Crotte's extradition was not time-barred.  Id. at 717.

But Mexican law and Korean law are different.  Mexico "which models its legal system not on Blackstone's common law but on Napolean's civil law," "lacks the sort of indictment and information procedures that exist in the United States."  Martinez v. United States, 828 F.3d 451, 456 (6th Cir. 2016).  Thus, if only an indictment or prosecutor's information stopped the clock, it could never be stopped.  As the Sixth Circuit put it:

> Does [the absence of an indictment procedure] mean that there is nothing Mexico can do . . . to prevent a 'lapse of time' from occurring?  No:  Because the issuance of an arrest warrant marks the end of the preliminary investigation and the beginning of the prosecution in Mexico, that event stops the . . . statute of limitations from running.  And because a Mexican court issued an arrest warrant within two months of Cruz Martinez's alleged offense, the five-year period does not bar his prosecution.

Id.

As Professor Han's affidavit shows, in Korea an arrest warrant does not mark the end of the preliminary investigation and the beginning of the prosecution.  That is the role of an indictment.  The United States-South Korea Extradition Treaty authorizes tolling the statute of limitations if it would be tolled in Korea, but a Korean arrest warrant does not do the trick.  In sum,

-15-

the issuance of an arrest warrant for Keith Yoo in Korea on May 8, 2014, did not toll the running of the statute under the Treaty.

>D.    Keith Yoo Did Not Flee from Justice

The second sentence of Article 6 addresses the question whether the statute of limitations is tolled by fugitivity.  It provides that "[t]he period during which a person for whom extradition is sought <u>fled from justice</u> does not count towards the running of the statute of limitations."  (Emphasis added).  That is the United States standard, <u>see</u> 18 U.S.C. §3290, and the Treaty adopts it for fugitivity tolling.  <u>See</u> S. EXEC. REP. No. 106-13 at 14 ("[t]he second sentence of the paragraph adopts the U.S. standard, stating that the period during which the person for whom extradition is sought fled from justice does not count toward the running of the statute of limitations").[11]

Fleeing from justice has a settled meaning in U.S. law, and more than absence or staying away is required.  The phrase means "leaving the place of the alleged offense to avoid prosecution or arrest."  <u>Jhirad v. Ferrandina</u>, 486 F.2d 442, 445 (2d Cir. 1973)(<u>Jhirad</u> I).  The applicable standard of proof is a preponderance of the evidence.  <u>Jhirad v. Ferrandina</u>, 536 F.2d 478, 484 (2d Cir. 1976)(<u>Jhirad</u> II).

Under this standard, Keith Yoo did not flee from justice.  Keith Yoo came to this country in 1989 to attend high school and then went to the University of Michigan for college.  After college, he obtained an H1-B visa and began working here.  In 2002, he married Betsy Nahm, and they lived together in an apartment in New York City.  In 2007, he obtained a green card, which he still holds.  That same year, after the birth of their second child, the Yoos moved to Pound

---

[11]    18 U.S.C. §3290 provides as follows:  "No statute of limitations shall extend to any person fleeing from justice."

Ridge in Westchester, where they have resided ever since.  Their children attend school there.  (In 2012 to 2014, the Yoos spent time in Paris in connection with the exhibition of Keith Yoo's father's photographs at the Louvre and Versailles.)  When the ferry sank on April 16, 2014, Keith Yoo was home in Pound Ridge.[12]  On this record, a claim that Keith Yoo fled from justice -- that he left Korea to avoid prosecution -- cannot be sustained.

In sum, the answers to the four questions raised at the outset of this Point compel the conclusion that the charges against Keith Yoo are time-barred.

## POINT TWO

### THERE IS NOT PROBABLE CAUSE THAT KEITH YOO COMMITTED EMBEZZLEMENT CRIMES

A.    Legal Principles

A central judicial function in an extradition proceeding is determining whether there is "probable cause" to support each of the charges for which extradition is sought.  Probable cause has its familiar meaning:  "reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person . . . arrested."  United States v. Howard, 489 F.3d 484, 491 (2d Cir. 2007).  Hearsay is admissible, but a court "must conduct an independent assessment of the evidence and closely examine the requesting country's submissions to ensure that any hearsay bears sufficient indicia of reliability to establish probable cause."  U.S. v. Pena-Bencosme, 2006 WL 3290361 at *2 (E.D.N.Y.); see also Freedman v. United States, 437 F. Supp. 1252, 1265 (N.D. Ga. 1977)(the magistrate "should involve [herself] in a determination as to the reliability of the affidavits presented and not merely blindly believe

---

[12]    In 2014, the Korea Resolution and Collection Corporation sued Keith Yoo on two commercial loans on which his father had been a surety.  See KRCC v. Keith Yoo, Index No. 156487/2015 (Sup. Ct. N.Y. County).  Keith Yoo's address in Pound Ridge is disclosed in numerous publicly-filed documents in the case.

such statements without regard to the underlying facts upon which the [affiant] believed the information was reliable").  The court is not a "rubber stamp."  In re Extradition of Khochinsky, 116 F. Supp. 3d 412, 419 (S.D.N.Y. 2015).

