UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF
THE EXTRADITION OF
HYUK KEE YOO
a/k/a "Hyukkee Yoo"
a/k/a "Keith Yoo"

20 Mag. 2252 (JCM)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION
AND IN OPPOSITION TO HYUK KEE YOO'S MOTION TO DISMISS**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Derek Wikstrom
Assistant United States Attorney
   *Of Counsel*

## **Table of Contents**

Preliminary Statement ........................................................................................................ 1

Background ......................................................................................................................... 2

    A.    The Offense Conduct in the Republic of Korea ........................................... 2

    B.    Procedural History ...................................................................................... 6

Discussion ........................................................................................................................... 7

I.    Applicable Law .......................................................................................................... 7

II.    The Court Should Certify that Hyuk Kee Yoo Is Extraditable ............................... 9

    A.    The Uncontested Factors ............................................................................ 9

        1.    The Court Has Authority Over the Proceedings ........................... 9

        2.    The Court Has Jurisdiction Over Yoo ...................................... 10

        3.    The Treaty Is in Full Force and Effect ...................................... 10

        4.    The Charges Against Yoo Are Covered by the Treaty ............................ 10

    B.    There Is Probable Cause To Believe that Yoo Committed the Charged Offenses ................................................................................................... 12

        1.    The Statements of Seung-il Park Are Independently Sufficient to Establish Probable Cause for All Seven Counts .................................... 14

        2.    There is Probable Cause for the Trademark Scheme ............................... 17

        3.    There is Probable Cause for the Business Consulting Scheme ................. 19

            a.    Semo .......................................................................... 19

            b.    Moreal Design .............................................................. 22

            c.    Chonhaiji ..................................................................... 24

        4.    There is Probable Cause for the Photograph Scheme .............................. 25

    C.    There Is No Time-Lapse Bar to Extradition Here ................................. 29

i

1. The Lapse-of-Time Provision Is Discretionary, and Therefore Reserved to the Secretary of State ............................................................ 30

2. The Prosecution Is Not Time-Barred Under United States or New York Law .................................................................................................. 32

D. Yoo's Fairness Arguments.................................................................... 35

Conclusion ............................................................................................................ 37

## Table of Authorities

**Cases**

*Ahmad v. Wigen,*
    726 F. Supp. 389 (E.D.N.Y. 1989) ....................................................................... 15

*Carpenter v. United States,*
    484 U.S. 19 (1987) ............................................................................................... 12

*Cheung v. United States,*
    213 F.3d 82 (2d Cir. 2000) ..................................................................................... 9

*Collins v. Loisel,*
    259 U.S. 309 (1922) ............................................................................................. 12

*Eain v. Wilkes,*
    641 F.2d 504 (7th Cir. 1981) ............................................................................... 37

*Factor* v. *Laubenheimer,*
    290 U.S. 276 (1933) ............................................................................................... 9

*Gerstein* v. *Pugh,*
    420 U.S. 103 (1975) ............................................................................................. 12

*Glucksman v. Henkel,*
    221 U.S. 508 (1911) ............................................................................................. 36

*Grin v. Shine,*
    187 U.S. 181 (1902) ............................................................................................. 33

*Hu Yau-Leung* v. *Soscia,*
    649 F.2d 914 (2d Cir. 1981) ................................................................................. 11

*In re Extradition of Atta,*
    706 F. Supp. 1032 (E.D.N.Y. 1989) ..................................................................... 8

*In re Extradition of Han,*
    No. 11 Civ. 2059, 2012 WL 33201 (C.D. Cal. Jan. 6, 2012) ............................... 33

*In re Extradition of Koskotas,*
    127 F.R.D. 13 (D. Mass. 1989) ............................................................................ 36

*In re Pazienza,*
    619 F. Supp. 611 (S.D.N.Y. 1985) ...................................................................... 10

iii

*In re Sindona*,
    450 F. Supp. 672 (S.D.N.Y. 1978)............................................................................ 13

*Jhirad v. Ferrandina*,
    536 F.2d 478 (2d Cir. 1976)...................................................................... 7, 11, 32, 36

*Lo Duca* v. *United States*,
    93 F.3d 1100 (2d Cir. 1996)............................................................................... 7

*Marzook v. Christopher*,
    No. 96 Civ. 4107 (KMW), 1996 WL 583378 (S.D.N.Y. Oct. 10, 1996) ............................... 34

*Merino v. U.S. Marshal*,
    326 F.2d 5 (9th Cir. 1963) ............................................................................. 35

*Messina v. United States*,
    728 F.2d 77 (2d Cir. 1984)............................................................................ 8, 36

*Mirela v. United States*,
    416 F. Supp. 3d 98 (D. Conn. 2019) .................................................................... 31

*Murphy v. United States*,
    199 F.3d 599 (2d Cir. 1999).............................................................................. 30

*Neely v. Henkel*,
    180 U.S. 109 (1901)...................................................................................... 7

*Patterson v. Wagner*,
    785 F.3d 1277 (9th Cir. 2015) ....................................................................... 30, 31

*Pettit v. Walshe*,
    194 U.S. 205 (1904)..................................................................................... 10

*Sainez v. Venables*,
    588 F.3d 713 (9th Cir. 2009) ........................................................................... 34

*Shapiro v. Ferrandina*,
    478 F.2d 894 (2d Cir. 1973)....................................................................... 7, 8, 32

*Skaftouros v. United States*,
    667 F.3d 144 (2d Cir. 2011)...................................................................... 8, 33, 36

*Terlinden* v. *Ames*,
    184 U.S. 270 (1902)..................................................................................... 10

*United States v. Ceballos*,
  812 F.2d 42 (2d Cir. 1987)............................................................................... 15

*United States v. Pena-Bencosme*,
  No. 05 Mag. 1518, 2007 WL 3231978 (E.D.N.Y. Oct. 30, 2007)........................... 36

*Valentine* v. *United States ex rel. Neidecker*,
  299 U.S. 5 (1936)............................................................................................ 9

## **Statutes & Rules**

18 U.S.C. § 1343 ............................................................................................... 12

18 U.S.C. § 3184 ........................................................................................ *passim*

18 U.S.C. § 3186 ................................................................................................. 7

18 U.S.C. § 3290 ............................................................................................... 32

18 U.S.C. § 3582 ............................................................................................... 32

N.Y. CPL § 30.10 .............................................................................................. 32

N.Y. Penal Law § 155.05 ................................................................................... 11

N.Y. Penal Law § 155.30 ................................................................................... 12

S.D.N.Y. Local Criminal Rule 59.1 ....................................................................... 9

## PRELIMINARY STATEMENT

The United States is seeking a certification that Hyuk Kee "Keith" Yoo ("Yoo") is extraditable to the Republic of Korea, pursuant to 18 U.S.C. § 3184 and the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea, U.S.-S. Korea, signed on June 9, 1998 and entered into force December 20, 1999, S. TREATY DOC. No. 106-2 (1999) (the "Treaty"). The Republic of Korea formally requested Yoo's extradition on seven counts of embezzlement, and on February 27, 2020, the Government filed an extradition complaint (the "Complaint") and obtained an arrest warrant for Yoo, who was arrested on July 22, 2020.

The Court's task in this proceeding is to consider the evidence of criminality presented by Korea to determine whether it is "sufficient to sustain the charge under the provisions of" the Treaty. 18 U.S.C. § 3184. If the Court finds that Korea has submitted evidence sufficient to sustain Korea's charges, then the Court must "certify the same" to the Secretary of State, who makes the final determination whether or not to extradite Yoo.

Yoo has moved to dismiss the Complaint, requesting that the Court decline to certify his extraditability on two grounds: first, that a statute of limitations forecloses extradition, and second, that Korea's various submissions in support of extradition do not establish probable cause. *See* Dkt. 18 (Yoo's moving brief). Korea has prepared an additional submission in support of Yoo's extradition, responding to some of the factual arguments raised in Yoo's brief. That submission is attached as Government Exhibit B.

The Government respectfully submits this memorandum to set forth the factual background to the charges against Yoo, to explain the legal standards and protocols that govern extradition proceedings and the limited findings the Court must make under Section 3184, and to discuss the application of those standards to the facts here. As explained below, Korea's submissions are more

than sufficient to sustain the charges under the provisions of the treaty, and neither of Yoo's challenges bars certification. The Court should certify to the Secretary of State that Yoo is extraditable to Korea.

