UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Extradition of          No. 20 Mag. 2252
Hyuk Kee Yoo a/k/a "Keith Yoo"

- - - - - - - - - - - - - - - - - - - - - - - - - - - X


### REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SOUTH KOREA'S REQUEST TO CERTIFY YOO HYUK KEE ("KEITH YOO") AS EXTRADITABLE

Paul Shechtman
BRACEWELL LLP
1251 Avenue of the Americas
49th Floor
New York, NY 10020
212-508-6107
paul.shechtman@bracewell.com


Shawn Naunton
ZUCKERMAN SPAEDER LLP
485 Madison Avenue
10th Floor
New York, NY 10022
646-746-8655
snaunton@zuckerman.com

Attorneys for Defendant Keith Yoo

December 21, 2020

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ....................................................................................... ii

I.    STATUTE OF LIMITATIONS ........................................................................... 1

      A.    The Statute of Limitations Issue is for the Court to Decide .................... 1

      B.    The Statute of Limitations Was Not Tolled ............................................ 4

II.   PROBABLE CAUSE .......................................................................................... 6

      A.    Introduction ............................................................................................. 6

      B.    Semo (Consulting Agreement) ................................................................ 7

      C.    Moreal Design (Consulting Agreement) ................................................ 10

      D.    Chonhaiji (Consulting Agreement) ........................................................ 13

      E.    Ahae Co. (Trademark) ............................................................................ 14

      F.    Onnara Shopping (Trademark) ............................................................... 15

      G.    Chonhaiji (Trademark) ........................................................................... 16

      H.    Chonhaiji (Photography) ........................................................................ 16

III.  CONCLUSION .................................................................................................. 18

TABLE OF AUTHORITIES

PAGE

CASES

Air France v. Saks, 470 U.S. 392 (1985) .......................................................................3

Extradition of Sindona, 450 F. Supp. 672 (S.D.N.Y. 1978) ...........................................7

Franks v. Delaware, 438 U.S. 154 (1978)....................................................................10

Jhirad v. Ferrandina, 486 F.2d 442 (2d Cir. 1973)(Jhirad I)..........................................5

Jhirad v. Ferrandina, 536 F.2d 478 (2d Cir. 1976)(Jhirad II) ........................................5

Mirela v. United States, 416 F. Supp. 3d 98 (D. Conn. 2019).......................................3

Patterson v. Wagner, 785 F.3d 1277 (9th Cir. 2015)....................................................1

Sandhu v. Burke, 2000 WL 191707 (S.D.N.Y.) ............................................................7

Shapiro v. Ferrandina, 478 F.2d 894 (2d Cir. 1973).................................................1, 7

Skaftouros v. United States, 667 F.3d 144 (2d Cir. 2011)............................................5

United States v. Howard, 489 F.3d 484 (2d Cir. 2007) .................................................7

United States v. Rodgers, 461 U.S. 677 (1983) ............................................................1


STATUTES AND RULES

Fed. R. Evid. 106 ............................................................................................................7


OTHER AUTHORITIES

Richard Posner, Reflections on Judging (2013) ............................................................4

This reply brief is submitted in further support of Keith Yoo's motion to dismiss South Korea's request to certify him as extraditable.

I.      <u>STATUTE OF LIMITATIONS</u>

A.     <u>The Statute of Limitations Issue is for the Court to Decide</u>

The government argues that the statute of limitations issue is for the Secretary of State, not the Court, to decide.  In support of that argument, it relies almost exclusively on the Ninth Circuit's decision in <u>Patterson v. Wagner</u>, 785 F.3d 1277 (9th Cir. 2015).

Notably, the government does not address most of the points that we made in our opening brief:  (i) that the use of the word "may" in a statute or treaty is not conclusive in determining whether the authority conferred is mandatory or permissive, <u>see</u>, <u>e.g.</u>, <u>United States v. Rodgers</u>, 461 U.S. 677, 706 (1983)("[t]he word 'may' . . . usually implies some degree of discretion but this . . . principle . . . can be defeated by indications of legislative intent to the contrary"); (ii) that the Treaty's drafters did not use "may" or "shall" consistently to identify those issues that are for the court or the Secretary to resolve; (iii) that leaving the timeliness issue to the Secretary, in his discretion, would allow a person to be sent abroad for trial on the stalest of charges, if political considerations favored extradition; and (iv) that determining whether a statute of limitations has expired is "particularly suited to the capacities of the judicial branch," <u>Shapiro v. Ferrandina</u>, 478 F.2d 894, 901-07 (2d Cir. 1973)(Friendly, J.).  These arguments remain valid.

