UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

IN THE MATTER OF THE EXTRADITION
OF HYUK KEE YOO

--------------------------------------------------------------X

**CERTIFICATATION OF
EXTRADITABILITY AND
ORDER OF COMMITMENT**

20 Mag. 2252

      In this action, the United States Government (the "Government"), acting at the request of the Government of the Republic of Korea, seeks a certification that Hyuk Kee Yoo ("Yoo") is extraditable pursuant to the Extradition Treaty Between the United States of America (the "United States" or the "Government") and the Republic of Korea ("Korea"), signed on June 9, 1998 and entered into force on December 20, 1999 (the "Treaty"). Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea, K.-U.S., June 9, 1998, S. TREATY DOC. No. 106-2 [hereinafter "Extradition Treaty"].  Yoo opposes extradition, arguing that (1) there is insufficient evidence for a finding of probable cause; and (2) it is barred by the applicable statute of limitations.  For the reasons set forth below, the Court finds that the extradition request demonstrates probable cause and satisfies the relevant requirements.  Furthermore, the Court lacks authority to determine whether this prosecution is time-barred, as that inquiry is a discretionary matter reserved for the Secretary of State.  Accordingly, the Court certifies that Yoo is extraditable pursuant to the Treaty.

**I.  BACKGROUND**

**A.  Procedural History**

      On or about February 27, 2020, the Government filed a complaint (the "Complaint") requesting the issuance of a warrant for the arrest of Yoo pursuant to 18 U.S.C. § 3184 and the Treaty, and attaching various documents submitted by Korea in support of its extradition request. (Docket No. 2).  The Court issued an arrest warrant, and the Government arrested Yoo on or

about July 22, 2020. During the initial presentment, at which Yoo appeared with counsel, the

Court ordered that Yoo be detained without bail pending the outcome of the proceeding, and set

a briefing schedule for any motion to dismiss. On October 5, 2020, counsel for Yoo moved to

dismiss on the grounds that Yoo is not extraditable, (Docket Nos. 17, 18), and after being granted

a six-week extension,[1] on December 8, 2020, the Government filed a brief in support of

extradition attaching additional materials to supplement Korea's extradition request, (Docket

Nos. 27, 27-1, 27-2). On December 21, 2020, counsel for Yoo filed a brief in reply. (Docket No.

30). On January 7, 2021, the Government submitted further supplemental materials from the

Republic of Korea in support of its request for extradition, (Docket Nos. 31, 31-1), and counsel

for Yoo filed a response to that submission on January 25, 2021, (Docket Nos. 34, 34-1, 34-2).

On March 3, 2021, the Court held an evidentiary hearing pursuant to 18 U.S.C. § 3184.

(*See* March 3, 2021 Minute Entry). At the hearing, the Government submitted the following

documentary evidence, which the Government had previously provided to the Court:

- Government Exhibit A: Declaration from the Department of State, the applicable extradition treaty, and the various submissions Korea made in support and clarification of its extradition request, (Docket Nos. 2-1–2-8);

- Government Exhibit B: Supplemental submission from Korea dated November 23, 2020 and authenticated by the State Department on December 17, 2020, (Docket No. 27-1);

- Government Exhibit C: Supplemental submission from Korea dated August 11, 2020, and authenticated by the State Department on January 29, 2021, (Docket No. 27-2); and

- Government Exhibit D: Supplemental submission from Korea dated January 6, 2021, and authenticated by the State Department the same day, (Docket No. 31-1).

---

[1] On October 19, 2020, the Court granted the Government a six-week extension in filing its opposition. (Docket No. 21). At a second bail hearing on November 5, 2020, counsel for Yoo argued that this extension, and the resulting delay of the extradition hearing, constituted special circumstances justifying release on bail. (*See* Nov. 5, 2020 Minute Entry). The Court again ordered that Yoo be detained without bail pending the outcome of the proceeding.

Counsel for Yoo submitted seventy-one additional exhibits, which they had also previously provided to the Court. (*See* Docket No. 38).  Pursuant to 18 U.S.C. § 3190, the Court admitted the Government's exhibits into evidence, with no objection from Yoo, as well as Defense Exhibits 5 and 8 through 15, with no objection from the Government.  However, the Government objected to admission into evidence of the remainder of Yoo's exhibits, and the Court reserved ruling on that issue. (*Id.*).  The Court also heard argument from the Government and counsel for Yoo for and against extradition.

## B.  Allegations against Yoo

The Complaint summarizes the allegations underlying Korea's charges against Yoo as follows.  Yoo is the son of Byung Eyn Yoo, the prominent founder and former leader of a religious group in Korea called the Evangelical Baptist Church (the "Church"). (Docket Nos. 2 ¶ 6a; 2-3 at 21, EX-YOO-00099).[2]  Yoo became the de facto leader of the Church in 2010. (Docket No. 2 ¶ 6a).  Yoo's family collectively controls a company called I-One-I Holdings ("I-One-I"), which in turn holds a controlling interest in a number of commercial entities. (Docket Nos. 2 ¶ 1.6b; 2-4 at 21-25, EX-YOO-S1-00021-25; *see also* Docket No. 2-8 at 4-5, EX-YOO-S5-00004-5).  Between January 2008 and March 2014, Yoo leveraged his family's power as business and religious leaders in Korea to take the assets of a number of these entities (the "Companies"). (Docket No. 2 ¶¶ 6-7).

Specifically, Yoo conspired with the chief executive officers ("CEOs") of the Companies to enter into sham contracts through which Yoo embezzled millions of dollars from the Companies to the detriment of their shareholders. (*Id.* ¶ 6).  To do so, Yoo used his stature in the Church, his connection with his father, and the overlapping leadership structure between the

---

[2] All citations refer to the ECF page numbers on the docket unless otherwise noted.  When available, the Court also provides the Bates page numbers associated with Korea's submissions, identified by the prefix "EX-YOO".

Companies and I-One-I to cause the executives to enter into contracts for fraudulent goods or services in exchange for payments to him or his private company, Key Solutions. (*Id.* ¶¶ 6c-e; *see also* Docket No. 2-3 at 21, EX-YOO-00099).  A number of executives of the various Companies with whom Yoo conspired are officers or directors of I-One-I, including Park Seung-il, who was a Director of I-One-I as well as Chonhaiji Co., Ltd., ("Chonhaiji"), and an auditor of Ahae. (Docket Nos. 2 ¶ 6c; 2-8 at 7, EX-YOO-S5-00007).   In addition, a number of these executives, as well as employees and shareholders of each Company, are followers of the Church. (Docket No. 2 ¶ 6c).  Yoo and his co-conspirators' embezzlement schemes took three forms: (1) pretextual and fraudulent trademark licensing agreements with the Companies; (2) pretextual and fraudulent agreements for business consulting services with the Companies; and (3) a scheme to cause the Companies to make advance payments in support of a photography exhibition by Yoo's father at inflated values. (*Id.* ¶ 6e).

Through these schemes, Yoo defrauded the Companies of over KRW 29 billion, causing their shareholders' investments to suffer because Yoo was plundering the assets of the companies in which they held an interest. (*Id.* ¶ 6g).  The details of these schemes, which make up seven counts of embezzlement, are described as follows. (*See generally id.* ¶ 7a-g).

## 1. Trademark Licensing Schemes

### i. Chonhaiji

In or around January 2008, Yoo conspired with Byeon Gi-chun, the CEO of Chonhaiji, to sign a contract requiring Chonhaiji to pay Yoo 1% to 5% of its revenue using the company's existing corporate name, which Yoo registered as a trademark even though the name had no brand value. (Docket Nos. 2 ¶ 7a; 2-3 at 5, 9, EX-YOO-00083, 87).  The payments under the contract were trademark royalty payments "in name only," and "actually" were "a means to

embezzle money from [Chonhaiji]." (Docket No. 2 ¶ 7a) (internal quotation marks omitted).  The payments continued until June 2010, totaling approximately KRW 1,235,426,711. (*Id.*).

## ii.  Ahae

In or around January 2009, Yoo conspired with Lee Jae-yeong, the CEO of Ahae Co. Ltd. ("Ahae"), to enter into a "sham" trademark licensing agreement requiring Ahae to pay .8% to 1.6% of its monthly revenue to Yoo in royalty payments for a trademark Yoo had previously registered. (Docket No. 2 ¶ 7b; *see also* Docket No. 2-3 at 5, 8-9, EX-YOO-00083, 86-87). However, Ahae had already been using the mark for approximately ten years before Yoo registered it and demanded the fee. (*See* Docket No. 2 ¶ 7b).  Moreover, the fee amount was not based on "common market pricing" and was "unilaterally" set by Yoo. (*Id.*).  The payments, which continued until December 2013, amounted to approximately KRW 5,346,311,045 in total. (*Id.*).

## iii.  Onnara Shopping

Also in or around January 2009, Yoo conspired with Lee Ho-seop, the CEO of Onnara Shopping Co., Ltd. ("Onnara Shopping"),[3] to sign an Exclusive License Contract (the "Exclusive License Contract"), which required the company to pay Yoo a percentage of its revenue as "purported compensation" for using its existing name, which Yoo registered as a trademark. (Docket Nos. 2 ¶ 7c; 2-3 at 23, EX-YOO-00101; 2-4 at 30, EX-YOO-S1-00030).  Again, Yoo unilaterally set the fee amount. (Docket No. 2 ¶ 7c).  Moreover, these payments were not in Onnara Shopping's financial interest, but rather, were "disguised as trademark royalties . . . to transfer . . . funds to Y[oo]'s family." (*Id.*) (internal quotation marks omitted).  Onnara Shopping

---

[3] In Korea's first supplemental submission, it clarified that its original request mistakenly identified Byeon Gi-chun as Onnara Shopping's CEO, instead of Lee Ho-seop. (Docket No. 2-4 at 30, EX-YOO-S1-00030).

made the payments until December 2011 and they amounted to approximately KRW 328,436,704. (*Id.*).

## 2.  Business Consulting Services Schemes

### i.  Semo

In or around March 2010, Yoo conspired with Go Chang-hwan, the CEO of Semo Co., Ltd. ("Semo"), to sign a Business Consulting Service Contract (the "Business Consulting Service Contract") pursuant to which Key Solutions promised to provide Semo with risk management advice. (Docket Nos. 2 ¶ 7d; 2-3 at 21-22, EX-YOO-00099-100).  The contract provided that in exchange, Semo would pay Key Solutions KRW 25,000,000 every month. (Docket No. 2 ¶ 7d).  However, Key Solutions only provided business consulting services in written form "once or twice per year," and the payments were made to Yoo's personal bank account. (*Id.*).  Go Chang-hwan and Park Seung-il, Yoo's associate, negotiated the contract terms, including this fee, without evaluating the company's need for business consulting services, comparing pricing estimates from other companies, or evaluating Key Solutions' expertise, past performance or reliability. (Docket Nos. 2 ¶ 7d; 2-3 at 12, EX-YOO-00090).  The payments continued until March 2014, amounting to approximately KRW 1,225,000. (Docket No. 2 ¶ 7d).

### ii.  Moreal Design

In or around April 2010, Yoo's sister, Yoo Chong Somena, and Ha Myeong-hwa – both CEOs of Moreal Design Inc. ("Moreal") – conspired with Yoo to sign a Consulting Service Contract (the "Consulting Service Contract") on behalf of Moreal, pursuant to which Key Solutions would provide management consulting, business valuation, marketing strategies, policy development and international training programs. (Docket Nos. 2 ¶ 7e; 2-3 at 22, EX-YOO-00100; 2-4 at 28-29, EX-YOO-S1-00028-29).  Although Moreal paid Key Solutions a

monthly fee until December 2013, the consulting services were never provided. (Docket No. 2 ¶ 7e).  The fees totaled approximately KRW 990,000,000. (*Id.*).

### iii. Chonhaiji

In or around February 2011, Yoo and Byeon Gi-chun of Chonhaiji conspired to pay Yoo fraudulent consulting fees instead of the trademark licensing fees under their original contract. (Docket Nos. 2 ¶ 7f; 2-3 at 10, EX-YOO-00088; *see supra* Section I.B.1.i.).  Byeon Gi-chun had "no choice" but to follow Yoo's instructions to do so. (Docket No. 2 ¶ 7f) (internal quotation marks omitted).  They "turned to consulting fees" because the trademark licensing fees were no longer tax deductible. (*Id.*) (internal quotation marks omitted).  These payments continued monthly until November 2011 and amounted to approximately KRW 200,000,000. (*Id.*).

### 3. Inflated Advanced Payments for Photography Exhibition

In or around 2013, Yoo coerced several of the Companies into funding an exhibition of his father's photographs, when it was not in their financial interest to do so, embezzling approximately KRW 19,862,077,987. (*See id.* ¶ 7g).  Yoo "ordered" these Companies to "purchas[e]" his father's "photographs through capital increase by consideration" or stock subscriptions, and the Companies had "no choice" but to comply because of his father's position. (*Id.*) (internal quotation marks omitted).  The Companies made the subject payments to a U.S.-based entity, Ahae Press Inc. ("Ahae Press"), of which Yoo was the CEO. (Docket Nos. 2 ¶ 7g; 2-3 at 10, EX-YOO-00088; 2-6 at 7-8, EX-YOO-S3-00007-08).  The Companies were not in the business of purchasing photographs – one sold dietary supplements, and one sold car parts – and they "had no idea about [Yoo's father's] works." (Docket No. 2 ¶ 7g) (internal quotation marks omitted).  The Companies also "didn't decide what works they would buy," and "follow[ed] what Yoo . . . told them to do." (*Id.*) (internal quotation marks omitted).

## II.  LEGAL STANDARDS

"In the United States, extradition is governed by the federal extradition statute." *Cheung v. United States*, 213 F.3d 82, 87 (2d Cir. 2000) (citing 18 U.S.C. §§ 3181–3196).  That statute provides that a magistrate judge may issue a warrant for the arrest of someone whose extradition is sought, so that the person charged may be brought before the Court "to the end that the evidence of criminality may be heard and considered." 18 U.S.C. § 3184.  If, on such hearing, a magistrate judge "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention," the magistrate judge "shall certify the same" to the Secretary of State.  *Id.*  "The judicial officer's inquiry is confined to the following: whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof." *Cheung*, 213 F.3d at 88 (citing *Lo Duca v. United States*, 93 F.3d 1100, 1103–04 (2d Cir. 1996)).

"An extradition hearing is not the occasion for an adjudication of guilt or innocence." *Melia v. United States*, 667 F.2d 300, 302 (2d Cir. 1981).  "Instead, it is 'essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation.'" *Lo Duca*, 93 F.3d at 1104 (quoting *Ward v. Rutherford*, 921 F.2d 286, 287 (D.C. Cir. 1990)).  "The judicial officer . . . 'thus performs an assignment in line with his or her accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense.'" *Lo Duca*, 93 F.3d at 1104 (quoting *Ward*, 921 F.2d at 287).

Neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure are applicable in extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3). Instead, admissibility is governed by 18 U.S.C. § 3190, which provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

Accordingly, hearsay evidence is admissible. *Melia*, 667 F.2d at 302.

## III. DISCUSSION

The three issues in dispute are whether (1) sufficient evidence exists for a finding of probable cause; (2) the Court has authority to deny extradition based on the running of the applicable statute of limitations; and (3) if the answer to the second question is yes, the charges brought by Korea are time-barred. For completeness, however, the Court addresses the relevant requirements in turn.

## A. Authority and Jurisdiction

The extradition statute authorizes proceedings to be conducted by "any magistrate judge authorized so to do by a court of the United States." 18 U.S.C. § 3184. In addition, Local Criminal Rule 59.1(b) specifically authorizes magistrate judges to exercise the jurisdiction set forth in 18 U.S.C. § 3184. Consequently, this Court has authority to conduct these proceedings. Furthermore, this Court has jurisdiction over Yoo, as he was located and arrested in the Southern District of New York. *See* 18 U.S.C. § 3184 (authorizing a magistrate judge to conduct extradition proceedings with respect to "any person found within his jurisdiction").

**B.  The Treaty**

The extradition statute provides for extradition in instances in which a treaty or convention is in force between the requesting State and the United States. *See* 18 U.S.C. § 3184. Here, the Government has submitted the Declaration of Tom Heinemann of the Department of State, which attests that there is a treaty in full force and effect between the United States and Korea, and a copy of the Treaty. (Docket No. 2-1 at 1, ¶ 2; 12-28).  Yoo does not challenge that the Treaty is in force.  Accordingly, this Court concludes that the Treaty is in full force and effect.

**C.  The Alleged Crime**

Yoo has been charged in Korea with seven counts of embezzlement, in violation of Article 355(1) of the Criminal Act and Article 3(1)(1) and 3(1)(2) of the Act on the Aggravated Punishment, Etc. of Specific Economic Crimes. (*See* Docket Nos. 2 ¶¶ 4-5; 2-3 at 1, 13-14, EX-YOO-00079, 91-92).  Article 2 of the Treaty provides for extradition based on an offense that is "punishable under the laws in both Contracting States by deprivation of liberty for a period of more than one year, or by a more severe penalty." Extradition Treaty art. 2(1) at 2.  The Treaty specifies that when determining whether an offense is extraditable, "the totality of the conduct alleged against the person whose extradition is sought shall be taken into account, and an offense shall be . . . extraditable": (a) "whether or not the laws [of both] . . . Contracting States place the offense within the same category of offenses or describe the offense by the same terminology;" (b) whether or not the relevant offenses of each State contain the same elements, as long as the offenses are "substantially analogous;" and (c) regardless of whether the relevant offense under U.S. law requires a showing of certain elements for the purpose of establishing jurisdiction in federal court. *See* Extradition Treaty art. 2(3)(a)-(c) at 2.

In construing such extradition treaty provisions – known as dual criminality requirements – the Supreme Court has held that "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).  When determining whether dual criminality exists, the extradition court "may look to federal law or the law of the state where the extradition proceeding is being held." *See In re Extradition of Sacirbegovic*, No. 03 CR. MISC. 01PAGE1, 2005 WL 107094, at *17 (S.D.N.Y. Jan. 19, 2005) (citing *Hu Yau-Leung v. Soscia*, 649 F.2d 914, 918 (2d Cir. 1981)).

Here, the relevant embezzlement charges are punishable by more than one year in prison in Korea. (Docket No. 2-3 at 13-14, EX-YOO-00091-92).  Moreover, Yoo's alleged taking of KRW 29 billion – which amounted to approximately $23 million on the date of the Complaint[4] – through various sham agreements and inflated fees, could be charged as a number of offenses punishable by more than one year in prison under New York state or U.S. federal law.  Under New York law, such conduct qualifies as larceny under Penal Law § 155.05(2)(a). *See* N.Y. Penal Law § 155.05(2)(a) (2021) ("Larceny includes a wrongful taking, obtaining or withholding of another's property, with the [requisite] intent prescribed in subdivision one . . . by . . . embezzlement . . . .").  Because this conduct involves property worth over $1,000, it could be charged as grand larceny in the fourth degree, a Class E felony, which is punishable by one to four years in prison. *See* N.Y. Penal Law §§ 70.00(1)-(3), 155.30(1)-(3).  Yoo's conduct could also be charged as wire fraud under 18 U.S.C. § 1343, which constitutes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

---

[4] (Docket No. 2 ¶ 6g).

representations, or promises," and is punishable by a maximum sentence of 20 years in prison. *See* 18 U.S.C. § 1343.