Not surprisingly, courts have denied extradition where the requesting country's submissions "were merely conclusory, or unsupported by underlying documentation, or otherwise unreliable."  Pena-Bencosme, 2006 WL 3290361 at *7.  Statements that "do not disclose which factual allegations are based on [the witness'] personal knowledge, which are based on the personal knowledge of some other individual, and which are merely conjecture" are entitled to no weight. In re Extradition of Ben-Dak, 2008 WL 1307816 at *6 (S.D.N.Y.); see also In Matter of Extradition of Ernst, 1998 WL 395267 at *9 (S.D.N.Y.)("the materials submitted must set forth facts from which . . . the reliability of the source . . . can be inferred").  Moreover, although an extradition hearing is not a trial, the accused may submit "reasonably clear cut proof . . . [with a] reasonable chance of negating the government's showing of probable cause."  Extradition of Sindona, 450 F. Supp. 672, 685 (S.D.N.Y. 1978).

Below we examine the evidence that Korean authorities have advanced in their effort to extradite Keith Yoo on seven embezzlement charges.  In each instance, the evidence is deficient -- there is no probable cause.  As will become obvious, we have located the actual interviews with Korean prosecutors on which the Korean submissions are based.[13]  Korean authorities have grossly distorted the witnesses' statements -- fabricating inculpatory statements and omitting exculpatory ones -- to support an unworthy request.

---

[13]    We have obtained the witness interviews from the court files in Korea.  The full interviews in Korean are included in a binder labelled "Korean Interviews."  The binder also contains certified English translations of relevant portions of the interviews; translating the full interviews was prohibitively expensive.

B.      Alleged Embezzlement from Semo

        The Korean submissions allege that, in March 2010, Keith Yoo conspired with Semo's then CEO to embezzle KRW 25 million -- approximately $21,000 -- per month from Semo through a sham consulting contract between Semo and Key Solutions, Keith Yoo's company. (Semo sells health care products and nutritional supplements, including squalene.[14])   More specifically, the submissions allege that Semo "did not require regular business consulting" and that Key Solutions "was neither capable of offering business consulting service nor did it actually provide practical business consulting."   EX-YOO-00085-86.   The supposed statements of five witnesses are proffered in support of this charge.   As discussed below, the charge is baseless.

        1.      Kim Gyu-seok.   The Korean submission dated June 24, 2014, quotes Kim Gyu-seok, the leader of Semo's Management Support Team, as telling Korean prosecutors, in an April 30, 2014 interview, that Keith Yoo was paid a large consulting fee every month "but he provided business consulting service[s] only once or twice a year" and those services "could have been easily found on the internet."   EX-YOO-S1-00027.   A review of Kim Gyu-seok's April 30, 2014 interview shows that he did not say the statements attributed to him.

        What Kim Gyu-seok actually said was this:

Q.      Paying monthly fees for these kind of work, especially, 25 million won per month to Key Solution, 5 million won per month to I-One-I Holdings Co., Ltd., 75 million won or 40 million won per month and 120 million for additional service expenses for design services to Moreal Design Co., Ltd., 3 million won for Haemato Centric Life Research Center, and 5 million won for Deo-Pyeonhan-Mom Clinic.  Were those consulting fees worth?

A.      You can check it out with each department.

---

[14]      Squalene is a natural organic compound obtained from shark liver oil; it is a skin care product said to have anti-aging properties.

Korean Interviews Ex. A at 20.  Thus, Kim Gyu-seok told Korean prosecutors that he couldn't judge whether the fees paid to Key Solutions were excessive.  Nowhere did he say that the consulting services were available on the internet.[15]

In connection with this proceeding, Kim Gyu-seok has submitted an affidavit in which he describes the valuable consulting services that Key Solutions provided in assisting Semo to obtain FDA and HACCP certifications, which were necessary for the company to export its products.[16]  Kim Gyu-seok's affidavit includes this sentence:  "I never told the prosecutors that the consulting services Key Solutions provided were not valuable and could be found on the internet."  Id.

2.      Go Chang-hwan.  The Korean submissions also quote Go Chang-hwan, Semo's former CEO, whom Korean prosecutors interviewed on April 25, 2014, and May 6, 2014.  The quote from the April 25 interview is supposedly this:  "I and PARK Seung-il decided on [Key Solutions'] business consulting fee without having estimates from other companies compared and taking into account Key Solution's level of expertise, performance records, reliability, and the need for two-way consulting service, etc."    EX-YOO-00090;  EX-YOO-S1-00026-27;  EX-YOO-S4-00006.[17]  The quote from the May 6, 2014 interview is supposedly this:  "Key Solution provided business consulting services once or twice a year in writing.  The consulting

---

[15]     In Korea's January 30, 2018 submission, the phrase "could have been easily found on the internet" is eliminated from Kim Gyu-seok's statement.  See EX-YOO-S4-00006.

[16]     Hazard Analysis and Critical Control Point ("HACCP") is a preventive approach to food safety from biological, chemical and physical hazards; HACCP programs are required by many countries.  The affidavit of Kim Gyu-seok, along with those of Jo Seon-ae, Hwang Ho-eun, and Ryu Geun-ha, is included at the front of the binder labelled Semo Documents.

[17]     In the Korean submissions, Key Solutions is sometimes misspelled "Key Solution."

service did not deserve a large amount of consulting fees, and could have been obtained by outsourced services."  EX-YOO-S1-00027; EX-YOO-S4-00006.

The quoted words do not appear in Go Chang-hwan's interviews.  What does appear is this statement:  Key Solutions provided "advice through documents related to HACCP (Hazard Analysis Critical Control Point) [and] data related to the US FDA."  Korean Interviews Ex. B at 16.  And this:

> Q.    In conclusion based on the above, it seems like excessive consulting fees were paid without any justifiable reasons.  What do you think about that?