## **BACKGROUND**

### A.  **The Offense Conduct in the Republic of Korea**[1]

On May 8, 2014, a judge of the Incheon District Court in the Republic of Korea issued a warrant for Hyuk Kee Yoo's arrest. Korea has charged Yoo with seven counts of embezzlement, in violation of Article 355(1) of the Criminal Act and Article 3(1)(1) and 3(1)(2) of the Act on the Aggravated Punishment, Etc. of Specific Economic Crimes.[2]

As described in the Complaint, the Korean government alleges that Yoo leveraged his power as a business and religious leader in Korea to steal money from various affiliated companies (the "Victim Companies"). Yoo is the son of Byeong-eun Yoo, the prominent founder and former leader of the Evangelical Baptist Church in Korea (the "Church").[3] Beginning in 2010, Yoo served as the de facto leader of the Church.[4] In addition to leading this religious organization, the Yoo family collectively owned a holding company called I-One-I Holdings, which in turn owned a stake in various commercial entities including the Victim Companies.[5]

---

[1] The facts contained in this section are taken from the Complaint as well as its exhibit, Government Exhibit A. Government Exhibit A to the Complaint contains a declaration from Tom Heinemann, an Assistant Legal Adviser in the Office of the Legal Adviser of the United States Department of State, authenticating a copy of the Treaty and the diplomatic notes making the extradition request, and the documents the Republic of Korea submitted in support of that request. *See* Compl. ¶¶ 9-10. The various documents contained in Government Exhibit A were bates stamped with the prefix "EX-YOO." Throughout this brief, citations with that prefix identify the bates page(s) of Government Exhibit A on which various factual information appears.

[2] Compl. ¶¶ 4-5.

[3] *Id.* ¶ 6.a; EX-YOO-00099; EX-YOO-S1-00020.

[4] Compl. ¶ 6.a; EX-YOO-S1-00020.

[5] Compl. ¶ 6.b; EX-YOO-S1-00021-25; EX-YOO-S5-00004-5.

By virtue of his position in the Church and his family's control of I-One-I Holdings, Yoo exercised significant power over the Victim Companies and their executives. For one thing, a number of the executives, officers, and employees of the Victim Companies were members of the Church. For another, Yoo's and his family's control over I-One-I Holdings provided effective control of the other entities in its corporate structure—including the Victim Companies—because the holding company shared officers and directors with the various entities in which it held interests. For example, one of Yoo's co-conspirators, Seung-il Park, identified as CC-1 in the Complaint, worked for a private company that Yoo created and owned, but was also a Director of both the holding company and one of the Victim Companies, and served as an auditor of another one of the Victim Companies.[6]

Taking advantage of the authority derived from his stature in the Church, his relationship to his father, and his family's control of the holding company, Yoo conspired with various executives at the Victim Companies to cause the companies to make payments to him—or to a private entity he created in 2005 called Key Solutions[7]—for fraudulent goods or services. Yoo's schemes took three forms.

*First*, Yoo and his co-conspirators embezzled money from three of the Victim Companies, Chonhaiji Co., Ltd., Ahae Co., Ltd., and Onnara Shopping Co., Ltd., using fraudulent trademark licensing agreements. In these trademark licensing schemes, Yoo would register Victim Companies' names as trademarks, and then conspire with the companies' executives to sign contracts licensing their names back to them. In exchange, the Victim Companies would pay licensing fees directly to Yoo, or to his private company, Key Solutions. One of Yoo's co-

---

[6] Compl. ¶ 6.b-d; EX-YOO-S1-00020-21; EX-YOO-S5-00007 (chart reflecting overlapping directors and officers at I-One-I Holdings and its affiliates).

[7] Compl. ¶ 6.e; EX-YOO-00099.

conspirators told Korean authorities that his company paid Yoo trademark licensing fees even though company staff had actually created the trademark; another co-conspirator admitted to Korean authorities that the fees were set too high and were for the purpose of transferring money to the Yoo family. And Yoo's co-conspirator Park, who collected the trademark fees, confirmed to Korean authorities that the fees under Yoo's licensing agreements were not bona fide trademark royalties, but instead were a means of disguising Yoo's embezzlement of funds.[8]

*Second*, Yoo and his-co-conspirators caused three of the Victim Companies—Chonhaiji (which was also a victim of the trademark licensing scheme), Semo Co. Ltd., and Moreal Design, Inc.—to make payments to Yoo or Key Solutions under fraudulent agreements for business consulting services. In these schemes, the Victim Companies signed consulting contracts, pursuant to which they would pay large monthly fees, nominally for business advice from Key Solutions. The actual business advice Key Solutions provided in return was minimal, if any was provided at all. One of Yoo's co-conspirators told Korean prosecutors that, with respect to Moreal Design, where she was an executive, she was unaware of any official records reflecting that the company actually received consulting services, despite having signed a consulting agreement at the direction of Park and another co-conspirator, Yoo's sister Chong Somena Yoo.[9] In another instance, Yoo began receiving fraudulent advisory fees from Chonhaiji only after the company had to stop paying him fraudulent trademark licensing fees for tax reasons—Yoo's co-conspirator at that company said that after the change in tax deductibility of trademark licensing fees, the company switched to paying Yoo consulting fees.[10] And it is little wonder that Yoo and his private company did not

---

[8] Compl. ¶¶ 6.f, 7.a-c; EX-YOO-00086-87; EX-YOO-S1-00029-31; EX-YOO-S2-00059-65; EX-YOO-S4-00008-11; Gov. Ex. B ¶ 4.1.

[9] Compl. ¶ 7.e; EX-YOO-S1-00028-29; Dkt. 18 at 27; Gov. Ex. B ¶ 3.1.

[10] Compl. ¶ 7.f; EX-YOO-S4-00010-11; Gov. Ex. B ¶ 7.1.

actually render material advisory services—they were ill-equipped to do so because, according to Park, Yoo's co-conspirator who ran Key Solutions, the company had relatively few employees and lacked people with academic or professional backgrounds in business consulting. Instead, Park confirmed to Korean officials that like the trademark fees, the consulting fees Yoo and Key Solutions collected were merely a means to embezzle money from the Victim Companies.[11]

*Third*, Yoo and his co-conspirators caused Victim Companies, including some of the companies discussed above and some others, to fund an exhibition of photographs taken by Yoo's father Byeong-eun Yoo, by making disguised payments that were structured as advance payments for the purchase of the photographs at inflated values. Multiple co-conspirators of Yoo's told Korean prosecutors that Yoo directed the CEOs of various Victim Companies to make payments to purchase his father's photographs. These were not companies that were in the business of buying photographs or other artworks. They were companies that, for instance, sold dietary supplements, or parts of ships. Yet, according to multiple co-conspirators, Yoo gave them no choice but to purchase the photographs anyway, and had the Victim Companies' executives disguise the payments as capital contributions or stock purchases on their books.[12]

In each of these three categories of schemes, Korea alleges that the Victim Companies received little or nothing of value in return for their payments to Yoo. And in each instance, Yoo conspired with executives of the Victim Companies, causing the executives to breach their fiduciary duties and causing their companies to make millions of dollars in payments to or for the benefit of Yoo. Many of the executives with whom Yoo conspired were interviewed by Korean

---

[11] Compl. ¶ 6.e; EX-YOO-S1-00026; *see also* Compl. ¶¶ 7.d-f; EX-YOO-00085-88; EX-YOO-S1-00026-27; EX-YOO-S2-00048, 00056-58, 00066; EX-YOO-S4-000006-07, 00010-11; EX-YOO-S5-00013-15, 00026-29.

[12] Compl. ¶ 7,g; EX-YOO-00088; EX-YOO-S1-00023-24, 00032-33; EX-YOO-S2-00067-68; EX-YOO-S3-00007-08; EX-YOO-S4-00011-13; EX-YOO-S5-00008.

authorities, and described being overpowered by Yoo, and having no choice but to comply with his demands that they help him embezzle funds. Indeed, each count—three corresponding to the three victims of the trademark scheme, three corresponding to the three victims of the consulting scheme, and one relating to the photograph scheme—is supported, in the materials submitted by Korea and attached to the Complaint, by statements made to Korean officials by co-conspirators of Yoo's. All told, the Korean Government alleges that Yoo embezzled the equivalent of approximately $25 million, to the detriment of the Victim Companies and their shareholders.

**B.     Procedural History**

The Republic of Korea submitted a diplomatic note formally requesting Hyuk Kee Yoo's extradition on May 28, 2014, a few weeks after a warrant for his arrest was issued by the Incheon District Court. Thereafter, between 2014 and 2019, Korea submitted a series of diplomatic notes providing additional information and supplementing the extradition request. On February 27, 2020, the United States Government filed the Complaint commencing this action, and at the Government's request, Chief Magistrate Judge Paul E. Davison issued a warrant for Yoo's arrest in the United States.

On July 22, 2020, the United States Marshals Service arrested Yoo in Westchester County, New York. That same day, Yoo was presented before Magistrate Judge Lisa Margaret Smith. At his presentment, Judge Smith ordered Yoo detained pending these extradition proceedings, at the Government's request. Yoo later sought bail from Your Honor and the Court again ordered him detained; he has been in custody since his arrest.

On October 5, 2020, Yoo filed the motion to dismiss and opening brief opposing certification of his extraditability, Dkt. 17 (notice of motion) & Dkt. 18 (moving brief), to which this memorandum responds. The Government of Korea submitted a supplemental document in support of its extradition request, responding to the factual allegations and proposed evidence in

Yoo's brief, dated November 23, 2020. That supplement, which is attached here as Government Exhibit B, was sent to the Department of Justice in electronic format; it is also being transmitted to the United States Government via diplomatic channels, so that an appropriately authenticated version can be offered in evidence at the extradition hearing in this matter.