In support of its position, the government cites <u>Patterson</u> for the proposition that the Senate Report's Technical Analysis "describ[es] Article 6 in permissive terms."  (G. Mem. 30, <u>quoting</u> 785 F.3d at 1282).  But that is not so.  As we noted in our opening brief, the Technical Analysis states that "Korea insisted on this provision because Korean law <u>demands</u> that extradition be denied if the statute of limitations would have expired in either Korea or in the Requesting State."  Sen. Rpt. 14 (emphasis added).  The Ninth Circuit did not mention this sentence in its

-1-

opinion (nor does the government in its memorandum), but the sentence is critical.  A country would not "demand[]" that extradition be denied for time-barred charges and yet leave the issue to the Executive to deal with as it pleases.

The government says nothing about the colloquy between Senator Grams and Mr. Harris, the Acting Director of the Office of International Affairs of the Department of Justice, in which Senator Grams asked Mr. Harris a question that began with these words:  "Article 6 of the proposed treaty bars extradition in cases where the law of the requested State would have barred the crime due to a statute of limitations having run out."  Sen. Rpt. 37.[1]  The Ninth Circuit concluded that the exchange "only weakly supports Patterson's contention that the Senate understood the provision to be mandatory, and it shows fairly clearly that the executive branch understood it to be permissive."  785 F.3d at 1282.  That is plainly mistaken.  Senator Grams' question shows, unambiguously, that he believed the bar was mandatory, and Mr. Harris' answer

---

[1]     The full exchange between the two men bears repetition:

SENATOR GRAMS:

Article 6 of the proposed treaty bars extradition in cases where the law of the requested State would have barred the crime due to a statute of limitations having run out . . . .  So the question is are you confident that this article of the treaty adequately insures that fugitives cannot simply run out the clock by fleeing to Korea?

MR. HARRIS:

Senator, this article of the treaty was the subject of considerable negotiation.  As you may recall, of the treaties that were before the Senate last fall, most of them had slightly different language.  Many of our most modern extradition treaties flatly state that the statute of limitations of the requesting State will apply.

We have a few in which it was not possible to reach that resolution.  In this case, because of the specific provisions of Korean law, we did agree that the statute of limitations of the requested State would apply.  But, as you have indicated, the specific language in the article is crafted so that those factors which toll the statute of limitations under the law of the requesting State would be given weight.

did not dispute that assessment.  Mr. Harris addressed only the Treaty's unorthodox tolling provision -- one that applies the statute of limitations of the Requested State but authorizes consideration of the tolling provisions of both States.  His answer lends <u>no</u> support to the claim that he viewed the provision as permissive.[2]

The Technical Analysis observes that our treaties with France, Japan, and Luxembourg have delay-of-time provisions "similar" to the treaty with Korea.  (G. Mem. 30-31).  Two of three countries -- France and Japan -- use "shall," and one -- Luxembourg -- uses "may," leading the government to assert that drafters "know how to state that it 'shall' apply" when they want to.  (G. Mem. 31, <u>quoting</u> 785 F.3d at 1282).  But that misses the point.  What is key is that the Departments of Justice and State, which prepared the Technical Analysis, saw the provisions of the four countries as "similar."  They did not distinguish between "may" and "shall" or suggest that the choice of words signifies a radical difference in decision-making.  Which is to say, they did not give weight to the word that the government now claims is dispositive.[3]

A court interpreting a treaty is obliged to give the words of the treaty "a meaning consistent with the shared expectations of the contracting parties."  <u>Air France v. Saks</u>, 470 U.S. 392, 399 (1985).  The Senate Report -- the principal document here -- gives no indication that our government or Korea's expected the statute of limitations issue to be left to the Executive to decide; it indicates just the opposite.[4]

---

[2]     If Mr. Harris had believed that the provision was permissive, he would have answered Senator Grams' question much differently.  He would have assured the Senator that the Secretary, in exercising his discretion, would not allow a fugitive to run out the clock by fleeing.

[3]     <u>Mirela v. United States</u>, 416 F. Supp. 3d 98, 110-11 (D. Conn. 2019), which the government also cites, relied solely on <u>Patterson</u>; its analysis stands or falls with <u>Patterson</u>'s.