Larceny, embezzlement and fraud fall within the same category of crimes such that they satisfy dual criminality for purposes of extradition. *See In re Extradition of Sacirbegovic*, 2005 WL 107094, at *17. Moreover, both federal and state courts have found that evidence of conduct similar to Yoo's supports convictions for these crimes. *See, e.g.*, *United States v. Kelly*, No. 3:11-cr-192 (JCH), 2014 WL 3565957, at *3–5 (D. Conn. July 18, 2014) (finding sufficient evidence for wire fraud conviction based on, among other things, documentary evidence of fake leases bearing defendant's signature and contract addenda "showing purchase prices significantly less than those reported"); *People v. DiCarlo*, 741 N.Y.S.2d 508, 509 (1st Dep't 2002) (finding legally sufficient evidence for grand larceny conviction based on "fraudulent devices" that enabled defendants to "inflate[] the cost of renovating a building, thereby obtaining reimbursement in excess of their contractual entitlement"); *People v. Williams*, 673 N.Y.S.2d 113, 114 (1st Dep't 1998) (holding there was sufficient evidence for grand larceny conviction based on agreement to receive payment in exchange for certain business and payroll transmittal sheets containing "substantially inflat[ed]" services); *People v. Headley*, 951 N.Y.S.2d 317, 322– 27 (Sup. Ct. Kings Cnty. 2012), *opinion adhered to on reargument*, 960 N.Y.S.2d 51 (Sup. Ct. Kings Cnty. 2012) (collecting cases regarding larceny by false pretenses based on fraudulent takings via contractual relationships).

Accordingly, the Court finds that the crimes for which Yoo is charged are extraditable offenses within the terms of the Treaty.

**D. Probable Cause**

The first issue in dispute is whether Korea's submissions are sufficient to support a finding of probable cause. The Korean authorities obtained evidence from multiple witnesses,

including Park Seung-il, Byeon Gi-chun, Lee Seong-hwan, Lee Gang-se, Kim Chun-gyun, Lee Ho-seop, Go Chang-hwan, Jo Seon-ae, Park Hwa-sun and Ha Myeong-hwa. (*See generally* Docket Nos. 2-3–2-8; 27-1).  Yoo's counsel alleges that this evidence is insufficient to establish probable cause because the Korean authorities "grossly distorted" these witnesses' statements to Korean prosecutors by either (a) fabricating admissions that do not appear in the original transcripts of their interviews; or (b) omitting exculpatory statements from the Republic of Korea's submissions in support of extradition. (Docket No. 18 at 23).  Yoo's counsel further argues that in evaluating the sufficiency of Korea's submissions, the Court should also admit into evidence and consider various documents, including affidavits, consulting reports and agreements, that further exculpate Yoo and/or his alleged co-conspirators by showing that the relevant services or goods provided in each alleged scheme were legitimate. (*See id.* at 30-43; Docket No. 30 at 9-20).  The Government responds that Korea's evidence is sufficient to establish probable cause, and with the exception of the witness interview transcripts Yoo has submitted,[5] it would be improper for the Court to consider Yoo's proposed exhibits. (Docket Nos. 27 at 18-35; 38).

After reviewing the legal standards applicable to these issues, the Court addresses the evidence offered for and against each embezzlement charge in turn.  For the reasons set forth herein, the Court finds that there is probable cause for all seven counts.

## 1.  Applicable Law

Probable cause exists where "[t]he evidence presented . . . 'support[s] a reasonable belief that [the fugitive] was guilty of the crimes charged.'" *Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993) (quoting *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990) (hereinafter "*Ahmad II*")).

---

[5] The transcripts are listed as Defense Exhibits 5 and 8 through 15. (*See* Docket No. 38).

To determine whether there is probable cause, courts use a "flexible, common sense standard"

taking into account the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238

(1983). This standard permits a finding of probable cause based on "knowledge or reasonably

trustworthy information sufficient to warrant a person of reasonable caution in the belief that an

offense has been committed by the person to be arrested." *United States v. Howard*, 489 F.3d

484, 491 (2d Cir. 2007) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Such

information may be based on "unsworn statements of absent witnesses." *Collins*, 259 U.S. at

317. Because hearsay evidence is admissible, *Melia*, 667 F.2d at 302, courts conducting this

analysis must "closely examine the requesting country's submissions to ensure that any hearsay

bears sufficient indicia of reliability to establish probable cause." *In re Extradition of Ben–Dak*,

No. 06 Mag. 1540(GWG), 2008 WL 1307816, at *4 (S.D.N.Y. Apr. 11, 2008) (quoting *United

States v. Pena-Bencosme*, No. 05-M-1518 (SMG), 2006 WL 3290361, at *2 (E.D.N.Y. Nov. 13,

2006)). On the other hand, the Court need not delve into questions of the weight of the evidence

offered by the demanding country, *In re Extradition of Marzook*, 924 F. Supp. 565, 592

(S.D.N.Y. 1996), nor credibility, *United States v. Hunte*, No. 04-M-0721(SMG), 2006 WL

20773, at *6 (E.D.N.Y. Jan. 4, 2006), as those issues are reserved for trial. Indeed, the

extraditing magistrate judge's task is only to determine whether there is "competent legal

evidence which . . . would justify [the defendant's] apprehension and commitment for trial if the

crime had been committed in th[e] state." *Collins*, 259 U.S. at 315.

In addition, a defendant's right to present evidence in the context of an extradition

hearing is significantly limited. *See Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984).

The defendant "has no right to cross-examine witnesses or introduce evidence to rebut that of the

prosecutor." *Id.* (citing *Charlton v. Kelly*, 229 U.S. 447, 462 (1913)). He or she may introduce

"testimony which explains rather than contradicts the demanding country's proof," *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963), whose "intention is to afford [him or her] the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." *See In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978); *see also Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) (hereinafter "*Shapiro II*").

The distinction between these two categories is far from obvious.  However, the Supreme Court has explained that whereas "contradict[ory] evidence" "relat[ing] strictly to the defense" is inadmissible, a defendant's evidence may be admitted when it "might . . . explain[] ambiguities or doubtful elements in the *prima facie* case made against the defendant" – *i.e.*, probable cause – or other "matters referred to by the witnesses for the government." *See Collins*, 259 U.S. at 315–17 (quoting *Charlton*, 229 U.S. at 461) (finding that evidence offered in support of insanity defense was inadmissible because it did not relate to the issue of probable cause) (internal quotation marks omitted); *see also Shapiro II*, 478 F.2d at 905 (noting that an extraditee may only introduce evidence that "explain[s]" or "obliterate[s]," rather than contradicts, the government's proof); *In re Extradition of Berri*, No. 07-M-1205(VVP), 2008 WL 4239170, at *3 (E.D.N.Y. Sept. 11, 2008) (distinguishing between evidence that "seek[s] to cast a different light on the proof submitted in support of the extradition request by offering a compelling alternative view of the evidence," which is admissible, and "contradictory proof that [the extraditee] is innocent," which is inadmissible).  The extent to which explanatory evidence is received is subject to the extraditing court's discretion. *See In re Extradition of Sindona*, 450 F. Supp. at 685.  Furthermore, the defendant cannot use this exception to "turn the extradition hearing into a full trial on the merits." *Id.*

## 2. Trademark Licensing Schemes

### i. Chonhaiji

#### (a) Evidence in Support of Extradition

In support of its allegations regarding the Chonhaiji trademark scheme, Korea relies on statements from Park Seung-il, who ran the day-to-day operations of Key Solutions,[6] as well as Chonhaiji's former director and CEO, Byeon Gi-chun. (Docket Nos. 27 at 20-25; 2-4 at 30-31, EX-YOO-S1-00030-31).  According to Korea's submissions, Park Seung-il was found guilty for criminal charges in Korea for embezzling from the Yoo affiliate companies for the Yoo family's benefit via fraudulent trademark royalties as well as consulting fees. (Docket Nos. 27 at 20-21; 27-1 at 41-42).  Moreover, Park Seung-il told prosecutors that the "trademark royalties" paid by these entities to Yoo were mere "disguise[s]" and "in fact a means to transfer affiliates' funds to Y[oo]'s family,"[7] (Docket No. 2-7 at 9, EX-YOO-S4-00009), and admitted to "manag[ing] the funds of the Yoo . . . family . . .[,] as well as collecting funds from group affiliates in an illegal manner on the pretext of trademark fees, consulting fees, etc.," through Key Solutions, (Docket No. 27-1 at 59-60, 67).  Similarly, without objection from the Government, Yoo's counsel submitted a translated excerpt of Park Seung-il's May 8, 2014 interview with Korean prosecutors in which he stated that Key Solutions "collect[ed] funds from affiliated companies" – including Chonhaiji – "under the pretext of trademark fees, consulting fees, advisory fees, etc.," (Korean Interviews Binder, Tab E at 5, 18; Docket No. 38 at 2), that the trademark fees were "unnecessary" and "actually a way for . . . Yoo['s] family to take the funds of affiliates," (Korean Interviews Binder, Tab E at 21), and that he was responsible for managing that activity,

---

[6] The fact that Park Seung-il ran Key Solutions' day-to-day operations is not in dispute. (*See* Docket Nos. 18 at 23; 27 at 20).

[7] The full quotation from Korea's submission reads: "This is, disguised as trademark royalties, was in fact a means to transfer affiliates' funds to Y[oo]'s family." (Docket No. 2-7 at 9, EX-YOO-S4-00009).

(*id.* at 9).  He also reported that he did not make an independent assessment of the value of the subject trademarks and "just did what [Yoo's family] told [him] to do," which included transferring the money to Yoo's personal bank account. (*See id.* at 19-20, 22).

According to Korea's submissions, Byeon Gi-chun also told Korean prosecutors that he had "no . . . choice but to accept [Yoo's] request" to "offer money as trademark royalties" because of Yoo's father's position. (Docket Nos. 2-4 at 31, EX-YOO-S1-00031; *see also* Docket No. 2-7 at 10, EX-YOO-S4-00010).  When Chonhaiji executed the contract in 2008, Byeon was a director, managing accounting and personnel affairs, and became CEO in January 2011. (Docket Nos. 2-3 at 9, EX-YOO-00087; 27-1 at 74).[8]  He admitted that the payments under the contract were trademark royalty payments "in name only," and "actually" were "a means to embezzle money from Chonhaiji." (Docket No. 2-4 at 31, EX-YOO-S1-00031).  He also admitted that the trademark fees were not "not right," "way too much money," "something that doesn't make sense," and merely a "scheme to funnel the affiliates' funds to [the] Yoo . . . family" because the relevant trademark was worth little and Chonhaiji could have registered it without Yoo's aid. (*See* Docket No. 27-1 at 71-74).[9]  Like Park Seung-il, Byeon Gi-chun was found guilty in Korea for assisting in embezzling affiliate funds and transferring them to the Yoo family "in the name of" trademark royalties, advisory fees and consulting fees. (*Id.* at 38-40).

In further support of these statements, Korea has submitted account records showing regular payments from Chonhaiji to Key Solutions between January 2008 and June 2010. (*E.g.*, Docket No. 2-5 at 64-65, EX-YOO-S2-00064-65).

---

[8] *See also* Korean Interviews Binder, Tab H at 29-30, 32.

[9] Although they are translated slightly differently, interview excerpts submitted by Yoo largely corroborate these admissions. (*See* Korean Interviews Binder, Tab H at 31-33).  The only notable difference is that whereas Korea's version describes the Chonhaiji trademark operation as a "scheme to funnel . . . funds to [the] Yoo family," Yoo's version describes it as "actually a way for the Yoo . . . family to leak the funds of affiliates," (Korean Interviews Binder, Tab H at 32).

**(b) Yoo's Response**

Yoo alleges that there is insufficient probable cause for several reasons.  With regard to Park Seung-il's statements, Yoo contends that (1) the word "명목" in both versions of Park's interview was mistranslated; and (2) Park never told prosecutors that trademark royalties were "in fact a means to transfer affiliates' funds to Y[oo]'s family." (Docket Nos. 18 at 35-36; 30 at 11-12; 34 at 5-8; *see also* Docket No. 27-3 at 9, EX-YOO-S4-0009).  With regard to Byeon Gi-chun's statements, Yoo argues that (1) Byeon Gi-chun's admissions should be discounted because they were "fed" to him by Korean prosecutors; and (2) Byeon Gi-chun lacks sufficient personal knowledge of any trademark scheme because he was not made CEO until 2011, after the relevant trademark royalty payments ended. (Docket Nos. 18 at 37-38; 30 at 19).

In support of his first argument, Yoo offers affidavits of Jong-Min Jeon, a former judge in Korea, as well as Fran S. Yoon, a Korean/English interpreter with twenty years of experience, attesting that the word "명목" should have been translated as "for" instead of "under the pretext of."[10] (Docket Nos. 30 at 11; 30-1; 34 at 6-7; 34-2).  According to both affidavits, the word only means "under the pretext of" when it has a negative connotation. (*See* Docket Nos. 30-1 at 2; 34-2 at ¶¶ 5-7).  Therefore, Yoo contends, Park Seung-il's statements to Korean prosecutors do not incriminate Yoo because, absent any indication that the questions Park was asked had a negative connotation, he admitted to collecting money from affiliates "*for* trademark fees, consulting fees, etc.," rather than "*under the pretext of*" such fees. (Docket Nos. 30 at 11; 34 at 7-8) (emphasis added).  Yoo argues that this corrected translation corroborates Park's assertion that at the time of the trademark royalty payments, he did not believe that he was "collecting money illegally,"

---

[10] These affidavits are listed as Defense Exhibits 2 and 7. (Docket No. 38 at 1).

such that there is no probable cause for this charge. (Docket No. 30 at 11).  In addition, Yoo

argues that his own translation of Park's interview with prosecutors does not reflect that Park

admitted that the trademark royalties for various affiliates were a "disguise" and "in fact a means

to transfer affiliates' funds to Y[oo]'s family," even though that statement appears in Korea's

January 2018 submission.[11] (Docket No. 18 at 35; *compare* Korean Interviews Binder, Tab E,

*with* Docket No. 2-7 at 8-9, EX-YOO-S4-00008-9).  To support his objection regarding Byeon's

personal knowledge, Yoo offers corporate registration documents listing Byeon's start-date as

CEO of Chonhaiji as January 2011, arguing that this timing forecloses the possibility that Byeon

knew of any embezzlement occurring beforehand. (*See generally* Docket No. 18 at 38; Other

Companies' Documents Binder, Tab 12).  He also urges the Court to consider a "Registered

Trademark User Agreement (4)" between Yoo, Yoo Dae-gyun and Chonhaiji CEO Shin Jaejik

dated January 10, 2009, and Chonhaiji's logo photos. (*See* Other Companies' Documents Binder,

Tabs 11, 13).[12]

**(c)  Analysis**

     Even taking Yoo's exhibits into account, Korea's evidence is sufficient to establish

probable cause with respect to the alleged Chonhaiji trademark scheme.  The specific translation

issues identified by Yoo do not neutralize the serious incriminatory statements elsewhere in Park

Seung-il's interview affirming that the trademark fees were out of proportion to the value of the

trademarks, and therefore, a mechanism to transfer funds from affiliates such as Chonhaiji for the

Yoo family's personal use. (*See* Korean Interviews Binder, Tab E at 21).  Moreover, Yoo's

---

[11] Yoo further contends that because this statement is absent from Korea's June 2014 submission, it must have been fabricated. (Docket No. 18 at 35-36).

[12] The agreement, corporate registration documents and logo photos are listed as Defense Exhibits 60-62. (Docket No. 38 at 4-5).

objections regarding the foundation and/or reliability of Byeon Gi-chun's statements are insufficient to defeat probable cause at this procedural posture.

As an initial matter, the Court finds that the Jeon and Yoon affidavits are admissible as explanatory evidence of the proof offered by the Korean authorities, as well as the excerpts of Park Seung-il's May 8, 2014 interview that are already in evidence. *See Collins*, 259 U.S. at 315–17.  Because Park Seung-il's statements are themselves translated versions of interviews conducted in Korean, Yoo deserves a limited "opportunity to explain" the nuances of Park's original words from a Korean speaker's perspective, and to assist the Court in understanding any ambiguities in the Government's evidence supporting probable cause. *See generally In re Extradition of Marzook*, 924 F. Supp. at 592 n.18 (admitting extraditee's evidence for purpose of explaining alleged mistranslation of Arabic interviews, including affidavit of Arabic translator); *see also Shapiro II*, 478 F.2d at 904–05; *In re Extradition of Ben–Dak*, 2008 WL 1307816, at *7 (considering "documentary evidence partially quoted" in prosecutor's affidavits).

On the other hand, the Chonhaiji documents that Yoo offers to challenge Byeon Gi-chun's personal knowledge are not admissible because, even assuming that they "explain" rather than "contradict" Byeon's statements to prosecutors, any doubt that they shed on his reliability would not "obliterate" probable cause. *See Shapiro II*, 478 F.2d at 905 (quoting *Petrushansky*, 325 F.2d at 567) (internal quotation marks omitted); (*see also* Other Companies' Documents Binder, Tab 12).  Whereas accomplice statements must be "made with[] . . . personal knowledge" to support probable cause, the totality of Byeon Gi-chun's admissions contain sufficient detail of the interworkings of Chonhaiji and the Yoo corporate empire "to demonstrate that [he] was indeed [speak]ing from personal knowledge." *See In re Extradition of Tang Yee-Chun*, 674 F. Supp. 1058, 1062 (S.D.N.Y. 1987) (citing *Rice v. Ames*, 180 U.S. 371, 375–76

20

(1901)).  Moreover, the weight assigned to testimony of the Government's witnesses "is solely within the province of the extraditing magistrate [judge]," *Austin*, 5 F.3d at 605 (quoting *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir.), *cert. denied*, 479 U.S. 882 (1986)) (internal quotation marks omitted), and "evidence that merely raises doubts about the reliability of the government's proof is insufficient to defeat an extradition request," *Pena-Bencosme*, 2006 WL 3290361, at *9. Here, the evidence already before the Court provides adequate foundation for Byeon Gi-chun's admissions – regardless of the timing of his tenure as CEO – for the limited purpose of establishing probable cause.  Since Byeon Gi-chun told Korean prosecutors that he joined Chonhaiji in 2007, (Korean Interviews Binder, Tab H at 30), and "tacitly approve[d]" of the alleged scheme while acting as Executive Director, (Docket No. 27-1 at 73),[13] the fact that he was not promoted to CEO until after the subject trademark payments stopped does not foreclose the possibility that he had knowledge of their existence and purpose.  Moreover, to the extent that Yoo alleges that Byeon's statements are based on hearsay, that objection is inappropriate because "hearsay evidence, including multiple hearsay and the unsworn statements of absent witnesses, is admissible at extradition hearings and may support a finding of extraditability."[14] *See In re Extradition of Chan Hon-Ming*, No. 06-M-296(RLM), 2006 WL 3518239, at *8 (E.D.N.Y. Dec. 6, 2006) (citing *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980)).

---

[13] Yoo's translation of this admission has a similar implication.  According to Yoo's translation, Byeon was asked: "Is there any reason that you, the general managing director of [Chonhaiji] had no choice but to turn blind eyes to the fact that tens of millions of won was paid for the monthly trademark fee?" (Korean Interviews Binder, Tab H at 32).  Byeon responded, "It was unavoidable for me because [Yoo's father] had me join [Chonhaiji], and [the current CEO] tolerated this and paid the trademark fee as requested by the Yoo . . . family." (*Id.*).

[14] The Court will not admit the rest of the Chonhaiji documents submitted by Yoo relating to this charge, as he has not provided any information regarding what aspect of Korea's submissions they are meant to "explain," or how they would "obliterate" probable cause. *See Shapiro II*, 478 F.2d at 905 (quoting *Petrushansky*, 325 F.2d at 567) (internal quotation marks omitted); (Other Companies' Documents Binder, Tabs 11, 13; *see generally* Docket Nos. 18 at 37-38; 30 at 19).