> A.    That is absolutely not the case.

Id. at 17.  Suffice it to say, Korea's failure to disclose Go Chang-hwan's exculpatory statements is shocking.

3.    Jo Seon-ae.  The Korean submissions include a quote from Jo Seon-ae, identified simply as a Semo employee.  On May 1, 2014, Jo Seon-ae supposedly told Korean prosecutors (i) that Semo's liabilities were higher than its equity and yet, at the direction of Keith Yoo, it was paying Key Solutions a consulting service fee, "which was excessive" and (ii) that Semo's performance did not get any better despite the high-priced consulting services and yet it did not replace Key Solutions, which was "far from normal."  EX-YOO-00090; EX-YOO-S1-00027-28.[18]

Once again what is quoted was not said.  In her interview with Korean prosecutors, Jo Seon-ae, who identified herself as an "office worker," said this:  that she had "no idea" why

---

[18]    Jo Seon-ae's statement is modified in Korea's January 30, 2018 submission, in which Jo's name is spelled "Cho":

> Statement made by CHO Seon-ae, an employee of Semo, at the Incheon District Prosecutors' Office on May 1, 2014:  'While Semo's debt exceeded its capital on its financial statement and its operating profits were on the decline, Semo provided KRW 300,000,000 to Key Solution every year, which amounted to a whopping

Semo had entered into a consulting contract with Key Solutions; that she didn't know what kind of consulting services were provided; and that the fee might have been "a little too much," but she "did not think about it seriously."  Korean Interviews Ex. C at 1, 7-9.  And this:

> Q.    In the case of contract of a normal company with a general consulting firm, it is not only rare to pay for such a high-priced consulting as above, and if the company's management performance does not improve even after paying such fees as above, it is better to replace the consulting firm or get a refund.  Isn't it normal?
>
> A.    Yes.  However, it was decided by my superiors, so I just did what I had to do.  At first, I thought it was a little weird, and then as I continued doing my job, I did it without giving a thought.

Id. at 9.  To go from this quote to a claim that the fee was "excessive," "whopping" and "far from normal" is to substitute the prosecutor's words for the witness's.

In connection with this proceeding, Jo Seon-ae has submitted an affidavit stating that she worked in the accounting department, was aware of the Key Solutions contract, but was not in a position to know what services were provided and therefore whether the fee was reasonable.

4.    <u>Kim Chun-gyun</u>.  Kim Chun-gyun is quoted as telling Korean prosecutors, in an April 26, 2014 interview, that "[u]nder the order of [Yoo Byeong-eun], each affiliate company raises funds using many excuses and the slush funds are transferred to the [Yoo] family . . . ."  EX-YOO-00089.  A review of Kim Chun-gyun's interview, however, reveals that he lacks personal knowledge relevant to this case.  Kim Chun-gyun is an auditor, but he did not audit any

---

KRW 1,150,000,000 in total over a period of four years, on the pretext of paying management consulting fees.  It was unusual that Semo didn't change the consulting company even when Semo's business performance barely improved with such expensive consulting service.'

EX-YOO-S4-00006-7.

of the five companies at issue here.  See Korean Interviews Ex. D at 4 ("I was in charge of external audits for Dapanda Co., Ltd., Trigon Korea Co., Ltd., Cheonghaejin Shipping Co., Ltd. [which is different from Chonhaiji, one of the five companies named in the Korean submissions] and Egg & Seed Co., Ltd.").  As he testified, his source of knowledge about the five companies came from overhearing other church members:

> Q.    You were in charge of the external audit of the Yoo Byung-Eon family group for a while.  Do you know about the family's corporate ownership structure?
>
> A.    Actually, I have been dedicated to external audits of Trigon Korea Co., Ltd., Cheonghaejin Shipping Co., Ltd., and Dapanda, so I do not know the exact corporate structure, but I am also a member of the same sect.  Because there are many members of the congregation around me, I know a little about the bottom line.  For the investigation of this case, I will state the truth.

Id. at 5.  Repeating what "many members of the congregation around me" were saying is not reliable proof.

5.    Park Seung-il.   Park Seung-il ran the day-to-day operations of Key Solutions.  The Korean submissions quote him as telling Korean prosecutors, in a May 8, 2014 interview, "[t]here are only three employees including me in Key Solution, but none of us have any academic or professional background in business consulting.  A business consulting fee was merely a means to collect money illegally from Semo, Moreal Design, and Chonhaiji.  [Keith Yoo] was behind all this."  EX-YOO-S1-00026.

Although the statement is contained in quotes, Park Seung-il did not say it.  He told Korean prosecutors that "the staff fluctuated between 3 to 5 people."  Korean Interviews Ex. E at 6.  (That Korean authorities distorted this statement into "[t]here are only three employees

including me" exemplifies their penchant to misquote to make their case.[19])  There was also this exchange:

> Q.    In addition, based on the statements of officers and employees of the Group [Eun-ju Kim (Research Support Team, Semo Institute), Jae-sik Shin (former representative director of Cheonhaeji), Seong-hwan Lee (former representative director of Ahae), Gi-chun Byeon (representative director of Cheonhaeji)], you served as senior secretary to the heir of the Group, [Keith Yoo] (the second son of Byeong-eon Yoo), and held concurrent posts as auditors of I-One Holdings, which was the holding company of the Group, Ahae, Moonjin Media, and Devoug, in addition to being a director at Cheonhaeji, Trigon Korea, and Onsesang Travel, in which capacities you were responsible for illegally collecting and managing funds from affiliated companies under the pretext of trademark fees, consulting fees, etc., as well as being responsible for the overall management of [the Yoo family's] finances.  Do you admit to this?