## **DISCUSSION**

**I.     Applicable Law**

An extradition hearing is neither a civil nor a criminal proceeding. As the Second Circuit has explained, extradition proceedings are "*sui generis*"—an order certifying that an accused may be extradited "embod[ies] no judgment on the guilt or innocence of the accused but serve[s] only to insure that his culpability will be determined in another and, in this instance, a foreign forum." *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir. 1976); *see also, e.g.*, *Shapiro v. Ferrandina*, 478 F.2d 894, 900-01 (2d Cir. 1973) ("[T]he function of the extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is competent legal evidence which…would justify his apprehension and commitment for trial if the crime had been committed in that state." (internal quotation marks and citation omitted)). Extradition is also primarily an executive responsibility. The applicable statutory scheme assigns the Court a specially defined and limited role: to determine whether the requesting country has submitted evidence "sufficient to sustain the charge," *i.e.*, to determine whether there is probable cause. 18 U.S.C. § 3184. The Secretary of State resolves questions left by the extradition treaty to the discretion of the United States, and makes the ultimate decision regarding whether the fugitive should be surrendered to the requesting country. *See id.* § 3186; *Lo Duca* v. *United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996).

Because of the limited nature of the Court's role at an extradition hearing, special procedural and substantive rules apply. The accused is not entitled to the rights available in a criminal trial. *See Neely v. Henkel*, 180 U.S. 109, 122 (1901) (constitutional rights available to one

charged with a criminal offense in this country not applicable to offenses committed outside the United States against the laws of another country); *Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011) ("[F]ugitives do not benefit from many of the protections that are traditionally accorded to defendants in the criminal context."). Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply. Hearsay is admissible, unsworn statements of absent witnesses can be considered, and there is no right to confrontation or cross-examination. *Skaftouros*, 667 F.3d at 155 n.16 (collecting cases). As a result, a finding of extraditability may be, and typically is, based entirely on documentary evidence. *Shapiro*, 478 F.2d at 901-03.

Moreover, the evidence contained in the requesting country's extradition submissions is "deemed truthful" for purposes of the probable cause analysis. *In re Extradition of Atta*, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989) (citing *Collins v. Loisel*, 259 U.S. 309, 315-16 (1922)), *pet. for habeas corpus dismissed sub nom. Ahmad v. Wigen*, 726 F. Supp. 389 (E.D.N.Y. 1989), *aff'd* 910 F.2d 1063 (2d Cir. 1990). As a result, the accused's ability to even offer evidence is strictly circumscribed: he has "no right to…introduce evidence to rebut that of the prosecutor," and while the Court has discretion to permit him "to offer explanatory testimony," the accused "may not offer proof which contradicts that of the demanding country." *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984). It is thus proper for the Court to exclude, among other things, evidence that would be considered *Giglio* or *Brady* material in the criminal context: the Second Circuit has, for instance, affirmed exclusion of evidence that the declarant of an inculpatory statement might be biased against the accused, and evidence that certain fraudulent statements attributed by the requesting country to the accused had not, in fact, been made. *Shapiro*, 478 F.2d at 905.

Finally, in fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effect its purpose, namely, the surrender of fugitives to

the requesting country. *See, e.g.*, *Valentine* v. *United States ex rel. Neidecker*, 299 U.S. 5, 10 (1936). Accordingly, the Supreme Court has made clear that an extradition treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor* v. *Laubenheimer*, 290 U.S. 276, 298 (1933).

## II.     The Court Should Certify that Hyuk Kee Yoo Is Extraditable

At an extradition hearing, the Court must determine whether (1) it is authorized to conduct the extradition proceeding; (2) it has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to the charges for which extradition is sought. *See* 18 U.S.C. § 3184; *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000). "If the judicial officer answers these questions in the affirmative, he or she 'shall certify' the extraditability of the fugitive to the Secretary of State." *Cheung*, 213 F.3d at 88 (quoting 18 U.S.C. § 3184). Yoo does not contest the first four factors. He challenges only the last—the sufficiency of Korea's proffered evidence to support a finding of probable cause—and also claims that a particular provision of the Treaty bars his extradition on statute-of-limitations grounds. As described below, all five requirements for certification are met, and Yoo's challenges do not justify refusing to certify his extraditability to Korea to stand trial.

### A.     The Uncontested Factors

#### 1.     The Court Has Authority Over the Proceedings

This Court has authority over the proceedings because the extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized to do so by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. And under this District's Local Criminal Rule 59.1(b),

9

"Magistrate Judges are hereby authorized to exercise the jurisdiction set forth in 18 U.S.C. § 3184, *Fugitives from foreign country to United States*."

### 2.     The Court Has Jurisdiction Over Yoo

This Court has personal jurisdiction because Yoo was arrested in Westchester County, within its jurisdictional boundaries. *See* 18 U.S.C. § 3184 (establishing that magistrate judge "may, upon complaint made under oath, charging any person found within his jurisdiction…issue his warrant for the apprehension of the person so charged"); *Pettit v. Walshe*, 194 U.S. 205, 219 (1904) ("The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found."); *In re Pazienza*, 619 F. Supp. 611, 616 (S.D.N.Y. 1985).

### 3.     The Treaty Is in Full Force and Effect

Section 3184 provides for extradition where a treaty or convention is in force between the requesting state and the United States. Courts generally defer to the executive branch on the question whether a treaty is in force. *See, e.g.*, *Terlinden* v. *Ames*, 184 U.S. 270, 288 (1902). Here, the Government has submitted a declaration from Tom Heinemann at the Department of State, attesting that the Treaty is in full force and effect. *See* Gov. Ex. A at 1. The Court should defer to the State Department in this regard.

### 4.     The Charges Against Yoo Are Covered by the Treaty

Like most modern treaties, the Treaty governing extradition between the United States and the Republic of Korea is a "dual criminality" treaty. It defines "extraditable offenses" as those "punishable under the laws in both Contracting States by deprivation of liberty for a period of more than one year, or by a more severe penalty." Treaty Art. 2(1).[13] The Treaty expressly provides

---

[13] The Treaty is included in Government Exhibit A, beginning at page EX-YOO-Decl-00012.

that while the conduct must be an offense in both countries, it need not be described "by the same terminology," *id.* Art. 2(3)(a), or have identical elements, *id.* Art. 2(3)(b), in both countries. And for purposes of the dual criminality analysis, the Treaty specifically provides that the Court can disregard elements in place "merely for the purpose of establishing jurisdiction in a United States federal court," such as "use of the mails or of other facilities affecting interstate or foreign commerce." *Id.* Art. 2(3)(c).

The documents submitted by the Government of Korea establish that Yoo has been charged with seven counts of embezzlement, and that embezzlement is punishable in Korea by more than one year in prison.[14] Dual criminality is established if the conduct underlying the foreign offense would be criminal under U.S. federal law, the law of the state in which the extradition hearing is held (here, New York), or the law of a preponderance of the states. *See Hu Yau-Leung* v. *Soscia*, 649 F.2d 914, 918 n.4 (2d Cir. 1981). The standard is readily met by the embezzlement charges here, which allege that Yoo conspired with the executives of various companies to steal money from those companies under false pretenses.

Both United States federal law and New York law would be violated by Yoo's embezzlement, had it taken place here. Embezzlement, for example, is prohibited by New York Penal Law § 155.05(2)(a) (defining larceny to include, among other things, "a wrongful taking, obtaining, or withholding of another's property" committed by "embezzlement"); *accord, e.g.*, *Jhirad*, 536 F.2d at 482 ("Embezzlement, now subsumed under the general category of larceny, is defined in New York Penal Code § 155.05 as the wrongful taking of 'property from an owner thereof.'"). Grand Larceny is a felony, punishable by imprisonment for longer than a year, beginning in the Fourth Degree, which is larceny involving property worth more than $1,000. *See*

---

[14] EX-YOO-00091-92.

N.Y. Penal Law § 155.30 (Class E felony). Yoo's conduct could also be charged as a violation of federal law. For instance, it could be charged as wire fraud in violation of 18 U.S.C. § 1343, which carries a maximum sentence of 20 years' imprisonment and prohibits devising or intending to devise "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 27 (1987) ("The concept of 'fraud' includes the act of embezzlement, which is 'the fraudulent appropriation to one's own use of the money or good entrusted to one's care by another.'" (quoting *Grin v. Shine*, 187 U.S. 181, 189 (1902))).

### B.    There Is Probable Cause To Believe that Yoo Committed the Charged Offenses

The only element under Section 3184 that Yoo's motion to dismiss challenges is the final one: whether there is probable cause that he committed the embezzlement Korea has charged. In order to certify that Yoo is extraditable, the Court must conclude that Korea has submitted evidence establishing probable cause to believe that the crimes charged were committed, and that Yoo, the person before the Court, committed them. The evidence is sufficient and probable cause is established if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein* v. *Pugh*, 420 U.S. 103, 111 (1975). And the Court's function, in conducting this analysis, "is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins v. Loisel*, 259 U.S. 309, 316 (1922).