[4]     The Ninth Circuit's reading of the Technical Analysis reflects what has been called "motivational reading" -- "the credulous acceptance of evidence that supports a preconception and

B.      The Statute of Limitations Was Not Tolled

On the merits, the government agrees that the statute of limitations is five years. (G. Mem. 32).  It argues that the statute was tolled (i) by the issuance of a Korean arrest warrant in May 2014 (G. Mem. 33) or (ii) because Keith Yoo was a fugitive from Korea under both New York State and federal law (G. Mem. 32).  We discuss these arguments below.

1.      Arrest Warrant.  We have submitted an affidavit from Professor Sang Hoon Han of Yonsei University Law School, one of Korea's leading law schools, who has taught criminal law for 25 years.  Professor Han avers that "the issuance of a warrant for arrest or a warrant for detention does not suspend the statute of limitations in the Republic of Korea."  Only an indictment has that effect.  Han Aff. ¶3-7.  In its response, the government does not proffer its own expert or cite to a Korean statute or treatise that contradicts Professor Han.  It notes only that Korea has "at least suggest[ed] that the arrest warrant suspends the running of the statute of limitations, since in Korea, prosecutors do not indict suspects who are not in custody."  (G. Mem. 33, citing EX-YOO-00081).  On that basis, the government urges the Court to pretermit the issue and not "wad[e] into an analysis of foreign law in this context."  (G. Mem. 33).

This response is astonishing.  As the Court knows, the government has had six weeks to consult with Korea, and, in that period, it has been unable to identify any Korean authority for the proposition that an arrest warrant tolls the statute of limitations.  The best it can do is note that Korean prosecutors "do not indict suspects . . . not in custody."  (Id.).  That may be so, but it

_____

peremptory rejection of evidence that contradicts it."  Richard Posner, Reflections on Judging 218 (2013).

does not speak to the limitations issue.  There is no need to wade into an analysis of foreign law because the law here is so clear.[5]

       2.    <u>Fugitivity</u>.  The U.S.-Korean Extradition Treaty contains its own fugitivity tolling provision:  "[t]he period during which a person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations."  As the Technical Analysis notes, this is "the U.S. standard."  Sen. Rpt. 14 ("[t]he second sentence of the paragraph adopts the U.S. standard, stating that the period during which the person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations").[6]  Thus, the sole question here is this:  did Keith Yoo "fle[e] from justice?"  That phrase has a settled meaning in U.S. law, namely that the person has "le[ft] the place of [the] alleged offense to avoid prosecution or arrest."  <u>Jhirad v. Ferrandina</u>, 486 F.2d 442, 445 (2d Cir. 1973)(<u>Jhirad I</u>).  "Mere absence" from the Requesting State is not enough.  <u>Id</u>.  As we demonstrated in our opening brief, Keith Yoo did not flee from Korea.  He was in this country, living at his home in Pound Ridge, when the ferry sank in April 2014, and has remained there for the past six years.

       In an effort to toll the statute, the government cites the Second Circuit's decision in <u>Jhirad v. Ferrandina</u>, 536 F.2d 478 (2d Cir. 1976)(<u>Jhirad II</u>).  But that case is readily distinguished.  Jhirad was the administrator of the Naval Prize Fund in India with authority to withdraw monies

---

[5]    <u>Skaftouros v. United States</u>, 667 F.3d 144 (2d Cir. 2011), which the government cites (G. Mem. 33-34), is not to the contrary.  There, the District Court had erroneously "imposed on the Government the burden of proving that the [Greek] arrest warrant was technically valid as a matter of Greek law."  667 F.3d at 160; <u>see also id</u>. at 161 ("the arrest warrant satisfies [the Treaty] because it is duly authenticated and shows that Skaftouros is currently charged with an offense recognized by the Treaty").  Keith Yoo's case is much different.  If an arrest warrant does not toll the statute in Korea -- and there is <u>no</u> showing that it does -- then it is hard to imagine that this Court, out of deference to Korea, should pretend that it does.

[6]    That means that the Korean and New York State provisions, which the government cites, have no relevance to the analysis.  (G. Mem. 32, 34).

from the fund.  On several occasions, he "withdr[ew] such monies and . . . shortly following many of those withdrawals, he deposited closely equivalent sums in his personal bank account."  Id. at 482.  The transfers occurred in 1961, and by 1972, when India sought his extradition for embezzlement, he was living in America.  Id. at 481.