Turning to whether the evidence before the Court supports probable cause, the totality of the circumstances support a reasonable belief that through Park Seung-il, Yoo used the subject trademark licensing agreement to embezzle funds from Chonhaiji from January 2008 to June 2010. *See Illinois*, 462 U.S. at 238; *Austin*, 5 F.3d at 605.  First, whatever meaning Yoo now attaches to Park Seung-il's use of the word "명목," (Docket Nos. 30 at 11-12; 34 at 5-8), the

Court is not convinced that this connotation is the only reasonable interpretation of his testimony.  The fact that Yoo's own translators initially interpreted this word to have the definition he now asserts is incorrect makes clear that its meaning is not straightforward, and there is little reason to believe that the linguistic analysis presented by Yoo is any more accurate than that submitted by Korea. *Cf. Pena-Bencosme*, 2006 WL 3290361, at *9; (Docket No. 30 at 11; Korean Interviews Binder, Tab E at 9).  For this reason, there is sufficient evidence to believe that Park Seung-il indeed meant that he assisted in collecting money from affiliates "under the pretext of" trademark, consulting and advisory fees. (Korean Interviews Binder, Tab E at 9). Yoo may challenge this interpretation of Park Seung-il's testimony before a factfinder in Korea, which will have greater insight into these subtleties than this Court.

Furthermore, even taking into account any ambiguity in the word "명목," the rest of

Park's statements to prosecutors are sufficient to establish probable cause because they convey that under Yoo's direction, Park facilitated a sham trademark agreement whose only purpose was to extract money from Chonhaiji for the Yoo family's benefit.  The same is true with regard to the "disguised as trademark royalties" admission that Yoo argues never took place. (Docket Nos. 18 at 35-36; 2-7 at 9, EX-YOO-S4-00009).  According to both parties' submissions, Park expressly admitted, in sum and substance, to "illegally collecting money and managing funds

from affiliated companies,"[15] (Korean Interviews Binder, Tab E at 9; *see also* Docket No. 27-1 at 59), and that the trademark fees were "unnecessary[ily]" high and "actually a way for the Yoo . . . family to take the funds of affiliates," (Korean Interviews Binder, Tab E at 21; *see also* Docket No. 27-1 at 68-69).  Park further admitted that he assumed "responsib[ility] for the overall management of the Y[oo] family's slush fund." (Korean Interviews Binder, Tab E at 25; *see also* Docket No. 27-1 at 69-70).  In addition, the excerpts of Park's interview provided by Yoo himself reflect that per Yoo's instructions, Park received and managed the funds through Yoo's personal bank account. (Korean Interviews Binder, Tab E at 10, 22).  Therefore, regardless of the semantic disparities noted above, the rest of Park's statements are sufficiently incriminating to support a charge against Yoo for this alleged scheme.[16] *See In re Extradition of Marzook*, 924 F. Supp. at 592 (finding probable cause despite "*de minimis*" semantic differences in translations of witness testimony offered as explanatory evidence) (emphasis in original).

---

[15] Although Park initially stated that he did not "think that [he] was collecting money illegally," upon further questioning, he admitted that "looking back on it . . . [he] collected those funds illegally." (Korean Interviews Binder, Tab E at 9; *see also* Docket No. 27-1 at 59-60).

[16] Yoo's complaint that the "disguised as trademark royalties" quotation did not appear in Korea's original submission or the underlying interview transcript is well-taken. (Docket Nos. 18 at 35-36; 2-7 at 9, EX-YOO-S4-00009).  Upon its initial review, the semantic disparities between the excerpts submitted by Korea and Yoo gave the Court pause.  However, Korea has explained that its earlier submissions were "summari[es of] . . . testimony for better understanding of readers[,] without intend[ing] to mislead." (Docket No. 27-1 at 38).  In similar contexts, courts have held that absent specific evidence of a deliberate intent to mislead, partial omission of witness statements in an extradition request is not reason to question the credibility of the requesting State's submissions. *See, e.g.*, *In re Extradition of Vukcevic*, No. 95CRIM.MISC.1P.1, 1995 WL 675493, at *9 ("The Swiss Government has no obligation under the Treaty to supply the entire transcript of the Mutapcic arraignments, and it may choose to edit those portions not relevant to the current extradition application.").  Furthermore, the requesting State need not submit exact quotations; as long as the State identifies its sources of information, summaries of hearsay statements by relevant witnesses in an affidavit of a foreign official "are admissible and may be sufficient to warrant a finding of probable cause." *See Pena-Bencosme*, 2006 WL 3290361, at *9; *see also United States v. Samuels*, No. 08-MJ-445 (RLM), 2009 WL 367578, at *7 (E.D.N.Y. Feb. 10, 2009).  Here, where the Korean submissions contain sworn statements attesting to the accuracy of the information contained therein by the prosecutors who collected it, and identifying the specific witnesses who provided such information, the Court is entitled to accept the witnesses' statements as true. *See Samuels*, 2009 WL 367578, at *7.  The Court is cognizant of the inherent difficulty in rendering exact English-language translations, and finds that taken as a whole, the summaries and excerpts of Park's interview provided by Korea sufficiently align with Yoo's version to support a finding of probable cause. *See In re Extradition of Marzook*, 924 F. Supp. at 592.

Even on its own, Park Seung-il's personal involvement in managing Yoo's finances per Yoo's direct orders gives his testimony "significant weight." *See In re Extradition of Vukcevic*, No. 95CRIM.MISC.1P.1, 1995 WL 675493, at *8 (S.D.N.Y. Nov. 14, 1995).  It is well-established that in extradition proceedings, a single "[a]ccomplice['s] testimony, whether corroborated or not, is competent evidence to support a finding of probable cause." *Id.*; *see also Ahmad v. Wigen*, 726 F. Supp. 389, 400 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) (hereinafter "*Ahmad I*") ("As a matter of law, accomplice testimony is sufficient even without corroboration to demonstrate probable cause to certify the accused for extradition.").  Such evidence based on firsthand knowledge is "particular[ly] importan[t] in extradition cases where all the alleged criminal activity occurred in a distant country." *See In re Extradition of Vukcevic*, 1995 WL 675493, at *8 (quoting *Eain v. Wilkes*, 641 F.2d 504, 510 (7th Cir. 1981)).  Park Seung-il's statements are especially reliable in light of the fact that they also constitute admissions against his own penal interest, which ultimately led to a conviction for charges similar to Yoo's.[17] *See In re Extradition of Atta*, No. 87-0551-M, 1988 WL 66866, at *5 (E.D.N.Y. June 17, 1988).

In addition, "[w]here accomplice testimony is corroborated by other reliable evidence, it will, *a fortiori*, support a finding of probable cause." *Ahmad I*, 726 F. Supp. at 400.  Although it

---

[17] The Court, however, cannot consider the specific factual findings of the Korean courts that convicted Park Seung-il or Byeon Gi-chun, (*see* Docket No. 27-1 at 38-39; 41-42), because the evidence supporting those conclusions has not been provided.  Courts within this District have declined to rely on such findings by foreign courts as substantive evidence in its own right supporting probable cause. *See, e.g.*, *In re Extradition of Ribaudo*, No. 00 CRIM.MISC.1PG.(KN, 2004 WL 213021, at *5–7 (S.D.N.Y. Feb. 3, 2004) (finding evidence insufficient to support probable cause where "[n]one of the documents concerning [extraditee] that are mentioned" by appellate decision attached to requesting State's submission had been "presented to th[e] Court"); *In re Extradition of Ernst*, No. 97 CRIM.MISC.1 PG.22, 1998 WL 395267, at *10 (S.D.N.Y. July 14, 1998) (hereinafter "*In re Extradition of Ernst II*") (finding no probable cause based on decision by Zurich Supreme Court that "d[id] not, for the most part, describe the evidence on which its decision is based").  Absent disclosure of the foreign court's evidentiary sources, the extraditing court cannot "make the required independent determination as to whether probable cause exists." *See In re Extradition of Ernst II*, 1998 WL 395267, at *10.

24

is unclear how direct of a role Byeon Gi-chun played in facilitating the alleged Chonhaiji trademark scheme while serving as a director, his confirmation that (1) the company had used the Chonhaiji mark before Yoo registered it in 2007; (2) the mark was not worth the agreed-upon fees; (3) the fees were paid pursuant to the "trademark right holder['s]" request; and (4) the fees were "actually a way" to enrich the Yoos, is consistent with Park's statements. (Korean Interviews Binder, Tab H at 30-33; *see also* Docket Nos. 2-7 at 10-11, EX-YOO-S4-00010-11; 27-1 at 71-74). Both witnesses' statements are also consistent with the account records provided by the Korean government showing regular payments from Chonhaiji to Key Solutions between January 2008 and June 2010, in accordance with Korea's allegations. (Docket No. 2-5 at 64-65, EX-YOO-S2-00064-65). These objective records, combined with the two witness statements expressly implicating Yoo, constitute sufficient evidence to support a finding of probable cause. *See Germany v. United States*, No. 06 CV 01201(DLI), 2007 WL 2581894, at *8 (E.D.N.Y. Sept. 5, 2007) (finding probable cause where "[e]ach witness testified that Petitioner was the head of a global cocaine conspiracy"); *In re Extradition of Neto*, No. 00 CRIM.MISC.1THK., 1999 WL 627426, at *3–4 (S.D.N.Y. Feb. 3, 2004) (concluding there was probable cause based on, among other things, wiretap records and hearsay testimony of convicted co-conspirators).

The Court finds Yoo's remaining arguments with regard to the alleged Chonhaiji trademark scheme meritless. (Docket Nos. 18 at 37-38; 30 at 19). As demonstrated by Yoo's own submissions, Korean prosecutors gained much relevant information from Byeon Gi-chun through open-ended questions to which Byeon responded in full sentences, in his own words. (*E.g.*, Korean Interviews Binder, Tab H at 29-32). Even if the prosecutors "fed words" to Byeon at some moments in his interview, it is completely permissible to use leading questions to establish probable cause. *See United States v. Torres*, No. 93 Cr. 673 (KMW), 1994 WL 48820,

at *4 (S.D.N.Y. Feb. 16, 1994), *aff'd*, 48 F.3d 1214 (2d Cir. 1994), (citing *United States v. Weiss*, 752 F.2d 777, 786 (2d Cir. 1985)); (Docket No. 18 at 37).  Furthermore, Byeon Gi-chun's responses contain sufficiently detailed information to establish personal knowledge of the alleged scheme, and therefore, support probable cause, even if they are partially based on what others told him. *See In re Extradition of Tang Yee-Chun*, 674 F. Supp. at 1062; *see also In re Extradition of Neto*, 1999 WL 627426, at *4 (finding that witness statements containing multiple hearsay were sufficiently reliable to support extradition based on consistency with other evidence and because witnesses were "in a position to have received reliable information" from others). Yoo may explore any gaps or inconsistencies in Byeon Gi-chun's knowledge at a full trial in Korea, which may ultimately lead to a finding that he is innocent. *See In re Extradition of Sindona*, 450 F. Supp. at 690.  However, that exercise is inappropriate at this stage, and in light of the multiple sources implicating Yoo, there is probable cause to support this charge. *See id.*

## ii.  Ahae

### (a) Evidence in Support of Extradition

In support of its allegations regarding the Ahae trademark scheme, in addition to Park Seung-il's statements noted above, Korea relies on statements from Lee Seong-hwan and Lee Gang-se, Ahae's former CEOs. (Docket Nos. 2-4 at 29-30, EX-YOO-S1-00029-30; 2-7 at 20, 24-25, EX-YOO-S4-00020, 00024-25; 27 at 20-25).  According to Korea's submissions, Park Seung-il specifically confirmed that in 2009:

> Y[oo] . . . ordered [him] to receive 1.6% of revenue from Ahae as a royalty payment for its trademark, so [he] told Lee Seong-hwan, the CEO of Ahae, that [they] should follow the order of Y[oo] [due to his father's position].  [They] signed a contract and the company paid trademark royalties.  The royalty payment was decided not

> based on a general way of estimation [or common market pricing], but based on Y[oo]'s unilateral direction.[18]

(*See* Docket Nos. 2-4 at 29-30, EX-YOO-S1-00029-30; 2-7 at 8-9, EX-YOO-S4-00008-9).  In turn, Lee Seong-hwan told prosecutors that although company staff "created" the "Ahae" trademark in 1998, "Yoo . . . , through Park . . . , made a directive to pay trademark royalties, saying that he registered it in 2009." (Docket No. 2-7 at 9, EX-YOO-S4-00009).  Due to Yoo's father's position, "it was hard not to follow [Yoo's] words so we couldn't help but pay the fees." (*Id.*).  Furthermore, Lee Gang-se, who acted as co-CEO alongside of Lee Seong-hwan between July 2009 and May 2012, admitted that "paying [Yoo] that much in royalties was unnecessary." (*Id.* at 20, 24, EX-YOO-S4-00020, 00024).  He asserted that he complained about the price to Ahae's auditor, but was told that "there was nothing he could do because it was the management's decision." (*Id.* at 24-25, EX-YOO-S4-00024-25).  Korea has also submitted records of bank transactions between Ahae and Key Solutions reflecting payments made pursuant to the subject contract between January 2009 and December 2013. (*E.g.*, Docket No. 2-5 at 59-61, EX-YOO-S2-00059-61).

**(b) Yoo's Response**

In addition to the above-mentioned semantic objections to Park Seung-il's statements, Yoo responds that the subject trademark agreement was legitimate because "there was not a ten-year period when the company used the Ahae name without making payments." (Docket No. 18 at 35; *see also* Docket No. 30 at 18).  In other words, Yoo applied to register the "Ahae" mark in March 1998, *before* the company took that name in September 1998, and well-before the 2009 agreement that forms the basis of the relevant charge. (*See* Docket No. 18 at 35; *see also* Other

---

[18] This summary is supported by multiple portions of Yoo's transcription of Park's interview. (*See* Korean Interviews Binder, Tab E at 12-14).

Companies' Documents Binder, Tab 1 at 1, 8; Docket No. 2 ¶ 7.b).  Moreover, Yoo and Ahae entered into a trademark licensing agreement permitting Yoo to use the relevant mark as early as 2001, and again for an increased fee in 2009. (Docket No. 18 at 35; *see also* Other Companies' Documents Binder, Tabs 2-4).  In support of these contentions, Yoo has submitted Ahae's corporate and trademark registration documents, the contracts reflecting these transactions, and a "product photo."[19] (*See* Other Companies' Documents Binder, Tabs 1-5).

Yoo also claims that an excerpted translation of Lee Seong-hwan's interview does not support Korea's allegations because it does not establish that Ahae staff created the company's mark in 1998, or reflect that Lee Seong-hwan admitted that the relevant contract was signed under pressure from the Yoo family. (Docket Nos. 30 at 17-18; 30-4; *see also* Docket Nos. 2-7 at 9, EX-YOO-S4-00009; 2-4 at 29-30, EX-YOO-S1-00029-30).  Rather, in Yoo's words, according to the translation, Lee Seong-hwan told prosecutors that "many staff members favored Ahae Co. for the company's name and the name was eventually chosen." (Docket Nos. 30 at 17-18; 30-4 at 5).  Moreover, there are no statements in the excerpt mentioning the status of the Yoo family as a reason why Lee Seong-hwan felt compelled to sign the agreement. (*See* Docket Nos. 30 at 17-18).

**(c)  Analysis**

As with Chonhaiji, there is probable cause for the alleged Ahae trademark scheme, even considering Yoo's exhibits that "explain" the evidence submitted by Korea. *See Collins*, 259 U.S. at 315–16.  In light of the consistent evidence that (1) the name "Ahae" was adopted in or about 1998, years before any trademark licensing agreement with Yoo; (2) Yoo did not own or create the subject mark; and (3) the royalty payments were disproportionate to the mark's value,

---

[19] These documents are listed as Defense Exhibits 50-54. (Docket No. 38 at 4).

Yoo's rebuttal evidence regarding the specific timing of the subject licensing transaction is ineffective. (*See* Other Documents Binder, Tab 1; Docket Nos. 2-7 at 9, 20, 24, EX-YOO-S4-00009, 00020, 00024; 30-4 at 5-6).  Although the Court is disquieted by some discrepancies in the Government's proof identified by Yoo, such doubts are insufficient to overcome the totality of the rest of the evidence against him at this stage. *See Illinois*, 462 U.S. at 238.

In arriving at this conclusion, the Court admits as explanatory evidence Ahae's corporate and trademark registration documents, as well as the 2009 trademark licensing agreements between Ahae and Yoo that form the basis of the Ahae trademark scheme in the complaint. *See Shapiro II*, 478 F.2d at 905; (Other Documents Binder, Tabs 1, 3-4; Docket No. 2 ¶ 7.b).  As Korea relies on witness statements that expressly reference the company's inception, the creation and registration of its mark, and the agreements at issue, these exhibits are admissible for the purpose of explaining any inconsistencies or doubtful elements in the Government's affirmative proof. *See Collins*, 259 U.S. at 315–16.  In addition, rather than contradicting the Government's assertions, the corporate and trademark registration documents "cast a different light" on the Government's proof by clarifying that Yoo applied for the Ahae trademark registration before the company was officially established in 1998, and the registration was completed a few months thereafter, in December 1998. *See In re Extradition of Berri*, 2008 WL 4239170, at *3.

On the other hand, the 2001 trademark licensing agreement is not admissible because it represents defensive evidence containing wholly new facts meant to establish that the subject trademark fees were part of a legitimate business relationship between Ahae and Key Solutions – *i.e.*, that Yoo is innocent. *See Collins*, 259 U.S. at 315–16; (Other Companies' Documents Binder, Tab 2).  Even if it were not contradictory, this agreement is insufficient to "negat[e] a showing of probable cause." *See In re Extradition of Sindona*, 450 F. Supp. at 685.  The mere

fact that the relevant trademark payments started earlier and at a lower price than alleged does not defeat the heart of Korea's claims, corroborated by multiple witnesses, that the subject fees were higher than appropriate and therefore a mechanism to enrich the Yoos.[20] *See id.*; (Docket Nos. 2-7 at 9, EX-YOO-S4-00020, 24; Korean Interviews Binder, Tab E at 21).

Considering the exhibits in evidence, the Court finds that Korea has provided enough support for its allegations against Yoo to satisfy the low threshold for probable cause. *See generally United States v. DiNapoli*, 8 F.3d 909, 915 (2d Cir. 1993).  In addition to his admissions that he helped Yoo use exorbitant trademark royalties to embezzle affiliate funds, *see supra* Section III.D.2.i.(a), Park Seung-il specifically told prosecutors that Yoo ordered him to carry out the subject trademark licensing agreement with Ahae and that the fee was not based on market pricing. (*See* Docket Nos. 2-4 at 29-30, EX-YOO-S1-00029-30; 2-7 at 8-9, EX-YOO-S4-00008-9).  Furthermore, Lee Gang-se admitted that "paying [Yoo] that much in royalties was unnecessary." (Docket No. 2-7 at 20, 24, EX-YOO-S4-00020, 24).  And according to Yoo's own submissions, Lee Seong-hwan also stated that the "price" was "too much" and "decided by Yoo." (Docket No. 30-4 at 5).  Taking these statements together, along with the bank records tracking the relevant payments directly to Yoo, there is sufficiently consistent evidence to support a finding of probable cause for Yoo's involvement in the alleged scheme. *See In re Extradition of Atta*, 1988 WL 66866, at *5.