> A.    Yes, I admit to all of this.  However, <u>I didn't think that I was collecting money illegally</u>.

> Q.    While you claim that you didn't think you were collecting money illegally, you still collected large sums of money from affiliates every month under the pretext of trademark use fees, management consulting fees, etc., through illegal means.  What do you say to this?

> A.    . . . yes, looking back on it now I think I collected those funds illegally.

---

[19]    The interview also includes this question and answer:

> Q.    Looking at Key Solution's staff, there was Manager In-jae Lee (32 years old, degree in Spanish from Hankuk University of Foreign Studies), Assistant Manager Geun-ha Yu (35 years old, degree in economics from University of Missouri), Assistant Manager Seong-eun Cho (32 years old, degree in electrical engineering from Sungkyunkwan University), and Assistant Manager Hee-seung Yang (31 years old, degree in Spanish from Dankuk University); it seems that most of the company's staff, excluding you, were in their early 30's, had good foreign language skills, and were highly dedicated to the company.  What do you think?

> A.    Yes, I think that's right.

Korean Interviews Ex. E at 6.

Id. at 9 (emphasis added).  If Park Seung-il believed that Key Solutions was not providing meaningful consulting services, he could not have thought that he was collecting money legally at the time.

\*   \*   \*

We have also submitted affidavits from two other people -- Hwang Ho-eun and Ryu Geun-ha -- who are not mentioned in the Korean submissions.  Hwang Ho-eun has been in charge of production at Semo since 2003.  In his affidavit, he reports on his numerous consultations with Keith Yoo and on Keith Yoo's pivotal role in improving Semo's production facilities, and, in particular, its processes for distilling squalene.  Keith Yoo's suggestions, Hwang Ho-eun avers, led to an increased squalene yield of 11 percent and a significant increase in Semo's profitability.  Hwang Ho-eun also writes that Ryu Geun-ha, of Key Solutions, was instrumental in Semo's obtaining FDA and HACCP certifications.  Ryu Geun-ha became a member of Semo's Task Force team on obtaining the certifications and regularly attended team meetings.

In his affidavit, Ryu Geun-ha confirms that he prepared consulting reports for Semo and met regularly with the company.  Ryu Geun-ha was born in Seoul but attended college at the University of Missouri, where he stayed on to obtain a master's degree in economics.  He joined Key Solutions in January 2012.  To the extent we have been able to locate them, Ryu Geun-ha's reports are provided in the "Semo Documents" binder.[20]  They include a 96-page report entitled Business Trategies [sic].  The report seeks to "predict the upcoming market changes and help establish [Semo's] management strategies accordingly" -- specifically to analyze "the trend of the health functional food market" so as to "set[] the direction in which [Semo] should go."  Also

---

[20]  The reports have been translated into English; the original Korean-language reports are available upon request.

included is (i) a lengthy 2012 consulting report entitled US-FDA On-Site Inspection of Semo Facilities and (ii) an equally long 2013 report on the HACCP certification process.  The Semo Documents binder also includes notes of 18 meetings that Key Solutions employees attended with Semo executives to discuss (i) topics of general interest (e.g., the "spread of new bacteria"); (ii) the FDA inspection; and (iii) the HACCP certification process.

These documents belie the claim that Key Solutions did not provide consulting services to Semo.

C.    Alleged Embezzlement from Moreal

Moreal has two separate divisions:  a medical division and a graphic design division.  The former manufactures medical devices, including a colonic irrigation system patented by Yoo Byeong-eun, which cleanses the colon.  The design team, which has 10 to 15 employees, does graphic design work -- corporate logos brochures, advertisements and the like -- for other companies.  The Korean extradition submissions allege that, in April 2010, Keith Yoo conspired with the former CEO of Moreal Design to execute a sham consulting contract, pursuant to which Moreal Design paid Keith Yoo KRW 30 million a month (approximately $25,000).  According to the submissions, Moreal Design "did not require regular business consulting for risk management, etc. and Key Solution managed by [Keith Yoo] was neither capable of offering business consulting nor did it actually provide business consulting to 'Moreal Design.'"  EX-YOO-00086.  The supposed statements of two new witnesses -- Ha Myeong-hwa and Park Hwa-sun -- are proffered in support of this embezzlement allegation.[21]  As shown below, the allegation does not withstand scrutiny.

---

[21]    The Korean submissions also identify Kim Chun-gyun and Park Seung-il as witnesses to the alleged Moreal embezzlement; they are discussed above at pages 22-23.

1.    <u>Ha Myeong-hwa</u>.  The Korean submissions include this purported quotation from Ha Myeong-hwa in a May 14, 2014 interview with Korean prosecutors:  "[Keith Yoo] was paid KRW 20,000,000 every month [but] there is no official record showing that the company received consulting services."   EX-YOO-S1-00028-29; EX-YOO-S4-00007-8.   In her May 14 interview, Ha Myeong-hwa actually said this:

Q.    Was there anything that Key Solution actually gave you as management advice?

A.    When our designers went abroad for training, it seems that Key Solution provided expenses for their stay, but I'm not sure about the details.

Q.    Do you have any documents to prove that?

A.    I looked it up, but there are no official documents, I only guess.

Q.    What do you think such thing has to do with management consulting?

A.    I remember that they said they would provide a design training program, but in fact, I wasn't in charge of design, so I'm not really sure what it was.