As explained below, there is probable cause to believe that Yoo committed the seven charged offenses. Because this is an extradition proceeding, Yoo is not permitted to offer, and the Court is not supposed to consider, evidence that contradicts or rebuts the assertions made by Korea. *See supra* at 8. But that is largely what Yoo does. In attempting an end-run around this limitation,

Yoo points to the case law holding that a fugitive *can* offer "explanatory" evidence, which is admissible only so as to afford:

> the opportunity to present reasonably clear-cut proof which would be of limited scope and having some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits.

*In re Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978), *aff'd sub nom. Sindona* v. *Grant*, 619 F.2d 167 (2d Cir. 1980); *see* Dkt. 18 at 18 (quoting *Sindona*).

Yet Yoo's supposed explanatory evidence is anything but "clear-cut." Yoo raises a variety of allegations, claiming that Korea's extradition submissions "have grossly distorted" witnesses' statements, and fabricated inculpatory evidence. Dkt. 18 at 18. Insofar as he argues that quotation marks do not appear to mark actual quotations, *see id.* at 38, Korea has confirmed Yoo is correct. According to its responsive submission, "Quotation marks were used in Korea's extradition requests to attribute paraphrased witnesses' statements to each witness. Many of the witnesses' statements were very lengthy, so quotation marks were used to summarize and condense testimony for better understanding of readers without intend[ing] to mislead."[15] But when it comes to his challenges to the substance, as opposed to the exact wording, of Korea's witness statements, Yoo's arguments wither under scrutiny. Gravely inculpatory statements from Yoo's closest co-conspirators, which Yoo argues were "fabricated," are right there in black and white in his supporting exhibits, just as they are in Korea's submissions. To be sure, Yoo has identified some misattributions and inaccurate quotations in some of Korea's voluminous submissions. And he has found witnesses who made statements that exculpate him. These might make for good rebuttal

---

[15] Gov. Ex. B ¶ 1.2.

13

evidence at Yoo's eventual trial. But this proceeding is not a dress rehearsal for that trial, and it is not the Court's role to admit Yoo's rebuttal evidence and weigh it against the inculpatory evidence Korea has submitted. The mere fact that Yoo vigorously contests Korea's factual allegations cannot prevent a finding of probable cause.

Korea's seven embezzlement charges fall into three categories—a scheme to embezzle money from three companies via trademark licensing agreements, a scheme to embezzle money from three companies via business consulting agreements, and a scheme to embezzle money by collecting payments for photographs at artificially inflated values. As explained below, there is sufficient probable cause for all three schemes based solely on statements submitted by Korea— many confirmed by Yoo's own motion-to-dismiss exhibits—from Yoo's principal co-conspirator, Seung-il Park. After explaining why that is so, the remainder of this section discusses the three schemes, and Yoo's attempts to contradict or rebut Korea's evidence of them, in turn.

1.   **The Statements of Seung-il Park Are Independently Sufficient to Establish Probable Cause for All Seven Counts**

Although Yoo alleges a litany of purported inaccuracies in Korea's extradition submissions, the single most important one relates to Seung-il Park. Park is central to Korea's evidence. Yoo readily admits that Park ran the day-to-day operations of Yoo's private company, Key Solutions. Dkt. 18 at 23. By virtue of his position at Key Solutions and his taking direction from Yoo himself, Park was the key player in all three schemes, and in all seven counts. Park was CC-1 in the Complaint, and he admitted to criminal charges in Korea for his involvement in the embezzlement.[16]

---

[16] *See* Gov. Ex. B ¶ 1.7 (reproducing an excerpt from an Incheon District Court Decision in Korea's criminal case against Park and another individual).

Korea's submissions assert that Park told Korean officials that, under the pretext of trademark licensing fees and business consulting fees, Park unlawfully collected money from the Victim Companies on Yoo's behalf.[17] Korea's claims about Park are crucial here because they are—standing alone—enough to find probable cause for all seven counts. In general, an accomplice's corroborated incriminating statements are sufficient to establish probable cause. *E.g. United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987). In the extradition context in particular, even *completely uncorroborated* accomplice testimony is sufficient to establish probable cause. *E.g. Ahmad v. Wigen*, 726 F. Supp. 389, 400 (E.D.N.Y. 1989) (collecting support for the proposition that "[a]s a matter of law, accomplice testimony is sufficient even without corroboration to demonstrate probable cause to certify the accused for extradition"), *aff'd* 910 F.2d 1063 (2d Cir. 1990). Thus, because, as discussed below, Yoo's challenge to Park's statements falls flat, so too does his challenge on the broader issue of probable cause.

Yoo's challenge to Park's statements fails because it is directly contradicted by his own exhibits. Yoo claims that Park "<u>never</u> told the Korean prosecutors that the trademark payments were merely 'a means to transfer affiliates' funds to Yoo's family.'"[18] Dkt. 18 at 30-31. But Yoo is wrong: Park *did* tell Korea that the trademark payments were a means to transfer the Victim Companies' funds to Yoo's family. Yoo obtained and translated a transcript of an interview Park gave to Korean authorities. In that interview, which Yoo submitted in support of his motion as an exhibit, Park admitted that he collected money for Yoo from the Victim Companies "under the

---

[17] Compl. ¶¶ 6.f, 7.a-c; EX-YOO-00086-87; EX-YOO-S1-00030-31; EX-YOO-S2-00059-65; EX-YOO-S4-00008-10.

[18] Yoo also claims that while Korea quoted Park as saying Key Solutions had three employees, he actually said that the private company's staff fluctuated between three and five people. Dkt. 18 at 23-24. In a context where Park admitted that the consulting fees were a pretext, it is difficult to see how this factual dispute could possibly be material.

pretext of trademark fees." And at one point in the interview, Park was asked about trademarks for which Yoo received licensing fees even though the trademarks had little value—the Korean interviewer summed up by asking "All together, it seems that it was actually a way for the Yoo [] family to take the funds of affiliates. What do you think?" and Park answered "Yes, it seems so."[19] In other words, Yoo's rebuttals of Park's statements are, at most, challenges to form—the exact wording of the statements—but not substance. Park in fact gave damning statements confirming that the trademark licensing fees collected from Chonhaiji, Ahae, and Onnara Shopping, the business consulting fees collected from Chonhaiji, Semo, and Moreal Design, and the photograph purchase money collected from a number of the Victim Companies, were a mere pretext, the actual purpose of which was to transfer funds to Yoo and his family. Many of those statements are confirmed by Yoo's own supporting exhibits.[20]

Korea's supplemental submission, similarly, reproduces at length various questions and answers from Park's interview. Under questioning by Korean authorities, Park admitted that he collected money from the Victim Companies "under the pretext of trademark royalty and consulting fees," that he then managed the funds received on Yoo's behalf, and that he did so on

---

[19] Yoo Korean Interviews Ex. E at 10 & 21 (transcript of Seung-il Park's May 8, 2014 interview).

[20] *E.g. id.* at 5 (Park confirms that he "collect[ed] and manag[ed] funds from affiliated companies under the pretext of trademark fees, consulting fees, etc."); *id.* at 8 (Park confirms that Semo paid consulting fees at Park's request, that there was no actual discussion of the matter, and that Park and the involved director "just did what" Yoo told them to do); *id.* at 9 (regarding his responsibility "for illegally collecting and managing funds from affiliated companies under the pretext of trademark fees, consulting fees, etc.," Park claims that he initially "didn't think that I was collecting money illegally," but confirms that "looking back on it now I think I collected those funds illegally"); *id.* at 18 (Park confirms that the funds were collected through Key Solutions from Ahae, Chonhaiji, Onnara, Semo, and Moreal); *id.* at 22-23 (Park states that he managed the money collected from the Victim Companies at Yoo's direction, including by transferring the money to Yoo's own account, and using it to purchase real estate and stocks for Yoo).

"the instructions of President YOO Hyuk Kee."[21] In short, Park admitted the exact substance that Yoo claims was invented, confirming the pretextual nature of the trademark and consulting fees collected from Ahae, Chonhaiji, Onnara Shopping, Semo, and Moreal Design (which correspond to the first six embezzlement counts) as well as the money collected from Victim Companies to purchase photographs as charged in the final count. Because these co-conspirator inculpatory statements are sufficient on their own to establish probable cause for the schemes charged by Korea, Yoo's motion to dismiss should be denied.[22]

### 2.    There is Probable Cause for the Trademark Scheme

Korea alleges that three Victim Companies, Chonhaiji, Ahae, and Onnara Shopping, entered into pretextual trademark licensing fees with Yoo or Key Solutions. Pursuant to those agreements, the companies made millions of dollars in payments that were nominally trademark royalties, but that were in fact a means of stealing money from the companies. Korea relies in substantial part on Park's statements for probable cause as to the trademark scheme, and as just discussed, those statements alone are sufficient to supply probable cause. Park's statements, including those found in Yoo's own exhibits, confirm that trademark fees paid to Yoo or Key Solutions by each of the relevant Victim Companies were pretexts to embezzle money from those victims. But Korea has offered further evidence as well.