After a hearing, the District Court found these facts:  In July 1966, knowing that he was under investigation for embezzlement, Jhirad, accompanied by his wife, left India purportedly to attend a conference in Brussels, which he had attended in previous years but from which he had always returned promptly.  Before he left, he sold his law books and other personal possessions. When the conference was over, he travelled to Switzerland, Israel and then to the United States in 1971.  On this record, the District Court concluded (and the Second Circuit affirmed) that Jhirad's intent in leaving India was to avoid prosecution.  Id. at 484 ("Jhirad formed a definite intent not to return to India [at least] in early September of [1966], by which time he had already been out of the country for a longer period than on any of his previous similar trips").  The difference between Jhirad and Keith Yoo is obvious.  Jhirad supports our position, not the government's.

For these reasons, Korea's extradition request is time-barred and should be dismissed.

## II.      PROBABLE CAUSE

### A.      Introduction

We recognize that an extradition proceeding is not a trial and that a judge's role is limited to determining whether there is probable cause to support each of the charges for which extradition is sought.  That said, we are disappointed that our government is willing to work so hard on Korea's behalf in light of Korea's wildly distorted submissions.  Without any sense of embarrassment, our government quotes Korea's explanation for its deception -- that "[m]any of the witnesses' statements were very lengthy, so quotation marks were used to summarize and

condense testimony for better understanding of readers without intend[ing] to mislead." (G. Mem. 13, <u>quoting</u> Gov. Ex. B ¶ 1.2).  Suffice it to say, quotation marks are not used for that purpose anywhere in the world.

   The issue for the Court, however, is not Korea's gamesmanship, but whether it has provided "reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that [Keith Yoo] has committed" embezzlement crimes.  <u>United States v. Howard</u>, 489 F.3d 484, 491 (2d Cir. 2007).  In making that determination, a court is not limited to the four corners of the Requesting State's submissions, as it is when reviewing a search warrant application. It can consider "reasonably clear cut proof . . . [with a] reasonable chance of negating the government's showing of probable cause."  <u>Extradition of Sindona</u>, 450 F. Supp. 672, 685 (S.D.N.Y. 1978).

   In this regard, courts have held that "the extraditee's right to introduce evidence is . . . limited to testimony which explains rather than contradicts the demanding country's proof." <u>Shapiro v. Ferrandina</u>, 478 F.2d 894, 905 (2d Cir. 1973).  The line "between the two types of evidence is hardly clear," and "courts have struggled to clarify the distinction."  <u>Sandhu v. Burke</u>, 2000 WL 191707, at *5 (S.D.N.Y.).  There is less reason to struggle here.  Much of the evidence that we have proffered comes from the same interviews as those Korea cites in its submissions. We have corrected Korea's quotes and quoted answers that it omitted.  Fairness compels consideration of such materials.  <u>Cf.</u> Fed. R. Evid. 106 ("[i]f a party introduces . . . part of a writing . . . an adverse party may require the introduction . . . of any other part . . . that in fairness ought to be considered at the same time").

B.  <u>Semo (Consulting Agreement)</u>

   The government relies heavily on the interview statements of Park Seung-il, who ran the day-to-day operations of Key Solutions.  <u>See</u> G. Mem. 15 (Park's statements "are - standing

alone - enough to find probable cause for all seven counts"). It asserts that Park told Korean prosecutors that the trademark royalties, consulting fees, and photograph purchases were "a mere pretext, the actual purpose of which was to transfer funds to Yoo and his family." (G. Mem. 16, citing Yoo Ex. E. at 5, 9). On this issue, we have been our own worst enemy. When the government focused on the word "pretext" at the last bail argument, a Korean speaker informed us that our translators had mis-translated the word. (The Korean word is "명목.") As the affidavit of Jong-Min Jeon, a former judge in Korea, explains, the word typically means "for" or "for the purpose of" or "in the name of"; it means "under the pretext" only when the context indicates that a negative connotation is indicated.[7] Thus, on page 5 of Yoo Ex. E, when Park was asked for his job responsibilities, his answer should have been translated that, among his responsibilities, was collecting money from affiliates "for trademark fees, consulting fees, etc.," and not "under the pretext" of such fees.[8] A neutral question should beget a neutral answer. If the mis-translations are corrected, Park's answers do not incriminate Keith Yoo.