That said, the Court is struck by certain significant discrepancies between Yoo's version of Lee Seong-hwan's interview and the summaries provided by Korea. (*Compare* Docket No. 30-4, *with* Docket Nos. 2-7 at 9, EX-YOO-S4-00009, *and* 2-4 at 30, EX-YOO-S1-00030).  Unlike the *de minimis* translation issues revealed by Park Seung-il's testimony, here there are

---

[20] Similarly, the "product photo" is inadmissible because Yoo does not explain how it clarifies any of Korea's evidence and it does not undermine the core allegations. *See id.*; (Other Companies' Documents Binder, Tab 5).

substantive gaps between the discussions reflected in Yoo and and Korean prosecutors' renditions of them. *Cf. In re Extradition of Marzook*, 924 F. Supp. at 592.  For example, a review of the entire interview excerpt submitted by Yoo demonstrates that Lee Seong-hwan did not tell prosecutors that Ahae staff "create[d]" the company's name in 1998, as Korea's submissions attest. (*See* Docket Nos. 2-4 at 30, EX-YOO-S1-00030; 2-7 at 9, EX-YOO-S4-00009).  To the contrary, he explained that although many staff supported it as the company name, "Ahae" is Yoo's father's pen name and was also the name of another company before it was chosen for Lee Seong-hwan's new company in 1998. (*See* Docket No. 30-4 at 5-6).  Therefore, his testimony simply does not reflect that the "trademark . . . was created . . . by company staff." (Docket No. 2-4 at 30, EX-YOO-S1-00030).  Additionally, the transcript is devoid of any indication that Lee Seong-hwan told prosecutors that the licensing transaction was prompted by pressure to obey Yoo's family, as Korea indicates. (Docket No. 2-7 at 9, EX-YOO-S4-00009).  Rather, when asked why he entered into the contract, Lee Seong-hwan only explained that he and Yoo discussed potential consulting services that were never provided. (Docket No. 30-4 at 4-5).  The Government has not explained nor fully acknowledged these discrepancies.[21]

These discrepancies are concerning because rather than merely reflecting poor word choice or grammar, they call into question the legitimacy of Korea's proof.  However, this concern is insufficient to defeat probable cause. *See Pena-Bencosme*, 2006 WL 3290361, at *9.  Even assuming that Ahae's mark existed and was used by affiliated companies before becoming the company's name in 1998, such facts do not change Korea's core allegation – which is

---

[21] The Court notes that the transcript provided by Yoo is only an excerpt, and is dated one day earlier than the interview date noted in Korea's submission. (*Compare* Docket Nos. 2-4 at 30, EX-YOO-S1-00030 *and* 2-7 at 9, EX-YOO-S4-00009, *with* Docket No. 30-4 at 3).  Although it is possible that Lee Seong-hwan gave prosecutors the relevant information supporting the summaries in other portions of his interview that were not transcribed, there is no indication in this record that that is the case.

supported by multiple witness statements, and consistent with objective records – that Yoo

forced Ahae to pay an exorbitant fee for a trademark that Yoo did not create. *See In re*

*Extradition of Atta*, 1988 WL 66866, at *5.  Similarly, irrespective of Lee Seong-hwan's

statements, Park Seung-il's testimony that Yoo used his father's position to cause Ahae and other

executives to accede to his demands stands unchallenged. (Docket Nos. 2-4 at 29-30, EX-YOO-

S1-00029-30; 2-7 at 8-9, EX-YOO-S4-00008-9).  Under such circumstances, "evidence that

merely raises doubts about the reliability of the government's proof is insufficient to defeat an

extradition request." *See Pena-Bencosme*, 2006 WL 3290361, at *9; *see also Desautels v. United*

*States*, 782 F. Supp. 942, 944 (D. Vt. 1991), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (finding that

inconsistency in affidavit was insufficient to defeat probable cause given "other evidence before

the magistrate [judge]" establishing that petitioner was guilty of the crimes charged).  The factual

disputes regarding the origin of the Ahae mark, as well as the inconsistencies between various

witnesses' testimony, are issues most appropriate for trial in Korea, when Korea's witnesses are

actually present. *See Shapiro II*, 478 F.2d at 905.

### iii.  Onnara Shopping

### (a) Evidence in Support of Extradition

Korea proffers statements from Park Seung-il and Kim Chun-gyun, an auditor for I-One-

I, as evidence supporting its charge involving Onnara Shopping. (Docket Nos. 2-3 at 9, 11-12,

EX-YOO-00087, 89-90; 2-7 at 10, EX-YOO-S4-00010; 27-1 at 50-57, 67-70).  In addition to

telling prosecutors that as a general matter, trademark royalties for affiliate entities were an

illegitimate means for enriching the Yoo family, *see supra* Section III.D.2.i.(a), according to

Korea's submissions, Park Seung-il specifically admitted that "a total of KRW 9,050,174,540

was provided by . . . Onnara [Shopping and other affiliates] . . . in the name of trademark royalty

. . . through Key Solutions between around January 30, 2009 and around December 31, 2013,"

(Docket No. 27-1 at 67; *see also* Docket No. 2-7 at 10, EX-YOO-S4-00010).  Further, Park

Seung-il "never evaluated" the value of Onnara Shopping's trademarks and simply followed

Yoo's instructions.[22]  (*See* Docket No. 27-1 at 68).  Kim Chun-gyun also told prosecutors that

"[u]nder the order of Y[oo] . . . , each affiliate company raises funds using many excuses and the

slush funds are transferred to the Y[oo] . . . family via I-One-I Holdings Co., Ltd.  They also

restructure the corporate governance so as to better obtain such funds. . . . Every year, affiliate

companies pay certain percentages of their revenues to . . . Key Solution [sic] . . . for consulting

and the use of trademark [sic]."[23]  (Docket No. 2-3 at 11-12, EX-YOO-00089-90; *see also* Docket

No. 27-1 at 55-56).  Korea also asserts that, as with Chonhaiji and Ahae, bank records from the

relevant period further corroborate its claims by showing monthly payments from Onnara

Shopping directly to Key Solutions between January 2009 and December 2011. (*E.g.*, Docket

No. 2-5 at 62-63, EX-YOO-S2-00062-63).

     In further support of this charge, Korea claims that Lee Ho-seop, the former CEO of

Onnara Shopping, failed to respond to a summons and "the fact that no actual activities under the

trademark license contract between Key Solution and other companies were found prove that

Onnara Shopping made the royalty payments to Y[oo] . . . although there was no use of

trademark in a normal way." (Docket No. 2-4 at 30, EX-YOO-S1-00030).  In its supplemental

---

[22] Yoo's translation of Park Seung-il's May 2014 interview corroborates this testimony. (*See* Korean Interviews Binder, Tab E at 20).

[23] Kim Chun-gyun stated that he became aware that "contracts and payments between affiliates w[ere] intended to establish slush funds of [sic] the Y[oo] family" when he and a colleague at his audit group realized that Yoo's family received funds from another affiliate company and certain of its trademark rights were registered under Yoo and his brother's names. (Docket No. 27-1 at 55-56).  The affiliate's management "knew about this," and when Kim Chun-gyun and his colleague reported the issue as potential embezzlement, the management expressed "that they could not help it." (*Id.*).  According to Yoo's rendition of the interview, although Kim Chun-gyun admitted that he could "not be sure" that "all other affiliates sen[t] money to the Yoo . . . family" in the same way, he "guess[ed]" that "it must have been the same for those companies." (Korean Interviews Binder, Tab D at 13).  Kim also explained that I-One-I held multiple "meeting[s]" with the "presidents of [each of the] affiliated companies . . . to exchange opinions with each other on how to raise funds" for Yoo's father. (*Id.* at 8-9).

submission dated November 25, 2020, Korea also states that "the trademarks registered by Y[oo]'s family do not have any brand awareness in Korea and nothing was paid for the creation and registration of the trademarks other than a registration fee of KRW 300,000.  Hence, the trademarks have no objective value." (Docket No. 27-1 at 71).

**(b) Yoo's Response**

Yoo argues that the Government's evidence is deficient because on top of the semantic disparities in Park Seung-il's statements, Kim Chun-gyun's statements are based on hearsay rather than the requisite personal knowledge to incriminate Yoo. (Docket No. 18 at 27-28, 36-37).  In support of this contention, Yoo alleges that according to the translated version of Kim Chun-gyun's interview, Kim Chun-gyun did not work for Onnara Shopping or any of the affiliated companies. (*See id.*; *see also* Korean Interviews Binder, Tab D at 4).  Although Kim Chun-gyun explained to prosecutors that he was an auditor for a number of entities in the Yoo corporate empire, including I-One-I, he did not audit Onnara Shopping. (*See* Docket No. 18 at 27-28, 36-37; Korean Interviews Binder, Tab D at 4-5).  Moreover, when asked whether he "kn[e]w about the [Yoo] family's corporate ownership structure," he stated that he "d[id] not know the exact corporate structure, but [was] also a member of the same sect" and "[b]ecause there [we]re many members of the congregation around [him], [he] kn[e]w a little about the bottom line." (Korean Interviews Binder, Tab D at 5).  Yoo maintains that this testimony is insufficient to render Kim Chun-gyun a competent witness because "repeating" what other church members said "is unreliable proof." (Docket No. 18 at 28).

Furthermore, Yoo contends that Korea cannot rely on Lee Ho-seop's failure to appear or its own conclusory assertions regarding Onnara Shopping's brand value as affirmative evidence of Yoo's guilt. (Docket No. 18 at 37).  Yoo also asserts that the subject contract between Onnara Shopping and Yoo was signed in 2001, not 2009, and "[t]hree of the four trademarks" covered

by the contract "were for logos that are used on popular Onnara products." (*Id.* at 36 n.25).  To support this last contention, Yoo offers into evidence Onnara Shopping's corporate and trademark registration documents; the relevant contract, dated December 1, 2001; and "[p]roduct and logo photos" of the relevant marks.[24] (Other Companies' Documents Binder, Tabs 6-9).

**(c)  Analysis**

Although there is less evidence to support the alleged Onnara Shopping scheme than the other two alleged trademark schemes, Korea's submissions meet the minimal requirements of probable cause for this charge as well. *See DiNapoli*, 8 F.3d at 915.  Kim Chun-gyun's testimony and Park Seung-il's accomplice statements, combined with the bank records of Onnara Shopping's payments to Yoo, provide just enough detail and objective evidence to support a reasonable belief that Yoo used his family's stature to cause Onnara Shopping to pay him spurious trademark fees that were not in the company's financial interest. *See Austin*, 5 F.3d at 605.  The Court agrees that certain of Korea's submissions must be disregarded, (*see* Docket No. 18 at 37), but excision of these materials does not negate the sufficiency of the rest of Korea's evidence.

Before addressing probable cause, the Court admits as explanatory evidence the 2001 trademark licensing agreement, (Other Companies' Documents Binder, Tab 8), but excludes the remaining documents offered by Yoo, (*id.*, Tabs 6-7, 9).  Given that Korea alleges that Yoo used a fraudulent trademark licensing agreement with Onnara Shopping to extract funds for his family, the Court permits Yoo to use that contract as explanatory evidence clarifying the specifics of the subject transaction. *See Collins*, 259 U.S. at 315–16.  However, neither the product photographs nor registration documents are admissible because they do not explain any

---

[24] These documents are listed as Defense Exhibits 55-58. (Docket No. 38 at 4).

aspect of Korea's proof with respect to this charge. *See id.* Although Yoo seems to argue that the photographs demonstrate that the relevant trademarks were "used on popular Onnara products," and therefore, were worth the fees set by the contract, (*see* Docket No. 18 at 36 n.25), evidence offered for this purpose – to contradict the allegations of the requesting State – is inadmissible in an extradition proceeding.[25] *See Shapiro II*, 478 F.2d at 905.

Even considering Yoo's explanatory evidence, the Court finds that Korea's submissions provide enough evidence in support of its allegation that through Park Seung-il, Yoo utilized the subject licensing agreement with Onnara Shopping to enrich his family by charging excessive fees, as he allegedly did with Chonhaiji and Ahae. (*See* Docket No. 2 ¶ 7c). Although Korea has no statements from Lee Ho-seop, by both parties' accounts, Park Seung-il – who, as Yoo's admitted accomplice, had firsthand knowledge of Yoo's operation – named Onnara Shopping as one of the affiliates from whom Yoo received money "in the name of trademark royalties," (Docket No. 27-1 at 67; *see also* Korean Interviews Binder, Tab E at 18),[26] and asserted that such royalties were "unnecessary" and a mechanism to take affiliates' funds to benefit the Yoo family's own wealth, (Korean Interviews Binder, Tab H at 21; *see also* Docket No. 2-7 at 9, EX-YOO-S4-00009). Park also confirmed that he received all of his instructions to facilitate such transactions from Yoo, and that looking back, the operation was illegal. (Docket No. 27-1 at 59-60, 67; Korean Interviews Binder, Tab E at 8-9). Therefore, Park Seung-il's testimony is sufficient on its own to establish probable cause. *See Ahmad I*, 726 F. Supp. at 400. It is also consistent with the account records provided by Korea, the subject contract implicating Yoo, and

---

[25] Yoo does not cite any specific purpose for introducing the registration documents. (*See generally id.*; Other Companies Documents Binder, Tabs 6-7). Therefore, the Court denies this request as well.

[26] Per Yoo's translation of this portion of the interview, Park Seung-il stated that the money was paid "as trademark fees." (Korean Interviews Binder, Tab E at 18).

Kim Chun-gyun's testimony, which generally affirms that based on his knowledge of the Yoo family's corporate structure, he was aware that affiliates of I-One-I generated funds for the Yoo family using fraudulent means. *See id.*; (Other Companies' Documents Binder, Tab 8; Docket Nos. 2-3 at 11-12, EX-YOO-00089-90; 2-5 at 62-63, EX-YOO-S2-00062-63; 27-1 at 55-56; *supra* n.23).

The fact that Kim Chun-gyun's testimony may be based on hearsay is of no moment in this extradition proceeding. (*See* Docket No. 18 at 27-28, 36-37).  Although "the hearsay character of a statement is . . . a factor in determining [its] weight," *In re Extradition of Neto*, 1999 WL 627426, at *4 (quoting *U.S. ex rel. Klein v. Mulligan*, 50 F.2d 687, 688 (2d Cir. 1931)) (internal quotation marks omitted), the weight "accorded [to a witness's] testimony is solely within the province of the extraditing magistrate [judge]," *Austin*, 5 F.3d at 605.  Here, Kim Chun-gyun's testimony is not exceptionally detailed, but it is explicit about the origins of his knowledge and consistent with Park Seung-il's statements regarding the purpose of the Onnara Shopping transaction and similar trademark licensing agreements spearheaded by Yoo. *See In re Extradition of Neto*, 1999 WL 627426, at *6 (finding sufficient evidence for probable cause though witness statement "contain[ed] multiple hearsay," as it was "sufficiently corroborated to be reliable"); (Docket No. 2-3 at 11-12, EX-YOO-00089-90; *see also* Docket Nos. 27-1 at 55-56, 67, 71-74; 2-7 at 10, EX-YOO-S4-00010).  Furthermore, as an auditor for I-One-I and some of its affiliates, it is conceivable that Kim Chun-gyun would have at least some knowledge of the Yoo family's business structure, and in turn, the way that it handles its finances. (*See* Korean Interviews Binder, Tab D at 5, 8, 12-13).

Korea's conclusory assertions regarding the relevant trademarks' brand value and Onnara Shopping's questionable use of them cannot support probable cause, because Korea does not

identify the source(s) for these statements. *See In re Extradition of Ben–Dak*, 2008 WL 1307816, at *6. Indeed, to establish probable cause, "the materials submitted [in support of an extradition request] must set forth facts from which both the reliability of the source and probable cause can be inferred." *In re Extradition of Ernst II*, 1998 WL 395267, at *9; *see also Illinois*, 462 U.S. at 239 ("[T]he magistrate [judge's] . . . action cannot be a mere ratification of the bare conclusions of others."). Furthermore, Lee Ho-seop's refusal to potentially incriminate himself by partaking in a consensual encounter with the Korean authorities is a far cry from meeting this standard. *Cf. Tom v. Voida*, 963 F.2d 952, 959 n.8 (7th Cir. 1992).

These arguments do not negate the sufficiency of the rest of Korea's submissions, however. Therefore, the Court finds that there is probable cause for the alleged Onnara Shopping trademark scheme as well.

**3. Business Consulting Services Schemes**

**i. Semo**

**(a) Evidence in Support of Extradition**

Korea proffers statements from five witnesses in support of its charge regarding the alleged consulting scheme involving Semo. These witnesses include Park Seung-il; Kim Gyu-seok, the leader of Semo's Management Support Team; Go Chang-hwan, Semo's former CEO; Jo Seon-ae, a Semo employee; and Kim Chun-gyun, identified above as an auditor of a number of affiliate companies. (*See generally* Docket No. 27-1 at 43-60).

In essence, Korea argues that Park Seung-il's statements are corroborated by the testimony of multiple Semo insiders. (*See id.*). According to Korea, in addition to his statements above regarding the illegitimate consulting fees charged to various affiliates, (*see supra* Section III.D.2.i.(a)), Park Seung-il asserted that there were only three to five Key Solutions employees including himself, none of whom had "any academic or professional background in business

consulting," (Docket Nos. 2-4 at 26, EX-YOO-S1-00026; 27-1 at 58).  Furthermore, the

consulting services the company provided were "mere translations of general information that

could be obtained through the internet." (Docket No. 27-1 at 44).  Korea also asserts that

according to Park Seung-il, "[a] business consulting fee was merely a means to collect money

illegally from Semo, Moreal Design, and Chonhaiji.  [Yoo] was behind all this." (Docket No. 2-4

at 26, EX-YOO-S1-00026).  In line with this testimony, both Kim Gyu-seok and Go Chang-

hwan told Korean prosecutors that despite being paid a large consulting fee each month, Yoo

provided business consulting services only once or twice a year,[27] (Docket Nos. 2-2 at 27, EX-

YOO-S1-00027; 27-1 at 43-44, 47; 2-7 at 6, EX-YOO-S4-00006), and Go Chang-hwan asserted

that Semo paid KRW 250,000,000 in 2010 and KRW 300,000,000 in 2011, 2012 and 2013 to

Key Solutions at Park Seung-il's "request." (Docket No. 2-3 at 12, EX-YOO-00090; *see also*

Docket No. 27-1 at 45).  Go Chang-hwan further explained that he and Park Seung-il "decided

on [the subject] business consulting fee without having estimates from other companies

compared and taking into account Key Solution[s]'[] level of expertise, performance records,

reliability, and the need for two-way consulting service, etc." (Docket Nos. 2-3 at 12, EX-YOO-

00090; 2-4 at 26-27, EX-YOO-S1-00026-27; *see also* Docket No. 27-1 at 45).  He also admitted

that "the quality of the report was not enough given that an expensive fee was paid on a regular

basis and you could get that quality of service if you hire another company." (Docket No. 2-7 at

6, EX-YOO-S4-00006; *see also* Docket No. 27-1 at 47).  Go Chang-hwan was convicted in

---

[27] In its submission dated June 24, 2014, Korea also quoted Kim Gyu-seok as stating that Yoo's business consulting services "could have easily [been] found on the internet." (Docket No. 2-2, EX-YOO-S1-00027).  After Yoo argued in his opening brief that neither quotation appeared in his actual interview, Korea clarified that the "internet" statement was misattributed, and was actually made by Park Seung-il. (Docket Nos. 27 at 26; 27-1 at 44).  Because Yoo concedes that "[w]hat Kim said may be true," and does not question the accuracy of the "internet" quotation from Park Seung-il, (Docket No. 30 at 12), the Court does not address this initial discrepancy.

Korea for paying excessive consulting fees to Yoo through Semo. (Docket Nos. 2-7 at 7, EX-YOO-S4-00007; 27-1 at 39-40, 48).