Korean Interviews Ex. F at 14-15.  Ha Myeong-hwa, a doctor trained in the United States, was in charge of Moreal's medical division.

In connection with this proceeding, Ha Myeong-hwa has submitted an affidavit, in which she explains that Key Solutions helped plan forums in New York, California, Germany, Vancouver and Japan, at which Moreal's colonic irrigation system was promoted; that Keith Yoo introduced her to potential customers in the Czech Republic and Canada, to which Moreal subsequently sold its products; that he aided in the interviewing and hiring of employees in Moreal's medical products division; and that he consulted on the production and design of Moreal's products and lectured to potential customers on the products' benefits.[22]

---

[22]    Ha Myung-hwa's affidavit, along with those of Park Hwa-sun and Han Yeon-ju, is included in the front of the binder labelled "Moreal Documents."

2.    <u>Park Hwa-sun</u>.    Korea's submissions quote Park Hwa-sun, a Moreal employee in charge of accounting, as telling Korean prosecutors:  "[Keith Yoo] signed a consulting service contract with [Moreal].  But I do not know whether Key Solution provided consulting services."  EX-YOO-S1-00029; EX-YOO-S4-00008.  Park Hwa-sun's precise words were these:

Q.    Why do you think Moreal signed a management consulting contract with [Keith Yoo]?

A.    I do not know.

Q.    Was there anything that Key Solution actually gave as management advice?

A.    I do not know.

Korean Interviews Ex. G at 13.  All that Park Hwa-sun said was that, working in accounting, she had no knowledge of the consulting services that Key Solutions provided.

In connection with this proceeding, Park Hwa-sun has submitted an affidavit, which confirms that she has no knowledge of an embezzlement.  The affidavit indicates that her job at Moreal was handling accounting, and therefore she was not in a position to know what consulting services were provided under the Key Solutions-Moreal agreement.

*    *    *

We have also submitted an affidavit from Han Yeun Ju, the leader of Moreal's Graphic Design team, who is not mentioned in the Korean submissions.  Han Yeun Ju explains that Keith Yoo developed Moreal's Abroad Internship program, which took designers overseas to broaden their knowledge.  Key Solutions, she avers, "provided the materials necessary for the program:  training dates, air tickets, accommodations, and guides."  The designers "profited greatly" from their experiences.  We have also provided a 93-page Key Solutions consulting report for Moreal entitled "Business Strategies," which can be found in the "Moreal Documents" binder.  Its introduction states this:

Customers now want differentiation provided by purchasing products rather than purchasing products based on their functions, and they pay premium prices for such differentiated products.   A good example would be superior sales volume of Apple's products . . . .   Companies [have] started to realize the importance of designs in order to create such differentiation, and this has led to the development of "design management" whereby designs are integrated with the overall company management.   As a result, our country's design market has continued to grow after 2008.   Therefore, it is important for Moreal Design Co., Ltd. to carry out "design management" in order to become a specialized design company that will lead the growing design industry.   This report will present guidelines about Moreal Design Co., Ltd.'s "Design management" as well the direction that Moreal Design Co., Ltd. should take through "Design management."

Also included are annual reports (2010 to 2013) that Key Solutions provided Moreal about the

Abroad Internship Program, which it conceived and planned.

All of this demonstrates that probable cause is lacking for the Moreal embezzlement

charge.

D.      Alleged Embezzlement from Ahae Co.

The Korean submissions allege that around January 2009 Keith Yoo conspired with

the CEO of Ahae Co. to enter into a royalty payment agreement (.8% to 1.6% of Ahae Co.'s

monthly revenue) for a trademark that "had been used by [Ahae Co.] for about ten years."

EX-YOO-00100-101.[23]  (Ahae Co. manufactures paint that is used for painting road lines and other

purposes.)  Specifically, the submissions quote Lee Seong-hwan, the former CEO of Ahae Co., as

telling Korean prosecutors that "the company's employees got together to create the company

named Ahae in 1998, but [Keith Yoo] ordered [Ahae Co.] to make royalty payments as he

registered the trademark in 2009."  EX-YOO-S1-00030; EX-YOO-S4-00009 (emphasis added).

---

[23]      The initial Korean submission identifies the Ahae Co. CEO with whom Keith Yoo conspired in 2009 as Lee Jae-yeong.  EX-YOO-00086-87; see also EX-YOO-S4-00008.  Lee Jae-yeong, however, became Ahae Co.'s CEO in May 2012.

Thus, the gist of the charge is that Ahae Co. was forced to make royalty payments in 2009 for use of a name that it had been using for a decade.

The relevant documents negate this allegation. On March 4, 1998, and October 15, 1998, Keith Yoo applied for three Ahae trademarks -- two of which were for logos.[24] The trademarks were registered in Korea beginning in February 1999. Semo Chemical changed its name to Ahae Co. in September 1998, <u>after</u> the trademark applications. In May 2001, Ahae Co. entered into a contract with Keith Yoo permitting it to use the three Ahae trademarks. The contract set a fee of .5 percent of sales per year. In 2009, the contract was extended to 2019 at an .8 percent fee, which was later raised to 1.6 percent. Thus, there was not a ten-year period when the company used the Ahae name without making payments.