For instance, as Yoo acknowledges, Gi-chun Byeon (identified as CC-2 in the Complaint), a Chonhaiji director and eventually CEO, was interviewed by Korean authorities and conceded

---

[21] Gov. Ex. B ¶ 4.2; *see also id.* ¶ 8.2 (quoting Park agreeing that money was collected for the photograph scheme "under the pretext of rights offering or cash deposits for new shares").

[22] Although corroboration is not required for probable cause in this context, Park's statements were corroborated by, among other things, evidence that the claimed pretextual payments were actually made, *see* EX-YOO-00102-17 (chart listing fraudulent payments by date and purpose), as well as the statements of other witnesses, many of which are discussed below.

that the trademark fees Chonhaiji paid to Yoo were for trademarks that weren't worth very much, were not "necessary" for the company, were "ultra-high," and were "actually a way for the Yoo [] family to leak the funds of affiliates."[23] Yoo attempts to rebut this clear evidence of his wrongdoing by arguing that prosecutors "fed words to" the witness.[24] This is precisely the type of argument that an extraditee is prohibited from making in extradition proceedings. And in any event, there is nothing improper about eliciting admissions of wrongdoing in an investigative interview by asking leading questions, and it in no way negates the probable cause supplied by Byeon's admission. Nor does Yoo's next argument, that Byeon did not become CEO of Chonhaiji until after the company stopped paying trademark licensing fees. That is because before he became CEO, Byeon was intimately involved in Chonhaiji's operations, working as a director and handling the company's accounting and personnel affairs, thereby providing ample foundation for his knowledge about the trademark scheme.[25]

Similarly, Korea relies on statements made to its investigators by Seong-hwan Lee, who formerly served as Ahae's CEO. Lee told Korea that Ahae's trademark was created by company staff in 1998, but that Yoo sought payment for it and, because of Yoo's stature, Lee had to agree for Ahae to pay the licensing fees.[26] Yoo does not contest that Lee said this, but claims that relevant documents rebut this allegation, because Yoo registered the trademarks earlier than Lee had stated,

---

[23] Dkt. 18 at 32-33; *see also* Gov. Ex. B ¶ 6.1 (recounting additional inculpatory statements Byeon made about this scheme); Yoo Korean Interviews Ex. H at 29-30 (interview of Byeon, confirming that Chonhaiji began paying royalties to Yoo for use of the Chonhaiji trademark in 2008, but was already using the trademark when Byeon joined the company in 2007).

[24] Dkt. 18 at 32.

[25] Gov. Ex. B ¶ 6.2.

[26] *E.g.* EX-YOO-S4-00009. Another former CEO of Ahae, Jae-young Lee, was identified as CC-3 in the Complaint and allegedly conspired with Yoo to facilitate this scheme. Jae-young Lee was criminally convicted in Korea in connection with this scheme. *Id.*

and began charging Ahae trademark licensing fees earlier in time than Korea alleged. Dkt. 18 at 29-30. But this rebuttal evidence is improper in these proceedings, and more importantly, not wholly inconsistent with Lee's statements. For instance, Yoo's purported rebuttal evidence does not contradict Lee's claim that Ahae staff created the trademark that Yoo then registered, which corroborates that the registration and the licensing agreement were pretextual. Moreover, as Korea points out, it is no defense to Korea's charges that Yoo actually began embezzling money from Ahae earlier than alleged in Korea's submissions.[27]

### 3.    There is Probable Cause for the Business Consulting Scheme

Korea next alleges that Yoo and Key Solutions received payments from three Victim Companies, Semo, Moreal Design, and Chonhaiji, for business consulting services. To the extent services were rendered at all, the services Key Solutions provided were limited and didn't justify the fees, which Korea alleges were actually another means of transferring money from the victims to Yoo. Here, again, Park's admissions to Korea that the consulting agreements were a pretext to allow Yoo and his family to obtain money from the victims supplies sufficient probable cause. But, as with his objections to Park's statements, many of Yoo's evidentiary challenges to this scheme fall apart upon examination, and Park's statements are corroborated by those of other witnesses.

### a.    Semo

The first consulting scheme count, and the one to which Yoo devotes the most space in his brief, involves a company called Semo. Korea alleged that Yoo conspired with Seung-il Park and Semo's CEO, Chang-hwan Go (identified as CC-5 in the Complaint) to cause Semo to enter into a consulting agreement with Key Solutions. According to Korea, Park and Go negotiated the

---

[27] Gov. Ex. B ¶ 4.1.

contract, pursuant to which Semo made large monthly payments (totaling more than $1,000,000) to Key Solutions for consulting services, but in fact only received reports from Key Solutions once or twice per year, and the reports simply recounted information that could be found on the internet.[28]

Yoo argues that this narrative was fabricated, and the charge "baseless," but his own exhibits and Korea's recent supplement bear out Korea's claims from its prior submissions. For instance, Yoo asserts that Gyu-seok Kim, the leader of Semo's management support team, did not actually tell prosecutors either that Yoo and Key Solutions only rendered consulting services once or twice annually, or that the "consulting" could easily have been found on the internet. Dkt. 18 at 19. On the first point, Yoo is incorrect: Korea produced a quoted excerpt from Kim's interview in which Kim said that Key Solutions only provided a consulting report to Semo once or twice per year.[29] As for the second point, Korea's supplemental submission notes that the "found on the internet" claim was misattributed: it was actually said by Yoo's principal co-conspirator, Seung-il Park. Park told Korean authorities that Key Solutions' reports to Semo were prepared by an employee who "had neither experience nor expertise in consulting services," and that the reports consisted of "translations of general information that could be obtained through the internet."[30]

Similarly, Yoo disputes that alleged co-conspirator and Semo CEO Chang-hwan Go told Korean authorities that Key Solutions only provided written consulting services once or twice per year.[31] Dkt. 18 at 20-21 ("The quoted words do not appear in Go Chang-hwan's interviews."). But

---

[28] *E.g.* EX-YOO-S1-00027; EX-YOO-S4-00005-07.

[29] Gov. Ex. B ¶ 2.1.

[30] Gov. Ex. B ¶ 2.2.

[31] Yoo also claims it is "shocking" that Korea's extradition submissions did not disclose Go's denial that the fees were excessive. Dkt. 18 at 21. But he identifies no basis for his shock, nor any legal authority requiring the disclosure in extradition submissions of all contradictory or

Yoo's corresponding exhibit contradicts that claim: Go was asked about the statement made by "another reference person" (presumably Kim) that "Semo only received 1-2 data per year from Key Solution. Is this true?" Go answered "I think so."[32] Yoo's exhibit also confirms that Go told Korean authorities that he, as CEO, caused Semo to enter into a consulting contract because he was "requested" to do so by Park.[33]

Yoo also disputes Korea's evidence from two lower-level Semo witnesses, arguing that one, Seon-ae Jo, who described Key Solutions' fees as "excessive,"[34] lacked relevant knowledge and did what she was told, and that another witness, Chun-gyun Kim, who reported that the Victim Companies operated as slush funds for the Yoo family, was only an auditor for some entities affiliated with the Victim Companies, but did not work for the directly involved companies, and his basis for the "slush fund" comment was thus hearsay.[35] While the Court should reject Yoo's attempts to impeach the statements of potential witnesses in an extradition proceeding, even without those witnesses there is ample probable cause to believe that the Semo consulting agreement was a fraud.

Yoo's right-hand man Seung-il Park told Korean authorities as much. He admitted the consulting fees were pretextual, that he collected the payments on behalf of Yoo, and that he did so at Yoo's direction. And he told Korea that the consulting services Key Solutions did provide to

---

exculpatory statements made by interested witnesses in the course of a criminal investigation. Go is alleged to have conspired with Yoo to steal from Semo, and was criminally convicted in Korea for doing so. *See* EX-YOO-S4-00007. So it is little surprise that Korea did not credit his conclusory denial of wrongdoing during the investigation.

[32] Yoo Korean Interviews Ex. B at 17.

[33] *Id.* at 15 ("[W]hen I got a request from Park Seung-il, I signed a contract.").

[34] *E.g.* Gov. Ex. B ¶ 2.6.

[35] Dkt. 18 at 21-23.