As we noted in our opening brief, Park told Korean prosecutors that, at the time, he "didn't think that [he] was collecting money illegally," but "looking back on it [he now thought he] collected those funds illegally." (Yoo Ex. E at 9). If this were the brazen embezzlement scheme that Korea posits, no person could have believed that he was collecting money legally. Park's contemporaneous belief goes far to prove that he was not a co-conspirator -- that he did not think he was collecting money pretextually.

---

[7]     Jeon's affidavit is attached to this brief as Exhibit 1.

[8]     The question that triggered the answer was this: "What was your job as auditor and director of the affiliated companies and companies mentioned above?"

The government also seeks support in the interview of Kim Gyu-seok, observing that Kim "said that Key Solutions only provided a consulting report to Semo once or twice per year." (G. Mem. 20).[9]  What Kim said may be true, but one does not judge a consulting firm solely on the frequency of its written reports.  As we have documented, Key Solutions employees attended at least 18 meetings with Semo executives on a variety of topics of critical importance to the company.  And Keith Yoo himself made vital recommendations on measures to improve Semo's production facilities and profitability, in particular with respect to its processes for distilling squalene.  See Affidavit of Hwang Ho-eun in the Semo Documents Binder.  If the number of written reports were the sole measure of a consulting company's worth, scores of American companies would be guilty of embezzlement.

The government chides us for finding it "shocking" that Korea's extradition submissions did not disclose that Go Chang-hwan, Semo's CEO, said that Key Solutions' fees were not excessive.  Yoo Ex. B at 17 (Go:  "[t]hat is absolutely not the case").  As the government sees it, Korea was not obliged to disclose "all contradictory or exculpatory statements made by interested witnesses in the course of a criminal investigation."  (G. Mem. 20 n.31).  We remain shocked.  How could it possibly be proper for a Requesting State to selectively quote (and misquote) a witness and not tell a court that the witness had fully exculpated the accused?

---

[9]      Three of the consulting reports are included in the Semo Documents binder:  The report entitled Business Strategies discusses domestic and overseas economic trends, focusing on the health food market, and it describes in detail a management strategy for Semo using a value chain analysis.  No one reading the report could conclude that it was just a collection of materials from the internet.  The report on the FDA facility inspection process is equally detailed.  It systematically describes how FDA diligence proceeds and what steps Semo needs to take to pass diligence.  See, e.g., US-FDA Semo Facility Inspection at 11 ("[m]ark on the gelatin production record and record the gelatin tank No. on the molding record").  Likewise, the HACCP Consulting Report explains the HACCP system step-by-step.  These are not slapdash efforts.

Cf. Franks v. Delaware, 438 U.S. 154 (1978)(discussing need for honesty in search warrant affidavits).[10]

      Finally, the government asks the Court to give some weight to the interview statements of Jo Seon-ae and Kim Chun-gyun, even though the former, a back room Semo employee, had no knowledge of the consulting services that Key Solutions provided and the latter got his "knowledge" from scuttlebutt at church.  The government writes that the Court "should reject Yoo's attempts to impeach the statements of [these] witnesses."  (G. Mem. 21).  That cannot be so.  Judicial review would be meaningless if a court had to credit witnesses who lacked personal knowledge.

C.    Moreal Design (Consulting Agreement)

      The case for extradition on the Moreal Design charge fares no better.  The claim here is that Keith Yoo conspired with "Park and Moreal's co-CEOs . . . to enter into a consulting contract pursuant to which Key Solutions was paid about $800,000 for, but did not actually render, consulting services."  (G. Mem. 22).  We have provided documentary evidence that obliterates this allegation:  a 93-page consulting report, entitled Business Strategies, and Annual Reports (2010 to 2013) that Key Solutions prepared about Moreal's Abroad Internship Program, a program which Key Solutions conceived and planned.  See Moreal Documents Binder.

---

[10]    In its memorandum, the government continues to rely on Go noting (i) that when asked about the truth of a statement made by "'another reference person' (presumably Kim) that 'Semo only received 1-2 data [i.e. reports] per year from Key Solution,' Go answered 'I think so'"; and (ii) that Go signed the consulting contract at Park Seung-il's request.  (G. Mem. 21).  Neither of these statements provides much, if anything, in the way of probable cause.  Moreover, the second omits part of Go's answer.  He told the Korean prosecutors that he entered into the consulting contract after "a request from Director Park Seung-il . . . and partly the contract was signed because we also needed it."  (Yoo Ex. B at 15)(emphasis added).