As additional support, Korea points to statements from Jo Seon-ae that Semo paid "excessive" consulting fees to Key Solutions every year, even though its operating profits were in decline and its liabilities surpassed its equity. (Docket No. 2-3 at 12, EX-YOO-00090; *see also* Docket No. 27-1 at 49).  Jo Seon-ae also asserted that Semo's performance did not improve after receiving such consulting fees, yet Semo did not replace Key Solutions, which was "far from normal." (Docket No. 2-3 at 12, EX-YOO-00090; *see* aso Docket No. 27-1 at 49-50).

Finally, Korea relies on Kim Chun-gyun's testimony that generally, the I-One-I affiliates raised "slush funds" for Yoo's family. (Docket No. 27-1 at 55; *see supra* Section III.D.2.iii.(a)). According to Korea's submissions, Kim Chun-gyun also stated that the consulting "advice" provided by Key Solutions to various affiliates was "suspicious since there were no consulting reports." (Docket No. 27-1 at 55, 57).  Korea provided bank account records showing monthly payments from Semo to Yoo between March 2010 and March 2014, amounting to KRW 1,225,000,000. (*E.g.*, Docket No. 2-5 at 54-55, EX-YOO-S2-00054-55).

**(b) Yoo's Response**

Yoo mounts several objections to Korea's evidence regarding Semo, challenging Korea's summaries and translations of various witnesses' statements as well as its witnesses' reliability. (Docket Nos. 18 at 24-31; 30 at 13).  He also complains that Korea failed to disclose certain exculpatory statements by Go Chang-hwan and Kim Gyu-seok, and offers additional documents and affidavits from non-witnesses to demonstrate that the services Key Solutions provided to Semo were legitimate. (Docket Nos. 18 at 25-27, 30-31; 30 at 12 n.9).

With regard to Park Seung-il's statements, in addition to the objections noted in Section III.D.2.i.(b), Yoo argues that this testimony cannot support probable cause because Park Seung-il

never told prosecutors that "[a] business consulting fee was merely a means to collect money illegally from Semo, Moreal Design, and Chonhaiji" and that Yoo was "behind all this." (Docket No. 18 at 28; *see also* Docket No. 2-4 at 26, EX-YOO-S1-00026).  Indeed, these words are absent from Yoo's translated excerpt of Park Seung-il's interview. (Korean Interviews Binder, Tab E).  Yoo also argues that contrary to Korea's representations in its initial submissions, (Docket No. 2-4 at 26, EX-YOO-S1-00026), rather than three employees, Park Seung-il told prosecutors that Key Solutions employed three to five employees, and that Korea's misstatement "exemplifies [its] penchant to misquote to make [its] case." (Docket No. 18 at 28-29).

Also according to Yoo, Kim Gyu-seok's interview transcript reflects that he made certain denials not noted by Korea's submissions that further undermine probable cause. (Docket No. 18 at 24-25).  For example, Kim Gyu-seok told Korean prosecutors that he did not know whether or not the services Key Solutions purportedly provided were worth the subject consulting fees. (Docket No. 18 at 24-25; Korean Interviews Binder, Tab A at 20).   In addition to the interview excerpt reflecting this testimony, (Korean Interviews Binder, Tab A at 20), Yoo urges the Court to consider an affidavit from Kim Gyu-seok stating he never told Korean prosecutors that Key Solutions' consultation services were "not valuable," (Docket No. 18 at 25; Semo Documents Binder, Tab 1).[28]  The affidavit also describes approximately ten written reports as well as services Key Solutions provided to Semo such as assistance in obtaining FDA and Hazard Analysis and Critical Control Point ("HACCP") certifications, "which were necessary for exporting [Semo's] products." (Semo Documents Binder, Tab 1).

With regard to Go Chang-hwan's statements, Yoo complains that Korea's summaries constitute improper quotations of this witness's testimony. (Docket No. 18 at 25-26).

---

[28] This affidavit is listed as Defense Exhibit 16. (Docket No. 38 at 2).

Specifically, Yoo claims that the transcript of Go Chang-hwan's April 24, 2014 interview does not reflect that "[he] and P[ark] Seung-il decided on [Key Solutions'] business consulting fee without having estimates from other companies compared and taking into account Key Solution's level of expertise, performance records, reliability, and the need for two-way consulting service, etc.," as claimed by Korea in its initial submissions. (Docket No. 18 at 25; *see also* Docket Nos. 2-3 at 12, EX-YOO-00090; 2-4 at 26-27, EX-YOO-S1-00026-27; 2-7 at 6, EX-YOO-S4-00006).  Similarly, Go Chang-hwan's May 6, 2014 interview does not indicate that he told prosecutors that Key Solutions only "provided business consulting services once or twice a year in writing," or that the services could have been "outsourced" and "did not deserve a large amount of consulting fees." (Docket No. 18 at 25-26; *see also* Docket Nos. 2-4 at 27, EX-YOO-S1-00027; 2-7 at 6, EX-YOO-S4-00006; Korean Interviews Binder, Tab B).  Yoo further asserts that Korea improperly failed to disclose that in his interview on the same date, Go Chang-hwan told prosecutors that Key Solutions provided Semo advice regarding HACCP and "data related to the US FDA," and refused to admit that "excessive consulting fees were paid without any justifiable reasons." (*See* Docket No. 18 at 26; Korean Interviews Binder, Tab B at 16-17).  Yoo directs the Court to a translation of Go Chang-hwan's interview from May 6, 2014, but has not submitted a translation of the April 24, 2014 interview. (Docket No. 18 at 25-26; Korean Interviews Binder, Tab B).

Yoo makes similar arguments regarding Korea's rendition of Jo Seon-ae's testimony. (Docket No. 18 at 26-27).  For example, rather than telling prosecutors that the subject consulting fees were "excessive" or "far from normal," as Korea's submissions reflect, Yoo's version of Jo Seon-ae's interview transcript shows that she said the fees may have been "a little too much," but "did not think about it seriously." (Docket No. 18 at 26-27; *compare* Docket No.

2-3 at 12, EX-YOO-00090, *with* Korean Interviews Binder, Tab C at 8-9).  Yoo further claims

that because Jo Seon-ae identified herself as an "office worker," she had little knowledge of the

relevant consulting contract. (Docket No. 18 at 26-27; Korean Interviews Binder, Tab C at 7).  In

support of this argument, Yoo offers into evidence an affidavit from Jo Seon-ae stating that she

lacks knowledge of what services were provided under the contract and whether the fees were

reasonable.[29] (Docket No. 18 at 27; Semo Documents Binder, Tab 2).

As to Kim Chun-gyun's statements, Yoo launches arguments that are identical to those

addressed in Sections III.D.2.iii.(b) and (c).

To buttress all of these arguments, Yoo offers affidavits from Hwang Ho-eun, another

employee of Semo, as well as Ryu Geun-ha, an employee of Key Solutions who worked with

Semo. (*See* Docket No. 18 at 30-31; Semo Documents Binder, Tabs 3-4).  Hwang Ho-eun's

affidavit states that Yoo suggested improvements to Semo's production processes, which

increased Semo's profitability by KRW 10 billion and increased its product yield by eleven

percent. (Docket No. 30 at 12; Semo Documents Binder, Tab 3).  According to Ryu Geun-ha's

affidavit, Ryu worked long hours preparing consulting reports regarding Semo's business

strategy as well as FDA and HACCP certification processes to enable Semo to export its

products. (Semo Documents Binder, Tab 4).  To further demonstrate that Key Solutions provided

valuable services to Semo, Yoo has also submitted six consulting reports, a Consulting Schedule

Management Table, and fifteen reports reflecting minutes of meetings conducted by Key

Solutions between 2012 and 2013.[30] (*See* Docket No. 18 at 30-31; Semo Documents Binder Tabs

5-26).

---

[29] The affidavit is listed as Defense Exhibit 17. (Docket No. 38 at 2).

[30] The Hwang Ho-eun and Ryu Geun-ha affidavits are listed as Defense Exhibits 18 and 19, and the additional
consulting documents and meeting minutes are listed as Defense Exhibits 20 through 41. (Docket No. 38 at 2-3).

**(c) Analysis**

As with the alleged trademark schemes, Korea's submissions present sufficient evidence to indict Yoo based on a reasonable belief that he orchestrated the alleged Semo scheme. *See Austin*, 5 F.3d at 605.  The additional affidavits and materials submitted by Yoo largely constitute contradictory evidence that the Court cannot take into account. *See Shapiro II*, 478 F.2d at 905.  The rest of his objections raise factual disputes and relatively minor translation and reliability issues that do not overcome the consistent evidence supporting the Government's case at this early stage. *See Pena-Bencosme*, 2006 WL 3290361, at *9; *In re Extradition of Marzook*, 924 F. Supp. at 592.  Likewise, because Korea had no obligation to produce its witnesses' exculpatory statements, its failure to do so has no impact on probable cause. *See Pena-Bencosme*, 2006 WL 3290361, at *9.

Turning first to the evidence Yoo offers, none of the documents are admissible because they constitute either impermissible contradictory evidence or evidence that is not legally sufficient to rebut probable cause. *See Shapiro II*, 478 F.2d at 905; *In re Extradition of Sindona*, 450 F. Supp. at 685. The Court cannot admit the affidavits of Kim Gyu-seok, Hwang Ho-eun or Ryu Geun-ha, as they all contradict rather than explain the testimony of the other government witnesses that the consulting services provided to Semo were not worth the fees charged. *See Collins*, 259 U.S. at 315–16.  For example, Kim Gyu-seok's affidavit asserts that for various reasons, the subject fees were "reasonable," and that he "never told the prosecutors that the consultation services Key Solutions provided were not valuable," (Semo Documents Binder, Tab 1), but this evidence simply offers an alternative set of facts that stand at odds with the heart of Park Seung-il's testimony, (Docket Nos. 2-4 at 26, EX-YOO-S1-00026; 27-1 at 44, 58).  The same is true with regard to Hwang Ho-eun's attestations that Key Solutions improved Semo's business and Ryu Geun-ha's assertions regarding the hard work he put into serving Semo on

44

behalf of Key Solutions, and the other documents submitted by Yoo meant to evidence the

legitimacy of this work. (*See* Semo Documents Binder, Tabs 3-26).  To the extent Yoo argues

that these documents are admissible to explain the FDA and HAACP-related work referred to by

Go Chang-hwan, (*see* Docket Nos. 27-1 at 46-47; 30 at 10), they cannot obliterate probable

cause because they merely create factual inconsistencies regarding the quality and professional

expertise behind this work that cannot be evaluated without a trial. *See Shapiro v. Ferrandina*,

355 F. Supp. 563, 572 (S.D.N.Y.), *modified and aff'd*, 478 F.2d 894 (2d Cir. 1973) (hereinafter

"*Shapiro I*"), ("The improbability or the vagueness of testimony may destroy the probability of

guilt, but the tendering of witnesses who testify to an opposite version of the facts does not.").

Although this evidence may prove Yoo's innocence at the end of the day, it is not appropriate for

the Court to consider it at this stage.

Nor will the Court accept as evidence Jo Seon-ae's affidavit regarding her limited

knowledge of the subject agreement with Semo. (*See* Semo Documents Binder, Tab 2).  The

affidavit constitutes "evidence that merely raises doubts about the reliability of the government's

proof," and therefore, is not admissible because it does not obliterate probable cause. *See Pena-*
*Bencosme*, 2006 WL 3290361, at *9.  In any event, Yoo's excerpted version of Jo Seon-ae's

interview, which is already in evidence, clearly shows that Jo Seon-ae explicitly denied

knowledge of what services were covered by the agreement as well as the circumstances under

which it negotiated. (*See* Korean Interviews Binder, Tab C at 7).  Viewed in this context, any

evidentiary value the affidavit would provide is minimal.

Now considering Korea's evidence, the discrepancies noted by Yoo in Park Seung-il's

statements are not sufficient to overcome probable cause. (Docket No. 18 at 28-29). Yoo is

correct that the exact words "[a] business consulting fee was merely a means to collect money

45

illegally from Semo, Moreal Design, and Chonhaiji.  [Yoo] was behind all this," do not appear in his translation of Park Seung-il's interview. (*Compare* Docket No. 2-4 at 26, EX-YOO-S1-00026, *with* Korean Interviews Binder, Tab E).  However, as explained, Korea was entitled to submit summaries of statements made by witnesses to the authorities for these proceedings, and Yoo's own rendition of the interview is ultimately consistent with the summary to which he objects. *See Samuels*, 2009 WL 367578, at *7; *In re Extradition of Marzook*, 924 F. Supp. at 592; (Korean Interviews Binder, Tab E at 8-10, 15).  In addition, although Park Seung-il technically told prosecutors that Key Solutions employed between three and five people – not three people – this misquotation is not sufficiently material to overcome the rest of the incriminating statements made by this and numerous other witnesses. (*Compare* Docket No. 2-4 at 26, EX-YOO-S1-00026, *with* Korean Interviews Binder, Tab E at 6 *and* Docket No. 27-1 at 58).

The discrepancies Yoo highlights in Go Chang-hwan's statements are *de minimis* as well. *See In re Extradition of Marzook*, 924 F. Supp. at 592.  Although Yoo claims that Korea misstated the contents of this witness's April 24, 2014 interview, the Court cannot meaningfully evaluate this assertion because Yoo has not submitted a translation of that proceeding for comparison purposes, as he has for other interviews. (*See generally* Korean Interviews Binder).  In response to this claim, Korea submitted certified interview excerpts from that date containing the exact content Yoo disputes. (*See* Docket No. 27-1 at 44-46).  The Court will consider these statements as true because the Court is permitted to accept such certified submissions from a requesting State as true, and Yoo has offered no reason beyond his conclusory assertions to do otherwise. *See Samuels*, 2009 WL 367578, at *7.  With regard to the May 6, 2014 interview, a close reading of Yoo and Korea's versions side-by-side reveals that Go Chang-hwan admitted, in

sum and substance, that the Semo consulting arrangement was not worth regular consulting fees, and could have been "outsource[d]" on a "one-time" basis. (*Compare* Korean Interviews Binder, Tab B at 16-17, *with* Docket No. 27-1 at 46-47).  Therefore, Yoo's complaint boils down to mere semantic disparities between inculpatory statements that ultimately confirm Park Seung-il and Kim Gyu-seok's testimony. *See In re Extradition of Marzook*, 924 F. Supp. at 592.

Taken together, the bank records submitted by Korea and the statements from these three witnesses establish a reasonable belief that, as with the alleged trademark schemes, Yoo used the Semo consulting agreement to enrich his family without providing Semo legitimate consulting services as promised under the contract. *See Austin*, 5 F.3d at 605.  This evidence is also consistent with Kim Chun-gyun's statements, which, as explained above, are sufficiently reliable at this early stage of the proceedings. *See supra* Section III.D.2.iii.(c).  Therefore, regardless of the weight afforded to Jo Seon-ae's statements, there is probable cause for the Semo charge. *See Pena-Bencosme*, 2006 WL 3290361, at *9; *Ahmad I*, 726 F. Supp. at 400.  This is so even though some portions of Go Chang-hwan and Kim Gyu-seok's testimony may be seen as exculpatory and/or inconsistent with their other statements. (*See* Docket No. 18 at 24-26).  Those discrepancies raise mere factual issues that must be resolved at trial. *See Samuels*, 2009 WL 367578, at *7 (finding that internal inconsistencies and inconsistencies between multiple witness statements were insufficient to defeat probable cause).

As to Korea's initial failure to disclose Go Chang-hwan and Kim Gyu-seok's exculpatory statements, district courts in this Circuit have declined to deny extradition on these grounds alone. *See, e.g.*, *Pena-Bencosme*, 2007 WL 3231978, at *6; *Sacirbey v. Guccione*, No. 05 Cv. 2949(BSJ)(FM), 2006 WL 2585561, at *14 (S.D.N.Y. Sept. 7, 2006), *rev'd on other grounds*, 589 F.3d 52 (2d Cir. 2009); *Hunte*, 2006 WL 20773, at *16.  Ordinarily, under *Brady v.*

*Maryland*, 373 U.S. 83 (1963) (hereinafter "*Brady*"), the Government's "suppression . . . of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87.  *Brady*'s purpose is to "protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *United States v. Bagley*, 473 U.S. 667, 675 (1985)).  However, as the Second Circuit has reiterated numerous times, an extradition proceeding "is not the occasion for adjudication of guilt or innocence," *Melia*, 667 F.2d at 302, and thus, is patently not a trial on the merits where a criminal defendant may cross-examine government witnesses or introduce rebuttal evidence. *See Messina*, 728 F.2d at 80. Therefore, "the evidentiary rules of criminal litigation are not applicable." *Id.* (rejecting contention that extradition proceedings were "defective" where court declined to grant motion for discovery of tapes of incriminating telephone calls); *see also Collins*, 252 U.S. at 316 (noting that "wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal").  Taking this logic one step further, courts in other jurisdictions have explained that there are no *Brady* obligations in an extradition proceeding precisely because, absent a full trial on the merits by the extraditing court, the extraditee has no rights that trigger *Brady*'s underlying purpose. *See, e.g.*, *Montemayor Seguy v. United States*, 329 F. Supp. 2d 883, 888 (S.D. Tex. 2004); *In re Extradition of Singh*, 123 F.R.D. 108, 112 (D.N.J. 1987); *see also Merino v. U.S. Marshal*, 326 F.2d 5, 13 (9th Cir. 1963).

The Court is persuaded that in light of Yoo's limited rights at this procedural posture, the Korean government was not required to apprise Yoo or this Court of the statements about which Yoo complains. *See Messina*, 728 F.2d at 80.  Moreover, even if *Brady* were applicable, the record indicates that rather than suppressing potential exculpatory evidence, the Government

and/or the Korean authorities ultimately cooperated with Yoo's requests for information. *See* 373 U.S. at 87. Yoo has submitted extensive translations of the original interviews conducted by Korean authorities, indicating that he was able to obtain material in Korea's possession that he deemed important to his case. (*See generally* Korean Interviews Binder). Therefore, the fact that this information was not included in Korea's initial submissions does not undermine the Court's finding of probable cause. *See Pena-Bencosme*, 2007 WL 3231978, at *6.

### ii. Moreal

### (a) Evidence in Support of Extradition

In support of the alleged Moreal consulting scheme, Korea proffers the above statements from Park Seung-il and Kim Chun-gyun as well as additional statements from Park Hwa-sun and Ha Myeong-hwa. (*See generally* Docket Nos. 2-4 at 28-29, EX-YOO-S1-00028-29; 2-7 at 7-8, EX-YOO-S4-00007-08; 27 at 21; 27-1 at 60-63; *see supra* Sections III.D.2.i.(a), iii.(a), 3.i.(a)).

Korea asserts that despite working for Moreal, neither of these additional witnesses were aware of any consulting services provided under the company's contract with Key Solutions. According to Korea's submissions, Park Hwa-sun, a Moreal employee in charge of accounting, stated that she did not know whether Key Solutions provided consulting services to Moreal, even though she was aware that a contract for such services was signed. (Docket No. 2-4 at 29, EX-YOO-S1-00029; *see also* Docket Nos. 2-7 at 8, EX-YOO-S4-00008; 27-1 at 62-63). In addition, Ha Myeong-hwa, a CEO of Moreal, told prosecutors that Yoo and Yoo Chong Somena, Ha's co-CEO and Yoo's sister, signed a business consulting contract whereby Yoo was paid KRW 20,000,000 every month even though "there is no official record showing that the company received consulting services." (Docket No. 2-4 at 28-29, EX-YOO-S1-00028-29; *see also* Docket Nos. 2-7 at 7-8, EX-YOO-S4-00007-08; 27-1 at 61). Ha Myeong-hwa also "concluded the contract at the amount P[ark] Seung-il demanded," and was told by Park Seung-il that Key

Solutions would provide a "design training program," but did not know whether such training was ever provided because she was "not in charge of design." (Docket No. 27-1 at 61).  Ha Myeong-hwa further asserted that rather than making an independent determination regarding whether Moreal needed consulting services, whether Key Solutions was capable of providing them, whether the price under the contract was appropriate, and whether the contract was being implemented properly, she "just followed" Yoo Chong Somena's lead. (Docket No. 27-1 at 61-62).