In its January 30, 2018 submission, Korea quotes Park Seung-il as follows:

> [Keith Yoo] directed to collect 1.6% of Ahae's sales revenue as trademark royalties. I told LEE Seong-hwan, then CEO of Ahae, to follow what [Keith Yoo] ordered saying he is YOO Byeong Eun's son. I signed a trademark licensing agreement and received licensing fees. The amount of the fee was singlehandedly decided by [Keith Yoo], not based on common market pricing. <u>This is, disguised as trademark royalties, was in fact a means to transfer affiliates' funds to YOO's family.</u>

EX-YOO-S4-00008-9 (emphasis added).

Significantly, the underlined sentence does not appear in an earlier Korean submission, dated June 24, 2014. See EX-YOO-S1-00029-30. Nor did Park Seung-il say it. In his May 8, 2014 interview with Korean prosecutors, Park Seung-il said only this about the Ahae trademark:

> Q.    In this regard Lee Sung-Hwan (former CEO of Ahae Co., Ltd.) said, "After being incorporated into the holding company, [Keith Yoo] said he would manage the Key Solution and provide management advice for Ahae when he requested payment. He said that the consulting fee includes the

---

[24]    Ahae is the name that Keith Yoo's father used for his artistic endeavors. The Ahae Co. documents are in a binder labelled "Other Companies' Documents."

> trademark fee for 'Ahae' that he has registered with the Korean Intellectual Property Office.  So I pushed forward the contract, but only the contract for the use of trademark rights.  The consulting service was discussed only verbally.  The standard of 1.6% of sales was set by [Keith Yoo].  Given the size of Ahae's sales, 1.6% is too much and I talked to Park Seung-Il that that was a bit high but didn't mention it directly to [Keith Yoo]."  What do you think about this?

A.     That is correct.  I admit that.

Korean Interviews Ex. E at 14.  Park Seung-il <u>never</u> told the Korean prosecutors that the trademark payments were merely "a means to transfer affiliates' funds to Yoo's family."

Most likely, our Department of Justice told Korean authorities that the statement initially attributed to Park Seung-il (EX-YOO-S1-00029-30) was too weak to support extradition, and those authorities then added a sentence of their own making (EX-YOO-S4-00008-9) to strengthen it.  Such conduct should not be rewarded.

E.     <u>Alleged Embezzlement from Onnara Shopping</u>

The Korean submissions allege that Keith Yoo conspired with the CEO of Onnara Shopping to enter into a trademark licensing agreement for a total of KRW 328,436,704 (approximately $281,000), even though the company name did not have any "brand value" and was "quite replaceable."  EX-YOO-00087.  (Onnara sells milk and milk products from cows from a farm on Jeju Island in Korea.)  No reliable evidence supports this charge, for which three witnesses -- Kim Chun-gyun, Park Seung-il and Lee Ho-seop -- are identified.[25]

We have previously discussed the "evidence" of Kim Chun-gyun.  <u>See supra</u> at p. 22.  He did not work for Onnara Shopping, and his source of information was the musings of

---

[25]     Three of the four trademarks were for logos that are used on popular Onnara products.  The Onnara licensing agreement was signed in December 2001, not January 2009 as the Korean submission states.  Onnara documents can be found in the binder labelled "Other Companies' Documents."

other church members.  The "evidence" of Park Seung-il has also been discussed.  <u>See supra</u> at p. 23.  Here, too, the January 30, 2018 Korean submission relies on Park Seung-il's alleged statement that the trademark payments were merely "a means to transfer . . . funds to Yoo's family" -- words that he never said.  <u>See</u> EX-YOO-S4-00010.  As for Lee Ho-seop, the second Korean submission advises that he "failed to respond to the summons served on him . . . and has been out of contact up until now."  EX-YOO-S1-00030.  Thus, there are <u>no</u> competent witnesses for this charge.  No doubt, for that reason, the Korean submissions assert, without attribution, that "[a] copy of the trademark license contract, accounting documents of Onnara Shopping such as ledgers for accounts, and the fact that no actual activities under the trademark license contract between Key Solution and other companies were found prove that Onnara Shopping made the royalty payments to [Keith Yoo] although there was no use of trademark in a normal way."  <u>Id.</u> Such conclusory assertions are not evidence.

F.      Alleged Embezzlement I from Chonhaiji (Trademark)

        The Korean submissions contend that there were three separate embezzlements from Chonhaiji, a ship building company.  The first allegation is that in January 2008, Keith Yoo conspired with "CEO Byeon Gi-chun of 'Chonhaiji'" to enter into a trademark agreement, pursuant to which Chonhaiji paid Keith Yoo a total of KRW 1,235,426,771 (approximately $1.05 million) between January 2008 to June 2010, "even though there is no brand value . . . and the name is quite replaceable."  EX-YOO-00087.  The witness here is Byeon Gi-chun, who supposedly told Korean prosecutors, in a May 6, 2014 interview, that "[t]he trademark royalty payment was in name only [and] was actually a means to embezzle money from Chonhaiji."  EX-YOO-S1-00031.

        A review of Byeon Gi-chun's interview shows that Korean prosecutors fed words to him:

Q.    Even in that situation, 1) it was not the case the brand of an existing recognizable company or product was used for a royalty-type fee, but a trademark was used that only worth about the cost of a trademark registration.  2) In particular, the trademark was not registered by others so the company could have simply registered the trademark.  It does not seem necessary to have that trademark registered with the Korean Intellectual Property Office.  3) Trademark fee of ultra-high 0.5 to 1% of sales paid.  It seems that it was actually a way for the Yoo Byung-Eon family to leak the funds of affiliates.  What do you think?

A.    <u>Yes, it seems so.</u>

Korean Interviews Ex. H at 32-33 (emphasis added).