Semo were performed by an inexperienced employee who pulled publicly available information online. Although Yoo's other co-conspirator on this charge, Semo CEO Go, denied wrongdoing (though he was criminally convicted for it in Korea), Go in fact admitted that he entered into the contract, that he did so at Park's "request" even though Park worked for the counterparty on the contract, and that monthly fees were paid to Key Solutions in exchange for providing data only once or twice a year. If this were a trial, the Court would have to weigh that evidence against the new affidavits Yoo has procured from Semo employees purportedly reflecting that some consulting services were rendered. But that is not the Court's task in an extradition proceeding: Korea's evidence, including as reflected in Yoo's own exhibits, establishes probable cause. Weighing that evidence against Yoo's evidence is a task for Korean courts, not this one.[36]

### b.    Moreal Design

The next consulting scheme count pertains to Moreal Design. Korea alleged that Yoo conspired with Park and Moreal's co-CEOs, his sister Chong Somena Yoo and Myeong-hwa Ha (identified as CC-6 and CC-7 in the Complaint, respectively) to enter into a consulting contract pursuant to which Key Solutions was paid about $800,000 for, but did not actually render, consulting services. According to Korea, among other evidence, co-conspirator and CEO Ha told

---

[36] Yoo also offers new affidavits in an attempt to rebut the evidence relating to the Moreal Design charge and the Chonhaiji consulting-scheme charge, *see* Dkt. 18 at 28, 34-35, as well as various exhibits purportedly rebutting the Onnara and Ahae trademark-scheme charges. In its own supplemental submission, Korea disputes some of this this new evidence. *See* Gov. Ex. B ¶ 3.4 (arguing, re Yoo's Affidavit from Myeong-hwa Ha, that Ha "had a special relationship" with the Yoo family, that her memory may have deteriorated over the intervening six years since her interview, and that she also appeared as a defense witness for Yoo's sister and the Korean court did not credit her testimony). The Court should not consider any of Yoo's affidavits, as they present only contradictory evidence, which has no role in an extradition hearing. The purpose of the hearing is not to sort out evidentiary disputes. The Court need only evaluate whether Korea's evidence is sufficient to permit it to bring Yoo to a trial, where a Korean court can do the weighing of evidence Yoo repeatedly asks this Court to undertake. The Court should decline Yoo's invitation to hold a trial in this country.

Korean officials that she signed a consulting agreement at the direction of co-conspirators Seung-il Park and Chong Somena Yoo, and that while Key Solutions was paid 20 million Korean won per month under the contract, there was no "official record" reflecting that the company actually received services.

Although Yoo disputes Ha's statements—he calls them "supposed statements," and "purported quotations," Dkt. 18 at 26-27—they all appear in the translation of Ha's interview that Yoo submitted as an exhibit. According to Yoo's own exhibit, Ha (1) confirmed that Moreal "paid about 20 million won every month to Key Solution"; (2) explained that she signed the contract on Moreal's behalf because "Park Seung-il asked me to sign a contract…so I signed a contract with the amount requested by Park Seung-il"; (3) said that she was "not sure about the details" of management advice provided by Key Solutions, and when asked if she had documents to prove that Key Solutions provided certain expenses, responded "I looked it up, but there are no official documents, I only guess"; and (4) said that she "just followed" a decision to "sign and maintain" the contract that had been made by Yoo's sister.[37]

For her part, Yoo's sister Chong Somena was found guilty in Korea for illegally causing Moreal to pay the relevant consulting fees to Key Solutions. The Court that convicted her identified a number of unusual facts about the formation and execution of the consulting contract: Moreal Design signed the contract with Key Solutions at Park's request, and Key Solutions unilaterally set the price; it signed the contract without any basic process, such as seeking quotes from other companies; and Moreal made payments for consulting services far in excess of its net annual

---

[37] Yoo Korean Interviews Ex. F at 14-15.

profits, going into debt in order to maintain its contract and continue paying money to Yoo and Key Solutions.[38]

These facts, together with Park's admission that the business consulting agreements were pretexts to obtain money for Yoo and his family, readily establish probable cause that the Moreal Design consulting contract was fraudulent.

### c.    Chonhaiji

The final business consulting scheme charge relates to Chonhaiji. As Korea alleges, when Chonhaiji was denied tax-deductibility for its payments to Key Solutions under the fraudulent trademark agreement discussed above, Yoo, Park, and co-conspirator and Chonhaiji CEO Gi-chun Byeon switched to fraudulent business consulting fees. Korea's submissions rely on both Park's and Byeon's admissions of these facts. Yoo acknowledges that Byeon described the consulting fees as a "pretext," and does not meaningfully challenge the allegation that Chonhaiji only began paying Yoo consulting fees because it had to stop paying him trademark fees. *See* Dkt. 18 at 33-34. Yoo does not challenge these Byeon statements, nor can he, because the Byeon interview Yoo submitted as an exhibit confirms Korea's allegations. Byeon told Korean officials that Chonhaiji stopped paying trademark fees in July 2010 because of a tax audit, that the company began paying consulting fees to Yoo in 2011, that Byeon agreed to this because he "just followed the instructions" he received, and that it was "probably right" that the consulting fees were a "replacement" for the trademark fees.[39]

---

[38] Gov. Ex. B ¶ 3.3 (noting that in 2012, Moreal Design paid KRW 280,000,000 to Key Solutions for consulting while bringing in only KRW 44,000,000 in net profits, and yet continued the contract during 2013).

[39] Yoo Korean Interviews Ex. H at 32, 35-26.

Rather than dispute these statements, Yoo argues at length that Korea's submissions ignored his long history of advising Chonhaiji about entering the yacht-manufacturing business. According to Yoo, he began advising Chonhaiji about yachts in 2007, and continued to do so for many years after, which Yoo claims demonstrates he "did valuable consulting work for Chonhaiji." Dkt. 18 at 34-35. This claim does not undermine probable cause. On the one hand, Korea has two accomplice witnesses—Park and Byeon—who say that Chonhaiji first paid about $1,000,000 in pretextual trademark licensing fees to Yoo, and then, when forced to stop by a 2010 tax audit, switched to paying pretextual consulting fees totaling about $160,000 between February and November of 2011. On the other hand, Yoo claims that those 2011 consulting fees were not fraudulent, based on the fact that he began advising a particular Chonhaiji employee named Sung Min Park about building yachts in 2007, helped Park get internships, and then met with Park in New York on some weekends while Park was attending a boat-building-and-design school in Maine. *Id.* Providing occasional advice about yacht building starting in 2007, and spending some weekends with one Chonhaiji employee who was in school in the United States, in no way explains the payment of a six-figure consulting fee for a brief period in 2011. The disconnect between Korea's strong evidence of fraud and Yoo's proffered "innocent" explanation is striking. Yoo's claim does not cast doubt on, let alone completely negate, Korea's probable cause on this count.

### 4.    There is Probable Cause for the Photograph Scheme

Finally, Korea alleges that Yoo embezzled more than $16,000,000 from Victim Companies including some of the five mentioned above, by causing them to raise funds—disguised as capital increases or stock subscriptions—to purchase photographs created by Yoo's father. Korea's allegations on this count are supported by interviews of both Park and Gi-chun Byeon, the

Chonhaiji CEO. The funds were routed through Chonhaiji, and Byeon apparently took the lead in collecting funds from the other Victim Companies and then disbursing them.[40]

Yoo concedes that Byeon "did tell Korean prosecutors that he felt he had little choice but to purchase the photographs because the Yoo family were major shareholders in the affiliated companies," but argues that Byeon himself was optimistic that his company would be able to sell the photographs purchased at a profit. Dkt. 18 at 37-38. And Yoo's brief does not engage with Park's corroborating statements, nor does it otherwise engage with Korea's evidence, on this count.

Instead, Yoo argues that Korea's submissions "tell none of the story that matters here." Dkt. 18 at 36. That story, according to Yoo, is that Yoo's father Byeong-eun Yoo was a prolific photographer whose work was exhibited, among other places, in Grand Central Terminal in New York, London's Royal Botanic Gardens, at the Louvre in Paris, and at the Palace of Versailles. As a result of the elder Yoo's purported success, Yoo claims that a plan was developed for Chonhaiji to invest in the photographs by purchasing rights from a company called Ahae Press (a company not directly related to the Victim Company Ahae, but owned and operated by Yoo and his father), in the hope that Chonhaiji would earn profits from the photos. In Yoo's telling, though "the art sale project never took off," it is "hardly a tale of embezzlement." *Id.* at 36-38.

Despite having criticized Korea for failing to tell the whole story, Yoo's version leaves quite a bit out. In particular, Yoo's tale omits all of the facts—many readily apparent in Yoo's own brief and exhibits—from which the Court can and should find probable cause to believe that this

---

[40] *See, e.g.*, Yoo Korean Interviews Ex. H at 9-17 (Byeon interview translation, in which Byeon discusses his involvement in collecting money from affiliates which was then paid to companies that owned rights to, and put on exhibitions of, Yoo's fathers photographs); Gov. Ex. B ¶ 8.2 (Park interview excerpt, explaining which victim companies contributed funds and stating that Byeon "led everything" in connection with the collection of money for the photographs).

was an embezzlement scheme. For one thing, Chonhaiji did not decide to pivot to photography-investing on its own, as a bona fide business strategy. Instead, a number of other Victim Companies, including Semo, Ahae, and other affiliates, chipped in money to provide to the company that then owned the photographs.[41] These were not companies in the business of buying photographs, or in any related business. Semo, for instance, sold nutritional supplements. Dkt. 18 at 19. Ahae manufactured industrial paint. *Id.* at 29. Chonhaiji built parts for ships. *Id.* at 34.