In its response, the government places heavy weight on the fact that Keith Yoo's sister, Yoo Chong Somena, a Moreal co-CEO, was found guilty in Korea for causing Moreal to pay consulting fees to Key Solutions.[11]  It writes this:

> The [Korean] Court that convicted her identified a number of unusual facts about the formation and execution of the consulting contract:  [i] Moreal Design signed the contract with Key Solutions at Park's request, and [ii] Key Solutions unilaterally set the price; [iii] it signed the contract without any basic process, such as seeking quotes from other companies; and [iv] Moreal made payments for consulting services far in excess of its net annual profits, going into debt in order to maintain its contract and continue paying money to Yoo and Key Solutions.

(G. Mem. 23-24).  The first three of these assertions proves little.  Lack of "basic process[es]" may be bad business (or may not be when two companies are affiliated), but it is not proof of embezzlement.

That leaves only the assertion that Moreal Design paid Key Solutions KRW 280,000,000 in 2012 when it had net profits of only KRW 44,000,000, yet the contract was continued the next year.  (G. Mem. 24 n.38).  But that assertion proves little.  First, it is odd to compare net profits to consulting fees, since the latter is deducted to get to the former.  Second, as the chart below and the underlying documents show, the consulting fees were not disproportionate to the revenue of the company, and the company was not in debt.

<u>Moreal Design</u>[12]

|      | Total Sales Revenue (KRW) | Consulting Fee (KRW) |
|------|---------------------------|----------------------|
| 2011 | 11,796,410,662            | 280,000,000          |
| 2012 | 4,578,024,497             | 280,000,000          |
| 2013 | 4,818,613,025             | 280,000,000          |

---

[11]    We continue to believe that members of the Yoo family cannot receive a fair trial in Korea, so that a conviction, by itself, should not count in the probable cause calculus.

[12]    The documents underlying this chart are attached as Exhibit 2.  Revenue declined in 2012 because the medical products division assigned the rights to some of its products to a subsidiary company.  <u>See</u> Exhibit 3.

Comparing net profits to consulting fees is not a meaningful comparison.

Finally, the government writes that Ha Myeong-hwa, Moreal's other co-CEO, told Korean prosecutors that "she was 'not sure about the details' of management advice provided by Key Solutions," and that, when asked if she had documents showing that Key Solutions provided certain expenses, she responded, "'I looked it up, but there are no official documents, I only guess.'"  (G. Mem. 23).  That mischaracterizes Ha's statement, which was this:

> Q:      Was there anything that Key Solution actually gave you as management advice?
>
> A:      When our designers went abroad for training, it seems that Key Solution provided expenses for their stay, but I'm not sure about the details.
>
> Q:      Do you have any documents to prove that?
>
> A:      I looked it up, but there are no official documents, I only guess.
>
> Q:      What do you think such thing has to do with management consulting?
>
> A:      I remember that they said they would provide a design training program, but in fact, I wasn't in charge of design, so I'm not really sure what it was.

(Yoo Ex. F at 14-15).  Thus, what Ha was not certain about were the details of the Abroad Internship Program, which is not surprising since she ran Moreal's medical products division, and what she was unable to locate were only documents showing that, when the designers travelled abroad, Key Solutions paid their expenses.[13]  Those answers do not move the ball forward toward probable cause.

Tellingly, Ha was never asked about the work that Keith Yoo himself did for Moreal's medical products division.  As we showed in our opening brief, it was considerable:  he helped plan forums in New York, California, Germany, Vancouver and Japan, at which Moreal's

---

[13]      We have submitted an affidavit from Han Yeun Ju, the leader of Moreal's design team, which attests to Key Solutions' critical role in Moreal's Abroad Internship Program.  See Moreal Documents Binder.

colonic irrigation system was promoted; he introduced Ha to potential customers in the Czech Republic and Canada, to which Moreal subsequently sold its products; he aided in the interviewing and hiring of employees in Moreal's medical products division; and he consulted on the production and design of Moreal's products and lectured to potential customers on the products' benefits. <u>See</u> Ha's Affidavit in Moreal Documents Binder. All of this defeats the claim that Key Solutions and Keith Yoo did not actually render consulting services for Moreal.

D.    <u>Chonhaiji (Consulting Agreement)</u>

The third consulting agreement charge involves Chonhaiji, the ship building company. The government argues that the consulting fee was "fraudulent" and merely a replacement for a trademark agreement that for tax reasons was abandoned. (G. Mem. 24). Remarkably, the government does not mention this paragraph in the interview of Byeon Gi-chun, Chonhaiji's CEO:

Q:    Have you received any advice from President Yoo Hyuk-Ki?