Korea also notes that Yoo Chong Somena, who "effectively managed Moreal," was convicted in Korea for her role in facilitating the provision of fraudulent consulting services to Moreal in exchange for exhorbitant fees through the same agreement. (Docket No. 27-1 at 64-65).  The adjudicating court found that Key Solutions "unilaterally" set the price under the contract, and that Moreal did not compare it to quotations from other consulting firms or "substantively review the needs of consulting services on a regular basis." (*Id.* at 64).  The arrangement was "done through P[ark] Seung-il upon the request of Key Solutions." (*Id.*).  In addition, whereas Moreal paid Key Solutions KRW 280,000,000 in 2012, its net profits that year were only 44,000,000. (*Id.* at 65).  The court reasoned that such an "expenditure [wa]s beyond comprehension," in light of the fact that the consulting reports provided to Moreal were prepared "ex post facto" by individuals with no background in consulting. (*See id.*).  The court concluded that "the reports were merely a formality to receive consulting fees." (*Id.*).

Korea further asserts that its claims are corroborated by account records from April 2010 to December 2013 showing regular monthly payments from Moreal's account into Yoo's account. (*E.g.*, Docket No. 2-5 at 56-58, EX-YOO-S2-00056-58).  It has also submitted copies of

two "Consulting Service Contract[s]," dated April 1 and December 31, 2010 and listing Yoo as Key Solutions' CEO. (Docket No. 2-8 at 22-29, EX-YOO-S5-00022-28).

**(b) Yoo's Response**

In addition to disputing Korea's summaries of their testimony, Yoo faults Korea for inordinately relying on Ha Myeong-hwa and Park Hwa-sun when both witnesses had limited personal knowledge of the consulting services provided under the relevant agreement. (Docket Nos. 18 at 31-33; 30 at 13-16). To support this contention, in addition to excerpts of their interviews, Yoo refers the Court to affidavits submitted by each witness denying knowledge of any fraudulent consulting services.[31] (*See* Moreal Documents Binder, Tabs 1-2; Korean Interviews Binder, Tabs F-G; *see also* Docket Nos. 18 at 31-33; 30 at 13-16). Yoo argues that Ha Myeong-hwa's uncertainty during her interview regarding whether Moreal received any consulting services from Key Solutions is explained by the fact that Ha was a doctor in charge of Moreal's medical division, and naturally would not have knowledge of the consulting services provided to Moreal's design division. (*See* Docket Nos. 18 at 31-32; 30 at 15-16). Furthermore, during her interview, "[she] was never asked about the work that Keith Yoo himself did for Moreal's medical products division," (Docket No. 30 at 15; *see also* Korean Interviews Binder, Tab F), and her affidavit lists numerous services that Key Solutions and Yoo personally provided to Moreal's medical division, which Yoo believes refute Korea's allegation that no consulting was provided under the contract, (Docket No. 30 at 15-16; 18 at 32; *see also* Moreal Documents Binder, Tab 1 ¶ 3). As to Park Hwa-sun, Yoo maintains that as explained in her affidavit, because she was an accounting employee, "she was not in a position to know what consulting services were provided." (Docket No. 18 at 33; *see also* Moreal Documents Binder, Tab 2).

---

[31] These affidavits are listed as Defense Exhibits 42 and 43. (Docket No. 38 at 3).

With regard to Yoo Chong Somena's conviction, Yoo asserts that the Korean court's findings do not sufficiently establish probable cause, and because Yoo's family "cannot receive a fair trial in Korea," this conviction "should not count in the probable cause calculus." (Docket No. 30 at 14 & n.11).  Specifically, according to Yoo, Moreal's unconventional approach to signing the subject contract, without bargaining for or vetting the fee, demonstrates nothing more than "bad business" or typical practices between affiliated companies. (*Id.* at 14).  As to the disproportionate relationship between Moreal's net profits and the consulting fees it paid in 2012, Yoo argues that the proper comparison is between the company's revenue and the fees because the fees are "deducted" to arrive at the figure for net profits. (*Id.*).  Furthermore, based on documentation of Moreal's finances between 2011 and 2013 and an asset purchase agreement between Moreal and a non-party dated March 8, 2012,[32] Moreal's revenue greatly surpassed the fees from 2011 to 2013, and Moreal was not in debt during this period. (*Id.* at 14-15; *see also* Docket Nos. 30-2–30-3).

Yoo also directs the Court to (1) an affidavit from Han Yeun Ju, the leader of Moreal's graphic design team, explaining that Key Solutions helped that division develop an internship program overseas; (2) a Key Solutions consulting report for Moreal; and (3) annual reports from 2010 to 2013 provided by Key Solutions to Moreal regarding the internship program.[33] (*See* Docket No. 18 at 33-34).

**(c) Analysis**

Although Yoo's complaints raise questions about the strength of Korea's case against him, these issues are not appropriate to resolve here. *See Melia*, 667 F.2d at 302.  The

---

[32] These documents are listed as Defense Exhibits 3 and 4. (Docket No. 38 at 1).

[33] These additional documents are listed as Defense Exhibits 44-49. (Docket No. 38 at 3-4).

combination of Park Seung-il, Ha Myeong-hwa and Kim Chun-gyun's statements; the contracts directly implicating Yoo; and the bank records tracking Moreal's payments to Key solutions, provides sufficient evidence to reasonably believe Yoo committed the Moreal charge, as well. *See Austin*, 5 F.3d at 605.  Thus, even considering Yoo's objections, the totality of the circumstances supports probable cause. *See Illinois*, 462 U.S. at 238.

As a preliminary matter, the Court excludes the Moreal consulting report and annual reports, as well as Han Yeun Ju and Park Hwa-sun's affdavits. (*See* Moreal Documents Binder, Tabs 2-8).  For the same reasons explained *supra* with respect to Jo Seon-ae's testimony, Park Hwa-sun's denial of relevant knowledge is inadmissible because it only "raises doubts about the reliability of the government's proof," and therefore cannot obliterate probable cause. *See Pena-Bencosme*, 2006 WL 3290361, at *9; *supra* Section III.D.3.i.(c).  The rest of these materials constitute impermissible contradictory evidence with regard to the quality of Key Solutions' services, which may successfully exculpate Yoo at trial, but cannot be considered at this stage. *See Collins*, 259 U.S. at 315–16.

The Court next excludes Ha Myeong-hwa's affidavit, which Yoo argues obliterates probable cause by demonstrating a plethora of valuable services Yoo and Key Solutions in fact provided to Moreal. (*See* Docket Nos. 18 at 32; 30 at 15-16).  The Court disagrees.  This affidavit is inconsistent with this witness's prior statements to Korean prosecutors, and thus constitutes recantation testimony subject to a unique set of considerations that bar its admissibility here. *See generally Pena-Bencosme*, 2007 WL 3231978, at *5–6 (collecting cases). Specifically, the affidavit details numerous consulting services provided by Key Solutions under the contract that Ha Myeng-hwa failed to mention when asked to describe them during her interview. (*Compare* Moreal Documents Binder, Tab 1, ¶ 3, *with* Korean Interviews Binder, Tab

F at 14).  For example, according to both Yoo and Korea's transcripts, when asked what advice

Moreal "actually" received from Key Solutions under the contract, Ha Myeng-hwa denied

having specific knowledge of any advice, stating that she thought Key Solutions helped finance

design training programs abroad, but was "not sure about the details" and could not find any

"official" documentation.[34] (*See* Korean Interviews Binder, Tab F at 14-15; *see also* Docket No.

27-1 at 61).  In contrast, her affidavit describes assistance from Key Solutions in planning

promotional forums abroad and hiring employees in Moreal's medical products division, as well

as from Yoo personally in introducing Ha to potential customers, consulting on product

packaging and design, and promoting Moreal's products. (*See* Moreal Documents Binder, Tab 1,

¶ 3).  The affidavit does not make reference to her interview with the Korean authorities, let

alone provide any explanation for this inconsistency. (*See id.*).

      As a general matter, federal courts "view recantations with suspicion." *Channer v.

Warden Leslie E. Brooks*, No. 3:99CV1707(AWT)(DFM), 2001 WL 34056850, at *6 (D. Conn.

Jan. 25, 2001), *aff'd sub nom. Channer v. Brooks*, 320 F.3d 188 (2d Cir. 2003); *see also Hysler

v. Florida*, 315 U.S. 411, 422 (1942) (noting that courts must "exercis[e] . . . hardy judgment to

determine whether such a belated disclosure springs from the impulse for truth-telling or is the

product of self-delusion or artifice prompted by the instinct of self-preservation").  In the context

of extradition proceedings, courts are divided over whether recantation testimony is even

admissible. *See Pena-Bencosme*, 2007 WL 3231978, at *5.  Whereas the Seventh Circuit has

---

[34] Yoo's argument that Korean prosecutors never asked Ha Myegon-hwa what work "Yoo himself did for Moreal's medical products division" is not persuasive. (Docket No. 30 at 15).  Although the prosecutors only asked about the advice Key Solutions provided to Moreal – rather than Yoo personally – Ha Myeong-Hwa's affidavit lists numerous services provided by Key Solutions that appear nowhere in the interview excerpt provided by Yoo, such as assisting in interviewing and hiring potential employees for Moreal's medical products division. (*Compare* Korean Interviews Binder, Tab F, *with* Moreal Documents Binder, Tab 1 ¶ 3).  Furthermore, the affidavit describes services from both Yoo and Key Solutions as distinct components of the consulting provided under the contract, so it is unclear why Ha Myeonghwa did not mention them both during her interview. (*See* Moreal Documents Binder, Tab 1 ¶ 3).

held that recantation testimony constitutes inadmissible contradictory evidence, *see Eain*, 641 F.2d at 511–12, district courts elsewhere[35] have found that recantations may be admissible where they (1) bear "sufficient indicia of reliability;" and (2) "obliterate probable cause," *see Hunte*, 2006 WL 20773, at *7; *see, e.g.*, *Bisram v. Quay*, 17-cv-6730 (KAM), 2018 WL 5624147, at *5 (E.D.N.Y. Oct. 30, 2018), *aff'd sub nom. Bisram v. United States*, 777 Fed. App'x 563 (2d Cir. 2019) (hereinafter "*Bisram I*"); *Kapoor v. Dunne*, No. 12-CV-3196 (FB), 2014 WL 1803271, at *3 (E.D.N.Y. May 7, 2014), *aff'd*, 606 Fed. App'x 11 (2d Cir. 2015) (hereinafter "*Kapoor II*"). However, recantations that raise credibility issues are best left within the province of the factfinder at trial. *See Pena-Bencosme*, 2007 WL 3231978, at *6.

Ha Myeong-hwa's affidavit is not admissible for two reasons.  First, it is not sufficiently reliable because it was introduced by Yoo's counsel and makes material changes to damaging aspects of her prior testimony. *See Pena-Bencosme*, 2007 WL 3231978, at *5; *see also In re Extradition of Kapoor*, No. 11-M-456 RML, 2012 WL 1318925, at *3 & n.7 (E.D.N.Y. Apr. 17, 2012) (hereinafter "*Kapoor I*").  "Where a prior incriminating statement bears greater indicia of reliability than a subsequent recantation, the recantation, if admitted, would fail to negate the existence of probable cause." *Hunte*, 2006 WL 20773, at *7.  Examples of recantations with sufficiently "strong" indicia of reliability include recantations "made during the course of a court proceeding or made against the interests of the individual recanting." *See Pena-Bencosme*, 2007 WL 3231978, at *5.  Here, Ha Myeong-hwa's original statements to prosecutors are far more reliable than her affidavit.  Her statements to prosecutors were clearly against her interest; she admitted that she failed to assess whether binding her company under the subject contract was a sound business decision, and was uncertain of the specific consulting services "actually"

---

[35] The Second Circuit has yet to weigh in on the admissibility of recantation testimony. *Cf. Kapoor v. Dunne*, 606 Fed. App'x 11, 13–14 (2d Cir. 2015) (summary order) (hereinafter "*Kapoor III*").

provided. (*See* Docket No. 27-1 at 60-62; Korean Interviews Binder, Tab F at 14-15).  Her

affidavit effectively neutralizes these statements by highlighting numerous legitimate services

provided under the contract and stating that "no payments . . . made to Key Solutions . . . lacked

a solid basis." (*See* Moreal Documents Binder, Tab 1, ¶¶ 3-4).   It was also obtained by private

counsel, and therefore, the Government had no opportunity to question her or "otherwise test the

reliability of [her] recantation[]." *See Hunte*, 2006 WL 20773, at *8.  Ha's failure to explain her

reasons for changing her testimony creates additional doubt as to her recantation's reliability. *Cf.*

*Bisram v. United States*, 777 Fed. App'x 563, 566–67 (2d Cir. 2019) (hereinafter "*Bisram II*")

(summary order).

        Second, Ha Myeong-hwa's affidavit does not obliterate probable cause due to the other

evidence against Yoo from multiple sources. *See id.*; *see also Kapoor II*, 2014 WL 1803271, at

*3.  Indeed, this is not a situation "[w]here the only evidence to support probable cause is the

unrecanted confession." *See Hunte*, 2006 WL 20773, at *7 (quoting *In re Extradition of Strunk*,

293 F. Supp. 2d 1117, 1126 (E.D. Cal. 2003)).  Rather, Ha Myeong-hwa's initial testimony is

corroborated by that of Park Seung-il, Yoo's alleged accomplice, as well as Kim Chun-gyun, that

the subject contract was meant to extract monies for the Yoo family and any work provided was

not valuable. (Docket No. 27-1 at 61; *see supra* Sections III.D.2.i.(a), iii.(a), 3.i.(a)).  Therefore,

the affidavit only creates conflicting factual narratives, the credibility of which must be assessed

at trial, when Ha Myeong-hwa and these other witnesses are present. *See Kapoor II*, 2014 WL

1803271, at *3.

        As to Yoo Chong Somena's conviction,[36] the Court declines to assign any independent

significance to the specific findings of the Korean court that convicted her. (*See* Docket No. 27-1

---

[36] The Court cannot consider Yoo's argument that Korea lacks the requisite protections that would afford him or his
older sister due process at trial. *See Marzook*, 924 F. Supp. at 578–79; (Docket Nos. 18 at 7-8; 30 at 14 n.11).  In the

at 64-65).  The excerpts of the decision provided by Korea do not disclose the testimony or

documentary evidence on which its conclusions are based. (*See id.*).  For this reason, the Korean

court's conclusions as to Moreal's financial condition, the fact that the consulting reports were

prepared *ex post facto*, and the unusual circumstances under which the contract was signed, are

insufficient to establish probable cause. *See supra* n.17; (*id.*).  As a consequence of that

determination, the documents Yoo submitted contextualizing the Korean court's conclusions are

not admissible because they will not obliterate probable cause. *See Shapiro II*, 478 F.2d at 905;

(Docket Nos. 30-2–30-3).

Even discounting the Korean court's findings, however, the totality of the circumstances

create a reasonable belief that Yoo utilized his relationship with his older sister, Moreal's co-

CEO, to embezzle Moreal's funds through a fraudulent business consulting contract. *See Illinois*,

462 U.S. at 238; *Austin*, 5 F.3d at 605.  Ha Myeong-hwa's description of the contract's unusual

formation, and uncertainty regarding the specific services provided despite her executive

position, are consistent with the other evidence before the Court that the contract was meant to

extract funds from the company for the Yoo family's sole benefit.  As with the majority of the

summaries at issue in this proceeding, a review of the excerpts of Park Hwa-sun and Ha's

testimonies provided by both sides reveals that the summaries provided by Korea are consistent

the original interviews.[37] (*Compare* Docket Nos. 2-4 at 28-29, EX-YOO-S1-00028-29; 2-7 at 7-

---

context of an already-existing extradition treaty, "good faith to the demanding government requires [an extraditee's]
surrender" upon a showing of probable cause. *See Glucksman v. Henkel*, 221 U.S. 508, 512 (1911).  Moreover,
"[t]he interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States
district judge concerning the fairness of its laws and the manner in which they are enforced." *Ahmad II*, 910 F.2d at
1067.  It is the Secretary of State – not this Court – who is responsible for deciding whether to deny extradition "on
humanitarian grounds." *See id.*

[37] As previously explained, it was perfectly permissible for Korea to submit summaries of statements made by
witnesses to the authorities. *See supra* n.16.

8, EX-YOO-S4-00007-08; 27-1 at 61-63, *with* Korean Interviews Binder, Tabs F at 14-15, G at 12-13).  Therefore, the Court finds probable cause with respect to the Moreal charge.

### iii.  Chonhaiji

#### (a) Evidence in Support of Extradition

As with the alleged Chonhaiji trademark scheme, Korea's charge regarding the Chonhaiji business consulting scheme relies on testimony from Park Seung-il and Byeon Gi-chun.  In addition to the statements from these witnesses noted *supra* regarding Key Solutions' spurious advisory and consulting work, according to Korea, Byeon Gi-chun told prosecutors that Chonhaiji and Yoo "turned to consulting fees" in 2010 when the National Tax Service of Korea determined that the trademark licensing fees pursuant to the 2008 contract were no longer tax deductible. (Docket Nos. 2-7 at 11, EX-YOO-S4-00011; 27-1 at 75-77); *see supra* Section III.D.2.i.(a), III.D.3.i.(a).  When asked whether it was "really necessary" for Chonhaiji to pay consulting fees to Yoo, Byeon Gi-chun stated that "as hired CEOs, we just followed instructions." (Docket No. 27-1 at 76).  Byeon Gi-chun also admitted that the subject consulting fees were simply an "alternative" to "replace" the trademark fees following the National Tax Service decision. (*Id.* at 76-77).  Although he stated that Yoo gave Chonhaiji "instructions" on Chonhaiji's future business in the yacht manufacturing industry, that he also explained that this business had been underway since "before 2007." (*Id.* at 76).  Furthermore, in line with Korea's allegations, bank records reflect that Chonhaiji made payments directly to Yoo from February to November 2011. (*E.g.*, Docket No. 2-5 at 66, EX-YOO-S2-00066).

#### (b) Yoo's Response

Yoo protests that Korea's initial submissions regarding this charge are misleading because they omit Byeon Gi-chun's statements to prosecutors regarding Yoo's assistance in developing Chonhaiji's yacht business. (Docket No. 18 at 38-39).  According to Yoo, these

statements "rebut the claim that . . . Yoo played no role in Chonhaiji's management," and therefore, overcome any probable cause. (*See id.* at 39).

In further support of this argument, Yoo offers into evidence an affidavit from Sung Min Park, a Chonhaiji employee who assumed a managerial role in Chonhaiji's shipyard business. (*See id.*; *see also* Other Companies' Documents Binder, Tab 10, at 2). Sung Min Park asserts that Yoo advised him on growing his career in this field beginning in August 2007, when they met at a meeting with Chonhaiji's executives. (Other Companies' Documents Binder, Tab 10, at 2). Thereafter, Yoo helped Sung Min Park secure a number of valuable internships, collaborated with him to compile research materials on shipyards and yacht building, and advised him to enroll at The Landing School in Kennebunk, Maine, to study boat building and yacht design. (*Id.* at 2-3). While at the Landing School, Sung Min Park and Yoo met "continuously" to discuss Sung Min Park's progress. (*Id.* at 3). That experience led to a formal partnership between the school and Chonhaiji in November 2012, whose purpose was to help advance Chonhaiji's ship building and marine operations and relationships in the United States and Europe. (*Id.*). Yoo has submitted a copy of the relevant partnership agreement with the school for additional consideration, as well as a Chonhaiji report on 2010 boat markets and what appears to be Sung Min Park's final project on Yacht Design from the Landing School. (*See* Other Companies' Documents Binder, Tabs 14-17). He claims that contrary to Korea's assertions, these materials[38] "demonstrate[] that [he] did valuable consulting work for Chonhaiji," (Docket No. 18 at 40), which was part of a "well-conceived yacht building plan," (Docket No. 30 at 17).