More fundamentally, as the Chonhaiji documents show, Byeon Gi-chun, with whom Keith Yoo allegedly conspired in January 2008, did not become Chonhaiji's CEO until January 2011.[26]  Thus, by the time he became CEO, the royalty payments had ended.  Plainly, he could not have direct knowledge of an embezzlement that predated his tenure, and therefore probable cause is lacking here as well.

G.    <u>Alleged Embezzlement II from Chonhaiji (Consulting Agreement)</u>

The Korean submissions allege that Keith Yoo conspired with the CEO of Chonhaiji to execute a sham advisory contract, "even though he did not play any special role concerning the management of [Chonhaiji]."  EX-YOO-00088.  The payments, which totaled KRW 200 million (approximately $171,000), were made between February 2011 and November 2011.[27]  Here, too, Korea's principal witness is Byeon Gi-chun, who allegedly told Korean prosecutors, in his May 6, 2014 interview, that Keith Yoo was paid "under the pretext of consulting fees."  EX-YOO-S1-00031.

---

[26]    Byeon Gi-chun's starting date can be found in the corporate registration in the Chonhaiji section of the binder labelled "Other Companies' Documents."

[27]    Keith Yoo became a director of Chonhaiji in late 2011, and the consulting payments stopped.

What the Korean authorities leave out of their submissions is this question and answer from Byeon Gi-chun's interview:

Q.   Have you received any advice from [Keith Yoo]?

A.   Cheonhaeji Co., Ltd., planned to build a yacht manufacturing plant in Gyeongsangnam-do, and [Keith Yoo] had data on technical alliances with US yacht schools, design, and design technology, so he instructed the company about the future yacht business policy.

Q.   Was the yacht business planned after you took office as CEO of Cheonhaeji Co., Ltd.?

A.   No.  Prior to 2007, it was already reported to the Gyeongsangnam-do or Goseong-gun that it had entered the yacht business, and was known to the media.  As part of that, we built the Han River water taxi.  All of this was part of [Keith Yoo's] business plan.

Korean Interviews Ex. H at 36.  Plainly, Byeon Gi-chun's answers rebut the claim that Keith Yoo played no role in Chonhaiji's management.

Keith Yoo's role in advising Chonhaiji is described in the affidavit of Sung Min Park, prepared for this proceeding.[28]  Sung Min Park met Keith Yoo in August 2007 at a meeting with Chonhaiji's executives in South Korea.  At the time, Chonhaiji was building parts for ships, but had stopped building ships.  At the meeting, the participants discussed building yachts and constructing a shipyard in the Philippines for that purpose.  Keith Yoo recommended that Sung Min Park, then a young Chonhaiji employee, serve an internship at Chonhaiji's shipyard in South Korea to begin learning the skills needed for the venture.  When Sung Min Park finished the internship, he met again with Keith Yoo, this time in New York, to discuss the next steps in his education.  After their meeting, Keith Yoo arranged for Sung Min Park to visit ship building companies in Vancouver, which specialize in aluminum boats.  The same pattern then followed.

---

[28]   Sung Min Park's affidavit is included with the Chonhaiji documents in the binder labelled "Other Companies' Documents."

After the trip to Vancouver, Sung Min Park met with Keith Yoo, who recommended another internship, this time with a German boat company that specializes in boat assembly systems. That internship, however, ended in 2009, when the German company declared bankruptcy.

Keith Yoo's interest in developing Chonhaiji into a leading yacht building company did not wane. He had Sung Min Park create a database collecting all his research materials. See Sung Min Park Affidavit ("[t]his website was only accessible by Mr. Yoo, the president of Chonhaiji . . . and myself . . . and holds 400,000 files"). He also encouraged Sung Min Park to enroll in The Landing School in Kennebunk, Maine, one of the world's leading boat building and design schools. Sung Min Park spent five years at the school, studying boat building and yacht design. During those years, he continuously met with Keith Yoo on weekends in New York to discuss his progress and ideas. Significantly, Sung Min Park's association with The Landing School led to a November 2012 partnership between the school and Chonhaiji. The letter agreement, addressed to Keith Yoo, includes this paragraph:

> We also want to be a valuable partner and we are pleased to offer support, consulting and training as you seek to expand your ship building and marine related operations in the United States. We graduate approximately 70 students each year and I would welcome a discussion about how we may help you achieve your business goals.

All of this, however, was cut short in April 2014, when the ferry accident occurred, and on-going projects stalled.

Sung Min Park's affidavit demonstrates that Keith Yoo did valuable consulting work for Chonhaiji.

H.     Alleged Embezzlement III from Chonhaiji (Photographs)

The Korean submissions allege that Keith Yoo conspired with Chonhaiji's CEO to embezzle money from Chonhaiji by ordering it to purchase the photographs of his father, Yoo Byeong-eun, at very high prices that "could not be priced accurately because [the photographs]

had never been sold in the market before."  EX-YOO-S4-00012.  The submissions tell none of the story that matters here.

Beginning in 2009, Yoo Byeong-eun, who used the pseudonym "Ahae" for his artistic endeavors, began photographing nature through the window of his studio.  He photographed tirelessly:  during the next five years, he produced more than three million images.  The works were subsequently shown at ten exhibitions in six countries:  Vanderbilt Hall, Grand Central Terminal, New York (April 29 to May 7, 2011 and October 13 to October 22, 2011); the Great Hall, National Gallery, Prague, (July 15 to August 14, 2013); Clarence House Gardens, London (July 27 to July 31, 2011); Royal Botanic Gardens, London (August 25 to August 29, 2011); Vremena Goda Center, Moscow (September 15 to October 5, 2011); Alinari National Museum of Photography, Florence (December 1 to January 8, 2012); Magazzini del Sale, Venice (March 20 to April 24, 2012); Louvre Museum, Paris (June 26 to August 26, 2012); and the Palace of Versailles (June 25 to September 9, 2013).