As the evidence submitted by Korean authorities and repeated in Yoo's own exhibits makes clear, these companies agreed to "invest" in these photographs because they had no other choice. When asked why Chonhaiji went into the photo business—who "was in charge of the overall plan"—Byeon said "President Yoo Hyuk-Ki gave the order, and [another executive] and I executed it."[42] And when asked whether a "normal company" would have paid for Yoo's father's photographs "at such a high price," Byeon responded "How can I not follow instructions as a CEO of one of [the] affiliates where Chairman Yoo's family are the major shareholders? Of course, if a company has nothing to do with Mr. Yoo's family, there is no way to use the company's funds to purchase photos."[43] And Byeon acknowledged that he did not seek any expert help in evaluating the photographic work before agreeing to cause the ship-building company of which he was CEO to invest in it.[44]

For another thing, Yoo's version of events makes it seem as if Chonhaiji and the other Victim Companies decided to invest after these photographs had been exhibited at prestigious institutions in major cultural centers. But in fact, the purpose of the investment was to *fund* those

---

[41] Yoo Korean Interviews Ex. H at 12.

[42] Yoo Korean Interviews Ex. H at 14.

[43] *Id.* at 19-20.

[44] *Id.* at 18-19.

exhibitions. Byeon explained that he and the other Victim Company executives agreed to collect and pay money because they were told, from on high, "that the affiliates had to pay for Chairman Yoo's Louvre exhibition."[45] Similarly, Byeon reported that "in order to raise the money for the exhibition of Chairman Yoo's photos at the Palace of Versaille in 2013, the company decided to receive funds from affiliates in the form of a paid-in capital increase of Chonhaiji"—and that money was then spent on exhibition site setup, hosting a gala, inviting the London Symphony orchestra, and donating money to the Palace of Versaille for the privilege.[46] In other words, the photographs weren't good investments because they had been exhibited at the Louvre on their merits; they were bad investments that the Yoo family sought to pump up, by causing the Victim Companies to pay millions of dollars so that the photographs *could* be exhibited at the Louvre, Versaille, and elsewhere, in the hopes of finding an audience.

Finally, the way the Victim Companies collected money to fund these exhibitions eliminates any doubt as to the fraudulent nature of this scheme. The paint company, and the dietary supplement company, and the various other Victim Companies, all sent money through the ship-building company to buy rights to these photographs. Even crediting Yoo's argument that Chonhaiji ultimately exchanged the money for photographs it mistakenly hoped would have value, it makes no sense for these other Victim Companies to have given away money so that Chonhaiji could invest. And if this were a legitimate investment, there would have been no reason for these Victim Companies to attempt to disguise it in their books—yet Byeon reported that along with the instruction to "invest" in the photographs came an instruction that the investment must be booked

---

[45] *Id.* at 12.

[46] *Id.* at 15, 18.

for accounting purposes as "participation in capital increase."[47] That the Victim Companies had to conceal the true purpose of the purportedly legitimate photography investment on their books is quintessential evidence of consciousness of guilt in a fraud case, and meaningfully contributes to the finding of probable cause here.

***

In sum, the evidence provided by Korean authorities amply supports the probable cause finding required to certify that Yoo is extraditable. Moreover, Yoo's attempts to contest the evidence, at this stage, are procedurally improper. The Court should therefore find probable cause as to all seven counts and deny Yoo's motion to dismiss the Complaint.

### C.      There Is No Time-Lapse Bar to Extradition Here

Article 6 of the Treaty, entitled "Lapse of Time," provides that "[e]xtradition *may be denied* under this Treaty when the prosecution or the execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State." Treaty, Art. 6 (emphasis added). Yoo argues that this provision prohibits this Court from certifying him as extraditable, because under the laws of the United States, a five-year statute of limitations would apply to fraud claims. Dkt. 18 at 13-14. Yoo's statute-of-limitations arguments fail for two reasons. *First*, there is nothing for this Court to decide: the Treaty's language establishes a discretionary basis for denial ("extradition may be denied"), and in the extradition context, discretion is reserved to the Secretary of State, not the extradition court. *Second*, if the Court does reach the statute-of-limitations issue despite the Treaty's language, it should rule against Yoo on the merits.

---

[47] *Id.* at 10.

### 1.    The Lapse-of-Time Provision Is Discretionary, and Therefore Reserved to the Secretary of State

Yoo first argues that the question whether the lapse-of-time provision prohibits extradition "is for the Court to decide." Dkt. 18 at 5-13. This argument misinterprets the Treaty. The Treaty does not condition extradition on a showing of timeliness. The relevant language is permissive, setting forth a discretionary ground for denial: extradition *may* be denied, but denial is not required. If interpreted literally, that "may" language is fatal to Yoo's argument, because discretionary exceptions to extradition are reserved exclusively to the Secretary of State—they are irrelevant to this Court's task. *See, e.g.*, *Murphy v. United States*, 199 F.3d 599, 601-02 (2d Cir. 1999) (the function of the courts is "to test only the legality of the extradition proceedings; the question of the wisdom of extradition remains for the executive branch to decide" (citation omitted)).

Yoo, conceding that the "plain meaning" of the Treaty's language supports the conclusion that the provision is permissive, is left arguing that while the "analysis begins with the treaty's words," it "does not end there." Dkt. 18 at 7. He asks the Court to override the Treaty's plain language based on legislative intent.

The Ninth Circuit rejected this exact argument, interpreting this exact Treaty, in *Patterson v. Wagner*, 785 F.3d 1277 (9th Cir. 2015). As the Ninth Circuit explained, taken together, the legislative history reinforces the plain meaning of the Treaty, that Article 6 is discretionary. Although the Senate Report accompanying the Treaty contained a summary that described the lapse-of-time provision using mandatory language ("precludes"), the Report's technical analysis "calls that reading into question," by "describ[ing] Article 6 in permissive terms." *Id.* at 1282 (discussing S. Exec. Rep. No. 106-13, at 5, 14 (1999)). What's more, the Senate Report identified other treaties—with France, Japan, and Luxembourg—containing "similar" provisions. Two of the three used mandatory "shall" language, while the third, like the Korea treaty, used the permissive

"may." As the Ninth Circuit noted: "When parties to a treaty intend to make an exception to extradition mandatory, in other words, they know how to state that it 'shall' apply." *Id.* The Ninth Circuit also relied heavily on the executive branch's interpretation of Article 6 of the Treaty, which is "that Article 6 was permissive rather than mandatory." *Id.* at 1283. Based on this analysis, the *Patterson* court concluded that "untimeliness is a discretionary factor for the Secretary of State to consider in deciding whether to grant extradition," but "there is no mandatory duty that a court may enforce." *Id.* at 1281.

Judge Haight, sitting by designation in the District of Connecticut, recently decided the same issue, in the context of the U.S.-Romania extradition treaty. Like the Treaty at issue here, our extradition treaty with Romania contains a similarly worded, and facially discretionary, time-lapse provision. Relying on *Patterson*, Judge Haight concluded that such provisions were not a legal bar to extradition. Instead, they presented a discretionary question solely to the Secretary of State. The court concluded that it had "neither the jurisdiction nor the authority to play any part in how the Secretary should exercise that discretion." *Mirela v. United States*, 416 F. Supp. 3d 98, 110-11 (D. Conn. 2019). Indeed, Judge Haight held that it would in inappropriate to even interpret the provision, because of the possibility that "the Secretary might not agree with the court's interpretation of Romanian law, and it is not clear that the Secretary would be bound to follow it." *Id.* at 112.

Yoo has identified no court that has reached a contrary conclusion. This Court should not do so here. The question whether the lapse-of-time provision bars extradition should be left to the discretion of the Secretary of State.

31

### 2.     The Prosecution Is Not Time-Barred Under United States or New York Law

If the Court disagrees, however, and decides to reach this issue, Yoo loses on the merits of the underlying legal question. As Yoo notes, Dkt. 18 at 13, the applicable statute of limitations is five years, under both federal and state law.[48] *See* 18 U.S.C. § 3582; N.Y. CPL § 30.10(2)(b). Yoo argues that this limitations period has expired as both a matter of United States and Korean law, but he is wrong on the first point and the Treaty forecloses his argument as to the second.