A:    Cheonhaeji Co., Ltd. planned to build a yacht manufacturing plant in Gyeongsangnam-do, and President Yoo Hyuk-Ki had data on technical alliances with US yacht schools, design, and design technology, so he instructed the company about the future yacht business policy.

Q:    Was the yacht business planned after you took office as CEO of Cheonhaeji Co., Ltd.?

A:    No. Prior to 2007, it was already reported to the Gyeongsangnam-do or Goseong-gun [the state and local governments] that it had entered the yacht business, and was known to the media. As part of that, we built the Han River water taxi. <u>All of this was part of President Yoo Hyuk-Ki's business plan</u>.

Yoo Ex. H at 36 (emphasis added).  Byeon's answer puts the lie to the claim that the consulting agreement was a sham.[14]

So, too, does the affidavit of Park Sung Min, which was provided with our opening brief.  See Other Companies' Documents Binder.  The government dismisses Park's detailed affidavit, claiming that it shows only that Keith Yoo "[p]rovid[ed] occasional advice about yacht building starting in 2007, and spen[t] some weekends with [Park] who was in school in the United States."  (G. Mem. 25).  But that is unfair.  Park's affidavit corroborates Byeon's statement that Keith Yoo "had data on technical alliances with US yacht schools . . . and design technology [and] instructed [Chonhaiji] about the future yacht business policy," all as "part of [his] business plan."  What Keith Yoo provided was not occasional weekend advice to a young student, but a well-conceived yacht building plan for the company.

E.      Ahae Co. (Trademark)

The government devotes only two pages to the three charges that involve what it calls the "pretextual trademark licensing fees" scheme.  (G. Mem. 17-19).  It candidly acknowledges that "Korea relies in substantial part on Park's statements for probable cause as to the trademark scheme."  (Id. at 17).  We have discussed Park's statements above and shown that they are not incriminating if the word 명목 is translated as "for," and not "under the pretext."  See supra at 8.

As to the Ahae Co. scheme, the government also cites Lee Seong-hwan's statement to Korean prosecutors in May 2014.  According to the government, Lee said that the trademark was actually "created by company staff in 1998" and that the company was compelled to pay

---

[14]     The government writes that we have "acknowledg[ed] that Byeon described the consulting fees as a 'pretext.'"  (G. Mem. 24).  We did no such thing (see Yoo Mem. at 33), and Byeon never described the consulting agreement with that word.

licensing fees to Keith Yoo "because of [his] stature."  G. Mem. at 18, <u>citing</u> EX-YOO-S4-00009;

<u>see also</u> <u>id.</u> at 19 ("Lee's claim that Ahae staff created the trademark that Yoo then registered

. . . corroborates that the . . . licensing agreement [was] pretextual").  But Lee did not say those

words.[15]  What he said was that in 1998, many staff members favored Ahae Co. for the company's

name and the name was eventually chosen. Ex. 4 at 19.  Favoring a name and creating a trademark

are quite different things.

Korea is also wrong in its claim that Ahae Co. took its name in 1998, but that

"[Keith Yoo] ordered [it] to make royalty payments <u>as he registered the trademark in 2009</u>."  EX-

YOO-S1-00030 (emphasis added).  As we showed in our opening brief, Keith Yoo applied for the

trademark in 1998, months before the company changed its name to Ahae Co., and he began

receiving payments in 2001.  Thus, there was not a ten-year hiatus in which the company used

Ahae logos without making payments.  Equally unavailing is Korea's claim that our documentary

evidence shows only that "Yoo actually began embezzling money from Ahae earlier than alleged

in Korea's submissions."  (G. Mem. 19).  The heart of the Ahae Co. embezzlement allegation is

that licensing payments post-dated the use of the name by a decade, and therefore the payments

were pretextual.  We have demolished that claim, and the Ahae Co. charge should fall with it.

F.      <u>Onnara Shopping (Trademark)</u>

The government does not mention the Onnara Shopping charge in its response.  We

take that as an acknowledgement that our opening brief was right:  that other than Park Seung-il's

supposed "pretext" statement, Korea has offered no evidence in support of this charge.

---

[15]      A translation of Lee's interview is attached to this submission as Exhibit 4.