---

[38] These additional materials are listed as Defense Exhibits 59 and 63–66. (Docket No. 38 at 4-5).

**(c) Analysis**

Although Yoo may succeed at trial with regard to this charge, his arguments are insufficient to defeat the minimal showing required for probable cause. *See DiNapoli*, 8 F.3d at 915.

First, the Court finds Sung Min Park's affidavit and the other materials Yoo has submitted to demonstrate the value of his work for Chonhaiji in 2011 inadmissible. (*See* Other Companies' Documents Binder, Tabs 10, 14-17). Even assuming that these submissions explain Yoo's role in the ship and yacht industry work referenced in Byeon Gi-chun's interview, they do not "obliterate" Byeon's key admission – contained in both Yoo and Korea's versions of the interview, and central to Korea's claims – that the consulting fees in question were merely a "replacement" for the illicit trademark fees described above. *See Shapiro II*, 478 F.2d at 905; (*compare* Korean Interviews Binder, Tab H at 36, *with* Docket No. 27-1 at 76-77). Furthermore, irrespective of Yoo's advisory work for Chonhaiji between 2007 and 2012, the submissions do not demonstrate that he performed any specific projects[39] during the ten-month period in 2011 when Korea alleges the embezzlement took place. (*See* Docket No. 2 ¶ 7g). According to Sung Min Park's affidavit, Yoo's only "work" during this time comprised of meeting with Park Seung-il while he was at the Landing School, and such meetings occurred throughout his enrollment between September 2009 and April 2014. (*See* Other Companies' Documents Binder, Tab 10 at 3). Simply because Yoo performed valuable work for Chonhaiji before and after the time period when the fees were paid does not mean that these fees were legitimate. A jury is required to weigh the evidence cited by Yoo against that submitted by Korea, to determine the true purpose of the consulting fees. *See Pena-Bencosme*, 2006 WL 3290361, at *9.

---

[39] Although Sung Min Park notes that Yoo "asked" him "to research the 2010 boating industry" for a report in 2011, that is work performed by Sung Min Park – not Yoo. (*See* Other Companies' Documents Binder, Tab 10 at 3).

Left with Byeon Gi-chun and Park Seung-il's testimony plus the corroborative bank records, there is sufficient evidence to support a reasonable belief that Yoo converted the Chonhaiji trademark scheme into a consulting scheme in 2011, when it no longer made financial sense to use fraudulent trademark fees to meet his goals. *See Austin*, 5 F.3d at 605.  The testimony of two convicted co-conspirators, combined with this objective evidence, is sufficient to meet the modest probable cause standard. *See, e.g.*, *In re Extradition of Neto*, 1999 WL 627426, at *3–4.  Any fault Yoo ascribes to Korea for failing to initially disclose Byeon's statements regarding Yoo's yacht building assistance is baseless, given that Korea had no duty to make this information available in the first place, and it was ultimately provided to him. *See Pena-Bencosme*, 2007 WL 3231978, at *6; *supra* Section III.D.3.i.(c).

### 4.  Inflated Advanced Payments for Photography Exhibition

### (a) Evidence in Support of Extradition

In support of its last charge, Korea proffers the statements of Park Seung-il, Byeon Gi-chun, and Kim Chun-gyun, all of which attest that Yoo ordered the affiliates of Semo Group to fund an exhibition of his father's photographs in Versailles, France by purchasing his photographs for well-above market value.  According to Korea, Park Seung-il told Korean authorities that Yoo "ordered the CEOs of affiliate companies of Semo Group to raise money in the form of paid-in capital increase[s] . . . telling them to sell Y[oo's father's] photographs.  The CEOs had no other choice but to obey because [of who Yoo's father was]." (Docket No. 2-4 at 32, EX-YOO-S1-00032; *see also* Docket No. 2-7 at 12, EX-YOO-S4-00012).  In turn, after collecting KRW 13,869,000,000 worth of funds from these affiliates through "rights offering[s]" and "cash deposit[s] for subscribing to new shares," Byeon Gi-chun, through Chonhaiji, transferred these funds and additional money in Chonhaiji's possession to Ahae Press and Ahae

Press France.[40] (Docket No. 27-1 at 80-81).  The amount transferred totaled KRW

19,862,000,000. (*Id.*).  Park Seung-il stated that whereas he "prepared logistical stuff like

invoices" for these transactions, Byeon Gi-chun "led everything." (Docket No. 27-1 at 81).  He

also admitted that Chonhaiji was essentially "collecting money from the affiliates under the

pretext of rights offerings or cash deposits for new shares and giving that money to A[hae Press

France] or A[hae Press] I&C as advance payment [sic] for purchasing Ahae's works." (*Id.* at 82).

Likewise, Byeon Gi-chun confirmed that Yoo "ordered the affiliate companies of Semo

Group to raise funds for [Yoo's father's] photo exhibition to be held at Chateau de Versailles."

(Docket No. 2-4 at 32, EX-YOO-S1-00032; *see also* Korean Interviews Binder, Tab H at 14).

To this end, Chonhaiji "collected KRW 11,024,000,000 from Dapanda, Moonjin Media, Onzigo

and Semo . . . under the pretext of paid-in capital increase[s]." (Docket No. 2-4 at 32-33, EX-

YOO-S1-00032-33).  It also "received KRW 2,800,000,000 from Ahae" which was "disguis[ed]

. . . [as] payment for subscription of new stocks." (Docket No. 2-7 at 12, EX-YOO-S4-00012).

Chonhaiji combined these funds with its own monies to pay KRW 19,862,077,987 to Ahae Press

and Ahae Press France "as an advanced payment for [Yoo's father's] photograph[s]."[41] (Docket

No. 2-4 at 32-33, EX-YOO-S1-00032-33; *see also* Docket No. 27-1 at 79-80; Korean Interviews

Binder, Tab H at 22-23).  The CEOs of the affiliate companies "had no . . . choice but to follow

---

[40] According to Byeon Gi-chun's interview, both Ahae Press and Ahae Press France are controlled by Yoo and his father. (Korean Interviews Binder, Tab H at 23).

[41] According to Yoo's transcript of Byeon Gi-chun's interview, Byeon explained that Chonhaiji and the other affiliate companies raised the funds based on instructions given at a meeting held by I-One-I President Kim Pil-Bae in December 2012. (Korean Interviews Binder, Tab H at 14-15).  At the meeting, Chonhaiji merged with the Hemato Centric Life Research Institute's ("Hemato") Culture and Arts Division to pursue a photography business. (*Id.* at 15).  Thereafter, Chonhaiji collected monies from affiliates three times in 2013, and on December 20, 2013, Chonhaiji borrowed KRW 2,845,000,000 from Ahae which was "replaced with [a] new stock subscription deposit." (*Id.*).  All of these funds were used as advance payments for the subject photographs or for repaying money borrowed in 2013, even though none of the photographs purchased had yet been created when the payments were made. (*See id.* at 15-17).

Y[oo's] order," even though they did not know "what photographs there were" or "decide what photographs they would buy." (Docket No. 2-4 at 33, EX-YOO-S1-00033; *see also* Docket No. 2-7 at 12-13, EX-YOO-S4-00012-13).  When asked how individual photographs were assigned their prices, Byeon Gi-chun stated that the prices were not based on artistic merit or a professional appraisal, but on what "Y[oo] . . . said." (Docket No. 27-1 at 78).  Furthermore, "most[]" of the money collected was used to cover the fees for holding the Versailles photography exhibition, rather than the artistic value of the photographs themselves. (*Id.* at 79; *see also* Korean Interviews Binder, Tab H at 18, 22-23).  Byeon Gi-chun did not request any expert evaluations of the value of the works, and the affiliates were never told that most of their advance payments were used to cover the costs of the exhibition. (*See* Korean Interviews Binder, Tab H at 18-19).  Byeon further admitted that he had "inflict[ed] damage to the company," explaining that he had followed Yoo's wishes to avoid being forced to resign.[42] (*See* Docket No. 27-1 at 79; *see also* Korean Interviews Binder, Tab H at 22-23).  In addition to being convicted for assisting Yoo in extracting the consulting and trademark fees noted above, Byeon Gi-chun was found guilty for his involvement in funding the exhibition. (Docket No. 2-7 at 13, EX-YOO-S4-00013; *see also* Docket No. 27-1 at 82-88).

In line with this testimony, Korea alleges that Kim Chun-gyun told prosecutors that Park Seung-il "contacted the CEO of each affiliate company and collected money whenever money [wa]s needed for Y[oo's father's] photograph exhibition." (Docket No. 2-3 at 11-12, EX-YOO-00089-90).  Korea has submitted account information demonstrating forty-four payments to Ahae Press between March and December 2013, amounting to 19,862,077,987. (Docket No. 2-3

---

[42] When asked whether a "normal" company would have purchased the photographs "at such a high price," Byeon Gi-chun stated that "if a company ha[d] nothing to do with Mr. Yoo's family, there [would be] no way to use the company's funds to purchase photos." (Korean Interviews Binder Tab H, at 19-20).

at 38-39, EX-YOO-00116-17).  However, Korea's submissions do not disclose the identity of the
company that made each payment. (*See id.*).

**(b) Yoo's Response**

Yoo mounts further semantic and *Brady* objections to Korea's submissions, and attempts
to introduce new evidence demonstrating that the advance payments were good investments
based on the intrinsic artistic value of Yoo's father's works. (*See* Docket Nos. 18 at 40-44; 30 at
19-20).

First, Yoo argues that Korea's summary of Byeon Gi-chun's testimony does not reflect
his actual statements to Korean prosecutors. (Docket No. 18 at 42-43).  Specifically, he contends
that Byeon Gi-chun's interview transcript is devoid of any admission that Chonhaiji "had no idea
about [Yoo's father's] works and didn't decide what works [it] should buy [because it] had no
choice but to follow what [Keith Yoo] told them to do." (Docket No. 2-7 at 12-13, EX-YOO-S4-
00012-13; *see also* Docket No. 18 at 42).  In addition, Korea's submissions did not disclose
Byeon Gi-chun's assertion that some amount of "sales w[ere] expected" given that many of
Yoo's father's followers had previously purchased his works after they were shown at the
Louvre in Paris, France in 2012. (Docket No. 18 at 41-43; Korean Interviews Binder, Tab H at
18).

To demonstrate the inherent value of the subject photographs, Yoo traces the trajectory of
his father's artistic career through evidence of several successful exhibitions that predated the
Versailles exhibition. (*See* Docket No. 18 at 41-42; *see also* Docket No. 30 at 20 n.16).   Yoo
asserts that although his father only began pursuing artistic photography in 2009, his works were
shown at nine exhibitions all over the world between 2011 and 2012. (*See* Docket No. 18 at 41-
42.  The works received numerous accolades from academics and art curators, and according to
a May 23, 2014 appraisal by Lorraine Anne Davis ("Davis"), an art photography appraiser, their

prices "are in line with other photographers working in a similarly closed market-place." (Other Documents Binder, Tab 20 at 1; *see also* Docket No. 18 at 41-42).  According to Yoo, Chonhaiji's purchase of the photographs was part of a strategic business decision to merge with Hemato and obtain the right to sell Yoo's father's works, which Chonhaiji hoped would increase its profits despite its dwindling shipbuilding business. (Docket No. 18 at 42; *see supra* n.41).  In support of these arguments, Yoo offers two Chonhaiji reports regarding this business plan and various exhibitions, Davis's full appraisal, excerpts of selected accolades, and a copy of Ahae, *Ten Exhibitions Around the World* (Prosper Assouline et al. eds., 2016), a hard-copy book which showcases Yoo's father's works.[43] *See* Ahae, *Ten Exhibitions Around the World* (Prosper Assouline et al. eds., 2016); (Other Companies' Documents Binder, Tabs 18-21).

**(c) Analysis**

Here, too, Korea's evidence is sufficient to support a reasonable belief that Yoo used his relationships with Park Seung-il and Byeon Gi-chun to extract monies from various affiliates to fund the Versailles exhibition in order to inflate the value of his father's photographs. *See Austin*, 5 F.3d at 605.  Consistent with Park Seung-il's statements, Byeon Gi-chun's detailed testimony explains the specific transactions undertaken by Chonhaiji and the other affiliates to raise a total of KRW 19,862,077,987, which was transferred to Ahae Press and Ahae Press France, which Yoo and his father controlled. (Docket No. 2-4 at 32-33, EX-YOO-S1-00032-33; 2-7 at 12, EX-YOO-S4-00012; *see also* Korean Interviews Binder, Tab H at 14, 23).  Byeon also admitted that the advance payment figures (1) were unilaterally set by Ahae Press, before the photographs had even been taken; (2) were used to cover substantial expenses associated with the exhibition; (3) and were not tied to any appraisal of the works in question. (Docket No. 27-1 at 78-79; *see also*

---

[43] These documents are listed as Defense Exhibits 67-71. (Docket No. 38 at 5).

Korean Interviews Binder, Tab H at 18-19, 22-23).  In addition, both of these witnesses

confirmed that the instructions for these arrangements all came from Yoo. (Docket Nos. 2-4 at

32, EX-YOO-S1-00032; 2-7 at 12, EX-YOO-S4-00012; *see also* Korean Interviews Binder, Tab

H at 14).

Yoo's objections fall flat for two reasons.  First, the semantic discrepancies between

Korea's summaries and Byeon Gi-chun's interview are immaterial. (*See* Docket No. 18 at 42-

43).  Yoo is correct that the specific words in the summary to which he objects do not appear in

his version of Byeon's transcript. (*Compare* Docket No. 2-7 at 12-13, EX-YOO-S4-00012-13,

*with* Korean Interviews Binder, Tab H).  However, the import of the summary – that the

affiliates who made advance payments did not know what photographs they were purchasing – is

consistent with Byeon's acknowledgement that the subject photographs were "pre-price[d] . . .

by size" and "ha[d] not . . . been completed" when the prices were set. (*See* Korean Interviews

Binder, Tab H at 17).  Moreover, Byeon's assertion that he expected some photograph sales from

the Versailles exhibition does not neutralize his damning admissions that only a "small portion"

of the advance payments raised were "used for [the] photography itself," and that the affiliates

were never told that most of their monies were used to cover the expenses of holding the

exhibition. (Korean Interviews Binder, Tab H at 18, 19).

Second, although Yoos' evidence raises substantial fact issues that may exonerate him at

trial, it is not sufficient to "obliterate" Korea's showing of probable cause. *See Shapiro II*, 478

F.2d at 905.  To the extent the Chonhaiji reports "explain" Byeon's testimony by shedding light

on the purpose of Chonhaiji's merger with Hemato, the reports do not defeat the heart of Korea's

allegations that the advance payments at issue were inflated to cover the costs of the Versailles

exhibition, and to pump up the resale value of the photographs. *See id.*; *supra* n.41 (Korean

Interviews Binder, Tab H at 14-15; Other Companies' Documents Binder, Tabs 18-19).

Moreover, any legitimate reasons behind Chonhaiji's actions do not negate Korea's evidence that

other affiliates were unknowingly coerced into making inflated payments to fund an exhibition

whose purpose was to increase the value of the photographs the affiliates thought they were

buying. (*See* Docket Nos. 2-3 at 6, EX-YOO-00084; 2-4 at 23, 32-33, EX-YOO-S1-00023, EX-

YOO-S1-00032-33; 27-1 at 79; *see also* Korean Interviews Binder, Tab H at 18, 22-23; Docket

No. 2 ¶ 6g).  Chonhaiji's motivations also do not change the undisputed fact that the affiliates

transferred their payments to Chonhaiji – rather than Ahae Press or Ahae Press France, the

ultimate recipients of their payments – and their payments were recorded as various types of

stock transactions, rather than transfers of cash. (*See* Korean Interviews Binder, Tab H at 14-15;

Docket No. 27-1 at 80-82).  These transactions constitute circumstantial evidence that, regardless

of Chonhaiji's own business plans, the advance payments had a nefarious purpose that needed to

be disguised on the affiliates' books as legitimate stock purchases. *See In re Extradition of

Sindona*, 450 F. Supp. at 689–90.

      The Court denies admission of the rest of the documents Yoo offers because they

constitute impermissible contradictory evidence intended to show that the photographs purchased

were worth the money the affiliates paid. *See Shapiro II*, 478 F.2d at 905; (Other Documents

Binder, Tabs 20-21; Ahae, *Ten Exhibitions Around the World*).  Admittedly, Davis's appraisal,

and the fact that Yoo's father gained international recognition through several exhibitions before

the one at Versailles, raise significant questions whether these photographs were completely

worthless. (Other Documents Binder, Tab 20; Ahae, Introduction, *Ten Exhibitions Around the

World*).  However, it is the role of a factfinder to weigh this evidence and determine what value,

if any, the affiliates gained from the advance purchases at issue. *Cf. In re Extradition of Sindona*, 450 F. Supp. at 689–90.

Although the Court declines to consider the specific factual findings of the Korean court that found Byeon Gi-chun guilty for charges related to this scheme,[44] the consistency between his and Park Seung-il's testimonies provides ample support for probable cause. These witnesses explicitly implicated Yoo as the decisionmaker driving the transactions underlying this alleged scheme. Moreover, the transaction dates and total advance payment amounts in their testimonies correspond with the account records provided by Korea. (*Compare* Docket No. 2-3 at 38, EX-YOO-00116-17, *with* Docket Nos. 2-4 at 32-33, EX-YOO-S1-00032-33, *and* 27-1 at 80-81; *see also* Korean Interviews Binder, Tab H at 15-16). This combination of accomplice testimony and objective evidence supports a finding that the Government has established the existence of probable cause. *See In re Extradition of Neto*, 1999 WL 627426, at *3–4.

### E.  Statute of Limitations

Yoo argues that even if Korea has established probable cause, he is not extraditable under the Treaty because the relevant charges are barred by the applicable statute of limitations. (*See* Docket Nos. 18 at 10-22; 30 at 4-9). The Government contends that this action is not time-barred, and even if it was, this Court lacks the requisite authority to decide whether the statute of limitations has run because the plain language of the Treaty reserves that decision for the Secretary of State. (*See* Docket No. 27 at 35-40). The Court agrees that this question falls outside the ambit of its limited role in this proceeding. Therefore, the Court will not address whether Korea's prosecution is, in fact, time-barred, and certifies extradition.

---

[44] *See supra* n.17.

"The interpretation of a treaty, like the interpretation of a statute, begins with its text."

*Abbott v. Abbott*, 560 U.S. 1, 10 (2010) (quoting *Medellín v. Texas*, 552 U.S. 491, 506 (2008))

(internal quotation marks omitted).  "Where the language of . . . [a] . . . treaty is plain, a court

must refrain from amending it because to do so would be to make, not construe, a treaty."

*Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 457 (2d Cir. 2003); *see*

*also Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989) ("We must . . . be governed by the

text[,] . . . whatever conclusions might be drawn from the . . . drafting history . . . .").  In

addition, because "a treaty is a contract . . . between nations," it must also be interpreted

according to principles of contract interpretation. *See Georges v. United Nations*, 834 F.3d 88, 93

(2d Cir. 2016) (quoting *BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25, 37 (2014)) (internal

quotation marks omitted).  Therefore, "it is [the Court's] responsibility to give the specific words

of the treaty a meaning consistent with the shared expectations of the contracting parties." *Air*

*France v. Saks*, 470 U.S. 392, 399 (1985).  To ascertain those expectations, the court may look to

the treaty's negotiating and drafting history. *See id.* at 400.  Although "the interpretation of a

treaty is a question of law for the courts, given the nature of the document and the unique

relationships it implicates, the Executive Branch's interpretation of a treaty is entitled to great

weight." *Lozano v. Alvarez*, 697 F.3d 41, 50 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya*

*Alvarez*, 572 U.S. 1 (2014) (quoting *Swarna v. Al-Awadi*, 622 F.3d 123, 133 (2d Cir. 2010))

(internal quotation marks omitted).

Article 6 of the Treaty, which addresses "[l]apse of [t]ime," provides as follows:

> Extradition *may* be denied under this Treaty when the prosecution
> or the execution of punishment of the offense for which extradition
> is requested would have been barred because of the statute of
> limitations of the Requested State had the same offense been
> committed in the Requested State.  The period during which a
> person for whom extradition is sought does not count towards the

> running of the statute of limitations.  Acts or circumstances that
> would suspend the expiration of the statute of limitations of either
> State *shall* be given effect by the Requested State, and in this regard
> the Requesting State *shall* provide a written statement of the relevant
> provisions of its statute of limitations, which *shall* be conclusive.

Extradition Treaty art. 6 (emphasis added).  The ordinary meaning of the word "may" is permissive, connoting discretion and possibility, whereas "shall" connotes a mandate or command. *Compare* Merriam Webster Online Dictionary, may, https://www.merriam-webster.com/dictionary/may (last accessed July 1, 2021) ("(1)(a) used to indicate possibility or probability . . . (b) have permission to . . . (c) have the ability to"), *with* Merriam Webster Online Dictionary, shall, https://www.merriam-webster.com/dictionary/shall (last accessed July 1, 2021) ("(1)(a) used to express what is inevitable or seems likely to happen in the future . . . (b) used to express simple futurity . . . (2) used to express determination . . . (3)(a) used to express a command or exhortation . . . (b) used in laws, regulations, or directives to express what is mandatory").  The permissive connotation of "may" "is particularly apt where," as here, these two words are "contrapose[ed]" in the same text. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005); *see also Atsilov v. Gonzales*, 468 F.3d 112, 116 (2d Cir. 2006) (finding that where statute used permissive "may" instead of mandatory "shall" in authorizing agency to grant relief, the "ultimate decision whether to grant relief [wa]s entrusted to the discretion of the [agency]").  Under this reading, Article 6's first sentence provides that denial of extradition on statute of limitations grounds is discretionary rather than mandatory. *See Simone v. United States*, 09-CV-3904 (TCP)(AKT), 2010 WL 11632765, at *10 n.11 (E.D.N.Y. June 17, 2010) (citing *Vo v. Benov*, 447 F.3d 1235, 1246 (9th Cir. 2006)).

This dichotomy signals a split in function and authority between the extraditing court and the Secretary of State.  Generally, whereas it is the court's role to determine whether the legal

requirements for extraditablity are established, "the executive branch . . . is empowered to make

the final decision on extradition" and "assume[s] discretion" regarding whether to deny

extradition on humanitarian or political grounds. *See Sindona v. Grant*, 619 F.2d 167, 176 (2d

Cir. 1980); *see also* 18 U.S.C. §§ 3184, 3186; *Cheung*, 213 F.3d at 88; *Petrushansky*, 325 F.2d at

565 (holding that role of extradition court is "limited to ensuring that the applicable provisions of

the treaty and the governing American statutes are complied with").

Because of this divide, "discretionary" determinations are reserved for the Secretary of

State, and "mandatory" determinations must be addressed by the extraditing court. *See Patterson*

*v. Wagner*, 785 F.3d 1277, 1281 (9th Cir. 2015); *see also Cheung*, 213 F.3d at 88 (noting that

judicial officer's role is "confined" to certain legal questions that, when answered affirmatively,

require certification of extraditability, but "the Secretary of State has sole discretion to weigh the

political and other consequences of extradition and to determine finally whether to extradite the

fugitive").  In *Vo v. Benov*, the Ninth Circuit explained that the coupling of "shall" and "may" in

an extradition treaty creates "two general types" of exceptions to extradition that correspond with

these roles: "mandatory exceptions" and "discretionary exceptions." *See* 447 F.3d at 1245–46.

Where an individual is subject to a "mandatory exception," he or she cannot be extradited to the

requesting country, and therefore, the extraditing magistrate judge "may not certify him [or her]

as extraditable." *Id.* at 1246.  On the other hand, where the individual is subject to a

"discretionary exception, . . . the United States can choose not to extradite him [or her] to the

requesting country, but is under no obligation to . . . do so." *Id.*  When this latter exception

applies – *i.e.*, when the individual satisfies discretionary criteria – upon a request for extradition,

the magistrate judge lacks the authority to "deny extradition on that basis" and "*must* certify [the]

individual," leaving the Secretary of State with the sole power to deny extradition on that

ground. *See id.* (emphasis added).  In other words, treaty provisions containing the word "shall" signal legal requirements to be reviewed by the extraditing court, whereas provisions containing the word "may" signal discretionary factors reserved for the Secretary of State alone. *See id.*

Faced with the same treaty and statute of limitations defense at issue here, the Ninth Circuit in *Patterson v. Wagner* extended this reasoning and held that based on the plain language of Article 6 and the relevant drafting history, "there is no mandatory duty [with regard to any alleged lapse of time] that a court may enforce." *See* 785 F.3d at 1281–83.  The extraditing court, therefore, was not permitted to consider whether the relevant charges were time-barred. *See id.* Rather, the court found that "the Secretary of State may choose, in his or her discretion, whether to grant or deny extradition in a case where the statute of limitations in the United States has expired," and federal courts are not authorized to "dictate to the Secretary of State what he or she must do in such a case." *Id.* at 1283.  Although not yet addressed by the Second Circuit, district courts analyzing extradition treaties with identical language in lapse of time provisions have reached the same conclusion.[45] *See, e.g.*, *Mirela v. United States*, 416 F. Supp. 3d 98, 110–11 (D. Conn. 2019), *appeal dismissed*, No. 19-3366, 2020 WL 1873386 (2d Cir. Feb. 25, 2020); *United States v. Porumb*, 420 F. Supp. 3d 517, 527–28 (W.D. La. 2019).

Yoo contends that use of the word "may" is not controlling, and in light of the Treaty's other provisions and legislative history, Article 6 requires the Court to consider the issue of statute of limitations. (*See* Docket No. 18 at 11-18).  Relying on *United States v. Rogers*, 461 U.S. 677, 706 (1983), Yoo asserts that although "[t]he word 'may' usually implies some degree

---

[45] Also in line with this reasoning, courts within this Circuit have interpreted the word "shall" in such lapse of time provisions as connoting a mandatory requirement that must be considered by the extraditing magistrate judge in order to certify extradition. *See Skaftouros v. United States*, 667 F.3d 144, 161 (2d Cir. 2011); *In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 222 (N.D.N.Y. 2013); *In re Extradition of Ernst*, No. 97CRIM.MISC.1PG.22 (HBP), 1998 WL 30283, at *3 (S.D.N.Y. Jan. 27, 1998) (hereinafter "*In re Extradition of Ernst I*").

of discretion, . . . [t]his . . . principle . . . can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." (Docket No. 18 at 12).  However, Yoo fails to appreciate that even following this reasoning, the overall structure and language of the Treaty, combined with its legislative history, evidence an intent that *confirms* Article 6's plain meaning. *Cf. Patterson*, 785 F.3d at 1283.

Although "the interpretation of a treaty . . . begins with its text," *Medellín*, 552 U.S. at 506, courts "also look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the [signatory] parties in determining the meaning of a treaty provision," *Swarna*, 622 F.3d at 132 (quoting *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991)) (internal quotation marks omitted) (alteration in original).  Yoo contends that three aspects of these materials evidence an intent that the time bar provision be mandatory, including (1) the Treaty's inconsistent use of the word "may" in various other provisions; (2) the "Summary" and "Technical Analysis" sections of the Senate Report; and (3) a colloquy during the Senate hearing between Senator Rod Grams ("Senator Grams") and John Harris, the Acting Director of the Office of International Affairs at the Department of Justice ("Harris"). (*See* Docket No. 18 at 13-17).  The Court addresses each argument in turn.

First, Yoo's characterization of "may's" usage throughout the Treaty is not supported by the analysis in the legislative history to which he cites. (*See* Docket No. 18 at 13-14).  For example, pointing to Articles 2(4) and 3(1), Yoo argues that this word cannot signal discretion because other words in those provisions, such as "executive authority" and "in its discretion," would otherwise constitute surplusage. *See* Extradition Treaty art. 2(4), 3(1), 4(4); (*id.*). However, a court's "hesitancy to construe statutes to render language superfluous does not require [it] to avoid surplusage at all costs. It is appropriate to tolerate a degree of surplusage

rather than adopt a textually dubious construction that threatens to render the entire provision a nullity." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 137 (2007).  A review of the Technical Analysis section[46] of the Senate Report reveals that Articles 2(4) and 3(1) are not the only provisions that the American and Korean delegations considered discretionary. *See generally* S. Rep. at 8-23.  That section explains that other provisions containing the word "may," but not the additional words noted by Yoo – such as Articles 7(1), 12(1) and 17(1) – are "discretion[ary]" or "permi[ssive]" with the regard to the powers conferred therein. *See* S. Rep. at 15, 18, 20; Extradition Treaty art. 7(1), 12(1), 17(1).  Therefore, Yoo's argument that the word "may" in Article 6 cannot connote discretion on its own is unavailing.  If applied, his rationale would impermissibly render this word meaningless in a number of places in the Treaty.[47] *See Atl. Rsch. Corp.*, 551 U.S. at 137; (Docket No. 18 at 13-14).

Yoo correctly notes that the Summary of the Treaty at the beginning of the Senate Report uses mandatory language, but any intent evidenced by that statement "is overwhelmingly outweighed by the contrary purport of the legislative history as a whole." *See Dir., Off. of Workers' Comp. Programs v. Rasmussen*, 440 U.S. 29, 43 n.15 (1979) (quoting *Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Rasmussen*, 567 F.2d 1385, 1388 n.5 (9th Cir. 1978), *aff'd sub nom. Dir., Off. of Workers' Comp. Programs v. Rasmussen*, 440 U.S. 29 (1978)).  As with the other provisions noted above, the Technical Analysis section connects the word "may" in the original text of Article 6 with discretionary authority through a detailed explanation of the provision's negotiating history. (*See* S. Rep. at 14-15).  Crucially, although

---

[46] The Technical Analysis section was prepared by the Office of International Affairs, United States Department of Justice, and the Office of the Legal Adviser, United States Department of State, and is based on notes from the negotiations. S. Rep. No. 106-13, at 8 (1999).

[47] The Court also disagrees with Yoo's reading of Article 10(4), which he claims "seems directed to the court," (Docket No. 18 at 14), as this provision for discharge from custody is contingent on "the *executive authority['s]*" non-receipt of a formal extradition request and supporting documentation. *See* Extradition Treaty art. 10(4).

Korea "insisted" that the first sentence comport with Korean law, the section explains that because "the delegations were sensitive" to the differences between Korean and United States statutes of limitations, "the Treaty provides that a request *may* be denied if it would be timebarred in the Requested State, *but* that acts or circumstances that would toll the statute of limitation in either state *would be applied* by the Requested State." (*Id.* at 14) (emphasis added). Contrary to Yoo's assertions, this passage does not communicate that the provision adopts Korean law's "demand[] that extradition be denied if the statute of limitations would have expired in either Korea or in the Requesting State." (*See* Docket No. 18 at 15; *id.*).  Rather, through a combination of permissive and mandatory language mirroring Article 6 itself, the passage reflects a compromise between the delegations, allowing Korea to apply its own statute of limitations law when it is the requested State – as it wanted – and requiring consideration of the tolling rules of either State whenever statute of limitations is in play. (*See* S. Rep. at 14). This reading is confirmed by the rest of the section, which explains that "[t]he second sentence of the paragraph *adopts* the U.S. standard" for tolling based on fugitivity, and that "the final sentence" provides that other "acts or circumstances" triggering tolling "in either State *shall* be given effect by the Requested State . . . ." (*See id.*) (emphasis added).  In other words, the first sentence of Article 6 provides discretionary authority to deny extradition on statute of limitations grounds; however, if the relevant authority of the requested State chooses to apply these considerations, it must also take into account any tolling by fugitivity and any other tolling rules from either State. (*See id.*; *see also* Extradition Treaty art. 6).  As the court in *Patterson* found in analyzing the same section, "[w]hen parties to a treaty intend to make an exception to extradition mandatory, . . . they know how to state that it 'shall' apply." *See* 785 F.3d at 1282.  The careful

construction of the Technical Analysis section therefore supports a finding that consideration of the statute of limitations is not mandatory under the treaty. *See id.*

The brief colloquy between Senator Grams and Harris at the conclusion of the Senate hearing evidences the same compromise and intent. *See* S. Rep. at 37; *see also Patterson*, 785 F.3d at 1282–83.   Yoo's analysis of this conversation focuses almost exclusively on Senator Grams' question and what is missing from Harris's answer. (*See* Docket Nos. 18 at 15-17; 30 at 5-6).   However, Yoo ignores Harris's words.   The Senate Report reflects the following conversation:

> Senator Grams:  Article 6 of the proposed treaty *bars* extradition in cases where the law of the requested State would have barred the crime due to a statute of limitations having run out.
>
> Now South Korea, unlike other treaty partners with similar commitments, also allows the time to continue running on the statute of limitations, even when charges are filed.  Actions that would toll the statute of limitations, therefore, will apply under this treaty.
>
> So the question is are you confident that this article of the treaty adequately insures that fuguitives cannot simply run out the clock by fleeing to Korea?
>
> Mr. Harris:  Senator, this article of the treaty was the subject of considerable negotiation.  As you may recall, of the treaties that were before the Senate last fall, most of them had slightly different language.  Many of our most modern extradition treaties flatly state that the statute of limitations of the requesting State will apply.
>
> We have a few in which it was not possible to reach that resolution. *In this case*, because of the specific provisions of Korean law, we did agree that the statute of limitations of the requested State would apply.  ***But***, as you have indicated, *the specific language in the article is crafted so that those factors which toll the statute of limitations under the law of the requesting State would be given weight.*
>
> So when the United States is making a request to Korea, there should be *the ability* to prevent a miscarriage of justice by the statute of

limitations of Korea having expired before extradition can be accomplished.

S. Rep. at 37 (emphasis added).  Although Senator Grams certainly frames the applicability of the statute of limitations as mandatory, Harris' answer communicates a far more nuanced reading. *See id.*  In line with the Technical Analysis, he explains that the delegations reached a unique agreement applying the statute of limitations of the *requested* State, which is different from typical modern extradition treaties that (1) use the *requesting* State's statute of limitations; and (2) "flatly state" that this law "*will* apply." *See id.*  Therefore, Harris acknowledges that, as noted by Senator Grams, the provision gives credence to the particularities of Korean law when Korea is the requested State. *See id.*; *see also* S. Rep. at 14.  However, Harris does not stop there. He explains that instead of simply "bar[ring]" extradition under that law – like typical treaties – the provision "is crafted so that" tolling rules from the requesting State "would be given *weight*," thereby providing "*the ability*" to prevent expiration of the Korean statute of limitations using American tolling rules. *See* S. Rep. at 37 (emphasis added).  Consequently, the Treaty does not mandate application of the requested State's statute of limitations, as Senator Grams stated, but rather, permits that law to be "weigh[ed]" alongside of tolling rules from both States. *See id.* This balancing act addresses Senator Grams' precise concern because it preserves the possibility for the United States to "prevent fugitives [from] . . . simply run[ning] out the clock by fleeing to Korea." *See id.*  Moreover, like the Technical Analysis and Article 6 itself, it reflects a permissive reading of the decision regarding whether to consider statute of limitations arguments, thus allocating that responsibility to the Secretary of State. *See id.* at 14, 37; *see also* Extradition Treaty art. 6.

This intent is clear from a final source, ignored by Yoo, but key to the Ninth Circuit's decision in *Patterson*. *See* 785 F.3d at 1283.  The Treaty's official submittal letter, which

President William J. Clinton transmitted with the Treaty for the Senate's review, states that "Article 6 *permits* extradition to be denied when the prosecution or execution of punishment" for the relevant offense would be barred by the "statute of limitations of the Requested State." (S. Treaty Doc. No. 1062, at v, vii (1999) (emphasis added). This letter is entitled to great weight, as it was drafted by Strobe Talbot of the Department of State, an office that played a key role in the Treaty's negotiations, and therefore was well-aware of the Treaty's implications. *See Lozano*, 697 F.3d at 50; *id.* at v. The same is true for Harris's explanation, as he represented the views of the Department of Justice, another executive agency that participated in negotiations. *See id.*; *see also* S. Rep. at 29-30.

Because these legislative history materials confirm rather than undermine a permissive reading of Article 6's plain language, the determination regarding whether Yoo's prosecution is time-barred is reserved for the Secretary of State. *See Patterson*, 785 F.3d at 1283. This reading aligns with the well-settled principle that the extraditing court is not to engage in matters of foreign policy and other political questions. *See In re Extradition of Mujagic*, 990 F. Supp. 2d at 217; *see also Regan v. Wald*, 468 U.S. 222, 242 (1984) ("Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)); *Shapiro II*, 478 F.2d at 906 & n.10. This conclusion also comports with the Court's obligation to construe extradition treaties "in the interest of justice and friendly international relationships." *See Factor v. Laubenheimer*, 290 U.S. 276, 298 (1933). The particular situation here especially implicates the United States' diplomatic relationship with Korea because *Korea* is seeking extradition of a *Korean* national for alleged crimes that caused harm within *Korea's* borders, yet under Article 6, *American* law supplies the applicable statute of

limitations. *See* Extradition Treaty art. 6.  The Secretary of State is best equipped to weigh the political ramifications of denying Korea the opportunity to hold its own citizen to justice based on American laws. *Cf. Shapiro II*, 478 F.2d at 906 n.10 (noting that "the Executive's responsibilities and need for flexibility are greater when the extradition is to another country, in which the sole effective remedies are diplomatic ones").

For these reasons, the Court declines to consider whether this action is time-barred and defers that question to the Secretary of State.  A judicial opinion analyzing this question, although not binding on the Secretary of State, would strip the Executive Branch of its exclusive authority to manage the United States' diplomatic relations with Korea, and contravene the plain meaning of the words adopted by both delegations in the Treaty.[48] *See Mirela*, 416 F. Supp. 3d at 111–12.

## IV.  CONCLUSION

For the foregoing reasons, the Court certifies that the evidence submitted is sufficient to sustain the charges against Yoo under the Treaty.  The Court orders that Yoo remain in the custody of the United States Marshal for the Southern District of New York, or his authorized representative, pending final disposition of this matter by the Secretary of State and possible surrender to the proper authorities of Korea.

---

[48] Because the Court does not reach the issue of whether the applicable statute of limitations has run, the evidence Yoo offers in support of his arguments on this topic is excluded. (Docket Nos. 18-1, 34-1).

The United States Attorney's Office for the Southern District of New York is directed to forward a copy of this Certification and Order, together with a copy of the transcript of the hearing conducted on March 3, 2021, and all the documents admitted into evidence in this matter, to the Secretary of State.

Dated:   July 2, 2021
         White Plains, New York

                              **SO ORDERED:**


                              _____
                              JUDITH C. McCARTHY
                              United States Magistrate Judge