At each location, the works were acclaimed.  Professor Milan Knizak, the former General Director of the National Gallery of Prague, wrote that Ahae's photographs "simultaneously testify to something lasting and eternal, something that flows beyond our lives."  Dr. Joseph Backstein, Director of the Institute of Contemporary Art in Moscow, wrote that "Ahae's works appear as a unique vision of the natural basis of human existence . . . what actually unfolds before our eyes is a sort of metaphor for man's ideal ecological environment."  Anne-Marie Garcia, the Curator of Photography at the Ecole Nationale Superieure des Beaux-Arts in Paris, wrote that Ahae is "heir to the unstoppable photographers of the 19th century" and his photographs are "stunning and alive, infused with . . . beauty and life."  And Henri Loyrette, then the Director of

the Louvre Museum, wrote that Ahae's work "demonstrates the beauty and diversity of our world if only we take the time to stop and look."[29]

In 2012, a plan was developed to merge the Hemato-Centric Life Institute, which then had the exclusive rights to sell Ahae's photographs in Korea, with Chonhaiji.  A report supporting the merger states that the plan was intended to "improve [the] overall . . . profits [of Chonhaiji] by incorporating high value-added industries [such as art sales] with the decline in net profits caused by the shipbuilding industry recession."  The report estimated that, by 2016, art sales would increase Chonhaiji's profits by KRW 1.5 billion a year (approximately $1.28 million).  The merger occurred in early 2013, and Chonhaiji purchased photographs from Ahae Press, which has the license to sell the images.

That is hardly a tale of embezzlement.  In support of the charge, Korea offers principally a statement of Byeon Gi-chun, the CEO of Chonhaiji, from a May 6, 2014 interview with Korean prosecutors.  Byeon Gi-chun supposedly said this:  Chonhaiji paid KRW 19,862,077,987 for the purchase of Yoo Byeong-eun's photographs, "even though . . . [it] had no idea about his works and didn't decide what works [it] should buy [because it] had no choice but to follow what [Keith Yoo] told them to do."  EX-YOO-S4-00012-13.  Yet again, the quoted words were not said.  Byeon Gi-Chun did tell Korean prosecutors that he felt he had little choice but to purchase the photographs because the Yoo family were major shareholders in the affiliated companies.  But he also said that he was optimistic that Chonhaiji would sell the photographs at a profit "since there were many followers of [Yoo Byeong-eun] . . . [who were] excited about the

---

[29]    We have provided the Court a book of Ahae's photographs.  The praise for the work is taken from the introductory essays.

fact that [his] works were on display in the Louvre."  Korean Interviews Ex. H at 18.[30]  The ferry accident, however, tarnished Yoo Byeong-eun's name, and the art sale project never took off.[31]

In sum, the Korean submissions have turned a viable business plan into an embezzlement by telling none of what actually occurred.

I.      Summary

At the outset of this brief, we expressed our concern that Keith Yoo could not get a fair trial in Korea.  The Korean extradition submissions confirm the point.  Statements are attributed to witnesses that they never said.  Quotation marks do not mark quotations.  Exculpatory statements are omitted or distorted.  When evidence is insufficient to supply probable cause, new "evidence" is manufactured to fill the void.  Our extradition scheme is designed to "giv[e] to judges, as members of relatively non-political departments, an important role in the avoidance of . . . threatened dangers to liberty."  Gill v. Imundi, 747 F. Supp. 1028, 1038 (S.D.N.Y. 1990). Certifying Keith Yoo's extradition to Korea -- a country that has shown so little regard for the truth -- would deprive him of liberty without probable cause.

---

[30]     There was also this question and answer:

> Q.     While quality is a fairly subjective problem and is not easy to discuss, but the market price is implicitly formed in the market where the art world, galleries, and critics participate.  It is said that prices are only formed for works by a small number and only when there is a consensus that the work is worthy of collection.  What do you think?

> A.     In general, I agree with what the experts say.  However, we thought that we could sell the photos to the followers of Yoo or to the people they introduced.

Korean Interviews Ex. H at 21.

[31]     The Chonhaiji section of the "Other Companies' Documents" binder includes an appraisal of Yoo Byeong-eun's photographs by Lorraine Anne Davis, an accredited art photography appraiser.  Ms. Davis concludes that the asking prices for Ahae's work "are in line with other photographers working in a similarly closed market-place."

<u>CONCLUSION</u>

      For the reasons set forth above, the Court should not certify Keith Yoo as extraditable.

Dated: New York, New York
      October 5, 2020

               Respectfully submitted,

               BRACEWELL LLP

               <u>/s/ Paul Shechtman</u>
               Paul Shechtman
               1251 Avenue of the Americas
               49th Floor
               New York, NY 10020
               212-508-6107
               paul.shechtman@bracewell.com

               ZUCKERMAN SPAEDER LLP
               Shawn Naunton
               485 Madison Avenue
               10th Floor
               New York, NY 10022
               646-746-8655
               snaunton@zuckerman.com

               Attorneys for Defendant Keith Yoo