*First*, Yoo's absence from the jurisdiction would—contrary to his argument—operate to toll the statute of limitations in this country. Under New York Criminal Procedure Law 30.10(4)(a), the limitations period excludes any period up to five years during which "the defendant was continuously outside this state." And under 18 U.S.C. § 3290, the statute of limitations is tolled during periods of fugitivity. Yoo conclusorily asserts that he has lived in Pound Ridge, New York since 2007, and that therefore he was not a fugitive from Korea. But that incorrectly assumes that actual, physical flight from pending charges is required. The Second Circuit has interpreted "fleeing" under Section 3290 liberally, holding that the provision covers not only actual flight, but also "constructive flight." The circuit held that there is no "meaningful distinction…between those who leave their native country and those who, already outside, decline to return." *Jhirad*, 536 F.2d at 483. In *Jhirad*, the court affirmed the application of Section 3290 to a fugitive in an extradition proceeding who had left the country seeking his extradition, India,

---

[48] Yoo argues that only federal law should be applied, because the United States is the contracting party to the Treaty, relying on an out-of-circuit decision. *See* Dkt. 18 at 13 (citing *Theron v. United States*, 832 F.2d 492, 499 (9th Cir. 1987)). The Second Circuit has apparently left this an open question: it applied New York's statute of limitations for larceny in an extradition case, although the court there also indicated that "it *might* be proper to look to federal, rather than state law, under which the limiting period is one of five years." *Shapiro*, 478 F.2d at 913 (emphasis added). The Court need not resolve this question here, because in the circumstances of this case, Yoo's absence from Korea extends the statute of limitations as a matter of both state and federal law.

for a reason other than to flee prosecution, but who then declined to return once he learned he was under criminal investigation. Korea has presented similar facts here: its extradition submission indicates that Korean officials conducting the criminal investigation into Yoo and his co-conspirators requested meetings with Yoo three separate times, but that he failed to appear in Korea.[49]

*Second*, Yoo asks the Court to hold that the issuance of the Korean arrest warrant in May 2014 did not toll any applicable statute of limitations. That holding would be inappropriate for at least two reasons. The first is that, as Yoo acknowledges, Korea at least suggests that the arrest warrant suspends the running of the statute of limitations, since in Korea, prosecutors do not indict suspects who are not in custody. Dkt. 18 at 14 (quoting EX-YOO-00081). Yoo argues that this is incorrect, though he notes the existence of one case, *In re Extradition of Han*, No. 11 Civ. 2059, 2012 WL 33201 at *12 (C.D. Cal. Jan. 6, 2012), that held to the contrary. But the Court should not reach this issue. The Treaty provides that "Acts or circumstances that would suspend the expiration of the statute of limitations of either State shall be given effect by the Requested State, and in this regard the Requesting State shall provide a written statement of the relevant provisions of its statute of limitations, which shall be conclusive." Treaty Art. 6. Although Korea has not provided a written statement setting forth a relevant provision establishing whether it is arrest warrant or indictment that tolls the statute of limitations under Korean law, this provision of Article 6 effectuates a judgment that each country is the best interpreter of its own laws. That judgment finds substantial support in case law, which militates against wading into an analysis of foreign law in this context. *See, e.g.*, *Grin v. Shine*, 187 U.S. 181, 190 (1902) (extradition court "can hardly be expected" to "become conversant with the criminal laws" of the requesting state); *Skaftouros*,

---

[49] EX-YOO-00084.

667 F.3d at 156 ("[A]rguments regarding the demanding country's compliance with its own laws…are properly reserved for the courts of that country."); *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[W]e have declined to rule on the procedural requirements of foreign law out of respect for other nations' sovereignty and because…the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles." (internal quotation marks and citation omitted)); *Marzook v. Christopher*, No. 96 Civ. 4107 (KMW), 1996 WL 583378, at *5 n.4 (S.D.N.Y. Oct. 10, 1996) ("In the context of extradition proceedings, it would be inappropriate for a court to review the demanding state's analysis of its own law."). Consistent with that law and the Treaty, the Court should decline to reach this question of purely foreign law, and should not second-guess Korea's description of charging practices in that country.

The second reason it would be inappropriate for the Court to hold that the statute of limitations has not been tolled under Korean law is because Korea *has* made a written submission to the contrary based on a different tolling theory. Korea's initial submission explained that the limitations period "shall be suspended during the period for which the offender stays abroad for the purpose of avoiding criminal punishment."[50] The Treaty provision quoted above forecloses the Court from reaching any contrary conclusion. Korea's written statement is conclusive, and is fatal to Yoo's argument against tolling as a matter of Korean law.

---

[50] EX-YOO-00092-93. This statute-of-limitations discussion in Korea's initial extradition submission contained a typographical error in the English translation: the sentence immediately following the one quoted above read "Therefore, the statute of limitations for KIM Pil Bae has not expired yet." Korea submitted a supplement fixing this error, which is attached here as Government Exhibit C. As that exhibit reflects, Korea's analysis states "the statute of limitations shall be suspended during the period for which the offender stays abroad for the purpose of avoiding criminal punishment. Therefore, the statute of limitations for YOO Hyuk Kee has not expired yet."

### D.      Yoo's Fairness Arguments

Although Yoo's brief identifies only two "points" of argument, already addressed above, it also repeatedly expresses "concern" about Korea's case against Yoo. Right up front, the brief claims that this case deserves particularly careful attention "because, if returned to Korea, Keith Yoo will not receive a fair trial." Dkt. 18 at 1. It goes on to argue that "[t]he Korean government's animus against the Yoo family cannot be overstated," because a ferry operated by one of the companies controlled by Yoo's family sank in 2014, claiming 304 lives, many children. *Id.* at 2-3. At the end of his recitation of the facts, Yoo argues: "Against this background, anyone who believes that Keith Yoo would receive a fair trial in Korea is closing his or her eyes to reality." *Id.* at 5. Yoo returns to these issues in conclusion, tying his "concern that Keith Yoo could not get a fair trial in Korea" to his claims that Korea's extradition submissions were inaccurate: "Exculpatory Statements are omitted or distorted. When evidence is insufficient to supply probable cause, new 'evidence' is manufactured to fill the void." *Id.* at 38. As discussed above, contrary to Yoo's assertions, Korea's extradition request did not "manufacture" evidence. The substance of the summaries of witness statements contained in Korea's submissions is confirmed by the transcripts of the relevant interviews, as reflected in both Korea's supplemental submission and Yoo's own supporting exhibits. Yoo's arguments about fairness and the omission of exculpatory evidence, while they make serious—and often overstated—allegations, are not a basis to deny certification of extraditability.

To the extent Yoo is attempting to argue that it is improper for Korea to have omitted exculpatory statements from its extradition submissions, the significant weight of authority is to the contrary.[51] *See, e.g.*, *Merino v. U.S. Marshal*, 326 F.2d 5, 12 (9th Cir. 1963) (holding that *Brady*

---

[51] The Sixth Circuit, has applied *Brady* in the extradition context where a petitioner seeks discovery from the Government and the "United States ha[s] conducted its own investigation of the offense

and various other cases establishing procedural protections in criminal cases "are not applicable to a preliminary examination in an international extradition case"); *United States v. Pena-Bencosme*, No. 05 Mag. 1518, 2007 WL 3231978, at *6 (E.D.N.Y. Oct. 30, 2007) ("A country requesting extradition is not obligated to disclose exculpatory, or *Brady*, material in an extradition request."); *In re Extradition of Koskotas*, 127 F.R.D. 13, 27 (D. Mass. 1989) ("Courts have expressly held that *Brady* principles do not pertain to extradition hearings because no determination of guilt or innocence is being made."). While the Second Circuit has yet to address this issue directly, it has previously recognized that, in general, "given the limited purpose of extradition hearings, fugitives do not benefit from many of the protections that are traditionally accorded to defendants in the criminal context," *Skaftouros*, 667 F.3d at 155 n.16, and that "evidentiary rules of criminal litigation are not applicable." *Messina*, 728 F.2d at 80.

As for Yoo's arguments about Korea's purported animus and the unfairness of any trial he might face there, the Court should disregard them. The possibility that a foreign proceeding will be unfair is exclusively a discretionary consideration for the Secretary of State to weigh after certification. There is a "rule of non-inquiry" in extradition proceedings, which forbids consideration of the fairness of the foreign proceeding—the Court is required to assume the proceeding will be fair. *See, e.g.*, *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair."); *Jhirad*, 536 F.2d at 484-85 ("It is not the business of our courts to assume the responsibility for supervising the

---

underlying the request for extradition and uncovered exculpatory material in the course of that effort." *In re Extradition of Drayer*, 190 F.3d 410, 414 (6th Cir. 1999) (discussing *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993)). But Yoo is challenging a foreign government's failure to disclose alleged *Brady* material in its own extradition submissions, a challenge that extends beyond the boundaries of even Sixth Circuit law in this area. The Government is not aware of any case applying *Brady* to a foreign country's extradition request.

integrity of the judicial system of another sovereign nation."); *Eain v. Wilkes*, 641 F.2d 504, 516-17 (7th Cir. 1981) (the executive branch has the sole authority to establish "an American position on the honesty and integrity of a requesting foreign government").

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court certify that Hyuk Kee Yoo is extraditable to the Republic of Korea.

Dated:  White Plains, New York
            December 8, 2020

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

By:      /s/ Derek Wikstrom
            Derek Wikstrom
            Assistant United States Attorney
            Tel.: (914) 993-1946