G.     Chonhaiji (Trademark)

As for the alleged Chonhaiji trademark scheme, the government points to the interview statements of Byeon Gi-chun to demonstrate probable cause.  The chronology here is important.  The trademarks were filed in 2005 and 2006, and Byeon did not become a director of Chonhaiji until March 2007 and its CEO until January 2011, after the last trademark payment was made.  See Yoo Ex. H at 30 ("when I joined the company in 2007, they were using the trademark and logo of Cheonhaeji").  A fair reading of Byeon's interview shows that he has no personal knowledge of the trademark agreement and was merely acceding to the Korean prosecutors' characterization of it.  Id. at 32-33 ("[y]es, it seems so").  The Rules of Evidence may not apply, but the answer "yes, it seems so" from a witness without personal knowledge is surely deficient.

H.     Chonhaiji (Photography)

The Korean submissions allege that Keith Yoo conspired with Chonhaiji's CEO to embezzle money from Chonhaiji by ordering it to purchase Yoo Byeong-eun's photographs at exorbitant prices.  (EX-YOO-00088).  When it comes to defending the charge, however, our government shifts gears.  It argues that "a number of other Victim Companies, including Semo, Ahae, and other affiliates, chipped in money to provide to the company that then owned the photographs . . . [and that] the purpose of the investment was to fund . . . the exhibition of [Yoo Byeong-eun's] photos at the Palace of Versailles in 2013."  (G. Mem. 27-28).  But none of this should matter.  The question here is simple:  did Keith Yoo aid in the embezzlement of funds from Chonhaiji by directing it to purchase photographs at a price that far exceeded their worth?  What other companies may have contributed to help fund exhibitions does not speak to that question.

What speaks to that question is the fact that a report was prepared showing that merging the Hemato-Centric Life Institute, which then had the exclusive rights to sell Yoo Byeong-eun's photographs in Korea, with Chonhaiji would "[i]mprove [the] overall . . . profits [of

Chonhaiji]."   <u>See</u> Other Companies' Documents Binder.   Rarely does the victim of an embezzlement scheme commission a report to examine whether a proposed transaction is sound. Moreover, our government, like Korea, ignores the statements of Byeon Gi-chun, Chonhaiji's CEO, that he was optimistic that purchasing the photographs was good business "since there were many followers of Yoo [Byeong-eun] . . . [who were] excited about the fact that [his] works were on display in the Louvre and more sales was expected."  Yoo Ex. H. at 18; <u>see also id.</u> at 21 ("we thought that we could sell the photos to the followers of Yoo or to the people they introduced"). Purchasing acclaimed photographs after commissioning a report on the wisdom of the transaction is not the stuff of which embezzlement charges are made.[16]

*   *   *

Challenging an extradition request for lack of probable cause can be a difficult task. Courts assume that the Requesting State has proceeded in good faith and observe that probable cause is not a high bar.  But Korea has not acted in good faith, and it has not cleared the bar.  It has distorted what witnesses have said so as to obtain the extradition of Keith Yoo, whose real "crime" is his lineage.  If we are right that Keith Yoo cannot get a fair trial in Korea (and we are sure of that), then he needs the protection of this Court.  And so we urge the Court to scrutinize the Korean interviews carefully -- to look at what was said, and not what has been "quoted" -- and to give our uncontested documentary evidence fair weight.  Keith Yoo belongs with his family in Pound Ridge, not in Korea, where a lengthy sentence would inevitably be his fate.

---

[16]     The government mentions the Louvre and Versailles exhibitions, but says nothing about the numerous exhibitions, in New York and elsewhere, that preceded those exhibitions.  Nor does it note the critical acclaim that was showered on the photographs.  (Yoo Mem. 36-37).  The government makes much of the fact that Chonhaiji was a shipbuilding company, and selling photographs was not its mission.  But some of the affiliated companies had dual missions.  Moreal Design, for example, did graphic design work and sold medical devices as well.

III.   <u>CONCLUSION</u>

For these reasons and those in our opening brief, this Court should not certify Keith

Yoo as extraditable.

Dated:  New York, New York
         December 21, 2020

Respectfully submitted,

BRACEWELL LLP

<u>/s/ Paul Shechtman</u>
Paul Shechtman
1251 Avenue of the Americas
49th Floor
New York, NY 10020
212-508-6107
paul.shechtman@bracewell.com


ZUCKERMAN SPAEDER LLP
Shawn Naunton
485 Madison Avenue
10th Floor
New York, NY 10022
646-746-8655
snaunton@zuckerman.com

Attorneys for Defendant Keith Yoo